# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSH COHEN<br>Plaintiff<br><br><div align="center">v.</div><br><div align="right">ACTION NETWORK<br>AFL-CIO<br>ACTION SQUARED<br>CIVITECH<br>DEMOCRATIC NATIONAL<br>COMMITTEE<br>MOVEON.ORG<br>NATHAN WOODHULL<br>NETROOTS NATION<br>Defendants</div> | THIRD AMENDED COMPLAINT<br>Civil Action: 23 cv 10359<br>RICO 18 USC 1962(a)(c)(d)<br>Fraudulent Inducement<br>Copyright Infringement<br>18 USC 2319<br>Robbery by Extortion<br>18 USC 1951<br>Wire Fraud<br>18 USC 1343<br>Sherman Act<br>15 USC 1<br>Injunctive and Damages |

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| I | Nature Of Action | 2 |
| II | Jurisdiction and Venue | 5 |
| III | Parties | 5 |
| III.A | Defendants | 5 |
| III.B | Co-Conspirators | 6 |
| IV | Facts of the Case | 7 |
| IV.A | Market Background | 8 |
| IV.B | OSDI Procompetitive Effort | 13 |
| IV.C | Plaintiff's Sole-Proprietorship | 19 |
| IV.D | Racketeering and Extortion | 20 |
| IV.E | Data War | 46 |
| IV.F | Copyright | 47 |
| V | Violations | 48 |
| V.A | Action Squared's Infringement | 48 |
| V.B | Bluelink's Infringement | 49 |
| V.C | RICO Predicate Acts | 50 |

V.D     Unfair Competition ................................................................ 57

V.E     Abuse of Process.................................................................... 84

VI      Injuries ................................................................................. 85

VI.A    Violations ............................................................................ 85

VI.B    Plaintiff's Antitrust Standing ............................................... 85

VII     Claims .................................................................................. 87

VII.A   Count 1 NY State Fraudulent Inducement ......................... 87

VII.B   Count 2 Copyright Infringement Action Squared ............... 88

VII.C   Count 3 Copyright Infringement Civitech........................... 88

VII.D   Count 4 RICO 1962(c) ......................................................... 89

VII.E   Count 5 RICO 1962(a) Invest Proceeds into Enterprise Action Squared.................................... 90

VII.F   Count 6 RICO 1962(a) Invest Proceeds into Enterprise Civitech ................................................. 90

VII.G   Count 7 Violation of Section I of the Sherman Act, 15 U.S.C. ................................................. 91

VIII    Prayer for Relief .................................................................. 92

# I  NATURE OF ACTION

1. In 2012, the market for Digital Political Microtargeting Platforms serving the American political left, which constitutes essential resources for candidates running for elections in the United States, was concentrated and dominated by a single player named NGPVAN, which had vertical agreements with the DNC giving it a virtual monopoly.

2. After serving as Director of Technology for the 2012 Washington State Gay Marriage campaign, Plaintiff founded and lead a project, "Open Supporter Data Interface" [1] (OSDI), which functioned as a Standards Development Organization (SDO) consistent with Office of Management and Budget Circular Number A–119 in this market. Plaintiff served as the leader and chair until Defendants' racketeering succeeded in gaining control of the project. Plaintiff was also the main contributor of labor and authorship, copyright registrations Txu 2-249-951 and TX0009315996 and traveling to industry conferences including Netroots Nation to drive adoption of the OSDI standard.



*337 meetings functioning as democracy*

3. The OSDI standard defines resources such as People, Events, Donations, core operations to Create, Read, Update, Delete (CRUD) resources, and optimizations for

---

[1] [D2003] Web Page Osdi Website Home. (2024, June 15). opensupporter.org. opensupporter [D2003] ↗

common integration scenarios defined as "OSDI Helpers".

4. OSDI's governance policy stated that the project operated as a democracy, where derivative works of the specification, memberships, leadership positions and other decisions were made by majority vote. Since each member organization had a vote, larger, wealthier organizations were unable to dominate or use OSDI and its application ecosystem for their own proprietary advantage. All platforms could compete at the level of the market by benefiting from the external network effect created by OSDI.

5. Adoption of the OSDI standard would result in lower costs and greater choice for customer campaigns for elected office or ballot campaigns.

6. Due to the time commitment required to do the OSDI work, Plaintiff created a sole-proprietorship that offered products including volunteer management, "Ballot Chase", and a data synchronizer, which was only viable in a standards-based ecosystem that allowed Plaintiff to compete at the level of the market by leveraging OSDI's external network effect.

7. Defendants racketeering goals included undermining the OSDI project, misappropriating its essential IP and application ecosystem to give themselves a head start on their proprietary ecosystems and use Embrace, Extend, Extinguish tactics to lock developers into their APIs.

## DEFENDANTS RACKETEERING ACTIVITY AND GOALS

8. Action Network joining in November 2013, agreeing OSDI policies under false pretenses, benefitting, then attempting to undermine the project. Plaintiff relied on those agreements when deciding to perform the labor and fund it by liquidating assets from his savings.

9. Exploiting Plaintiff's labor, savings and expertise, using the IP to secure venture capital (Woodhull) and use OSDI and its ecosystem to to get a head start on Action Network's proprietary ecosystem by attempting to undermine the project in summer 2014.

10. Using Plaintiff and his sexual orientation as a shield to protect their platform disintermediation play. The dominant player, NGPVAN or other large entities who lose in a level playing field couldn't destroy OSDI without appearing homophobic and the powerful destroying the weak.

11. Fraudulently inducing Plaintiff's labor through the end of 2019 so he could continue to do the work that increased the size of its application ecosystem and the value of the project.

12. In parallel, Defendants worked covertly to undermine the project by inciting conflicts to sow discord to fracture the membership and undermine OSDI's democracy, using proxies and surrogates to conceal their hand.

13. Destroy OSDI to prevent other competitors from gaining the same ecosystem and competing at the level of the market.

14. Once they succeeded, misappropriate the OSDI application ecosystem to get a head start and the essential IP in the OSDI specification to bootstrap their proprietary ecosystem and APIs for their products. Then create disguised incompatible forks of the stand-

ard to lock-in application developers to their products, commonly referred to as "Embrace, Extend, Extinguish" tactics. These proceeds were invested in Action Squared, led by Jason Rosenbaum, Action Network's Director of Technology as well the portfolio companies of venture capitalist Higher Ground Labs, led by Nathan Woodhull.

15. Create an artificial inefficiency to allow them to sell universal adapters including Lightrail, which is a clone of Plaintiff's synchronizer product combined with "universal adapters" which creates an economy of scale as an internal network effect to create barriers to entry and cost increases for competitors

16. Exclude Plaintiff from the market to allow Defendants and thier co-conspirators to enrich themselves by using OSDI to secure venture capital, clone Plaintiff's first-mover innovations, shield their products from competition from Plaintiff,

17. Create a new origin story for their OSDI related gains.

18. Create gatekeeper powers for themselves over economies of scale which constitute essential resources for candidates running for election.

19. To accomplish this, Defendants, their co-conspirators and proxies (the Campaign), engaged in racketeering conspiracies to gain control of OSDI, operate it, and invest these proceeds into their enterprises.



*Defendants Racketeering Activity*

20. Their predicate acts include Wire Fraud, Extortion, Copyright Infringement, as well as other schemes including exploiting a self-preferencing technical architecture using AFL-CIO's monopsony power and Abuse of Process and Litigation Privilege.

*Predicates*

21. The beginning of the Campaign's extortion in summer 2016 coincides with the 2016 DNC Convention and the beginning of the Data War who's seeds were planted during the Data Breach during the 2016 election, leading to power struggles for control of economies of scale that could allow gatekeeper powers. Their extortion scheme weaponized #metoo to remove due process, apply "The man's side doesn't matter" to a gay male's property, contract, and civil rights, disguise their aggression and extortion as "holding another man accountable".

22. The Campaign's Abuse of Process coincides with the arrival of Reid Hoffman and other billionaires in the market in response to the election of President Donald Trump, the creation of venture capitalists Acronym and Higher Ground Labs which were funded by the Hoffman via his political director Dimitri Mehlhorn who disbursed Hoffman's money. Their Abuse of Process scheme used the "Indirect Objectives" defined on page 22 of the Senate report RUSSIAN ACTIVE MEASURES CAMPAIGNS AND INTERFERENCE IN THE 2016 U.S. ELECTION "The indirect objective entices overreach", then they abused Litigation Privilege to misrepresent it.

23. The members of the campaign actively misled Plaintiff using false hope of saving the project while fraudulently concealing their actions to achieve their racketeering goals, preventing Plaintiff from discovering the pattern and goals of the racketeering and the facts needed to bring a complaint forward.

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2 |
|---|---|---|---|---|---|---|---|
| | | Active Misleading | | | | | |

24.

25. Defendants actions have anticompetitive effects, giving themselves an unfair competitive advantage, creating barriers to entry for competition, creating an artificial inefficiency, increasing customer switching costs and creating gatekeeper powers in a market that constitutes essential resources for candidates for election.

## II JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964

27. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Plaintiff is subject to personal jurisdiction in this judicial district and resides in this district.

## III PARTIES

28. Plaintiff Josh Cohen is a person with his principal place of business in New York, NY.

### III.A    Defendants

29. Defendant Action Network is a corporation with its principal place of business in Washington, DC. Individuals involved include Founder Brian Young, Director of Technology Jason Rosenbaum, and Martha Grant.

30.    Defendant AFL-CIO is a corporation with its principal place of business in Washington, DC. The individual involved is Jeff Mann.

31.    Defendant Nathan Woodhull is a person with his principal place of business in Hudson, NY. Woodhull also leads ControlShift which was the OSDI member entity.

32.    Civitech is a corporation with its principal place of business in Austin, TX. Individuals involved include Gerard Niemira and Irene Tollinger.

33.    DNC Services Corporation, d/b/a Democratic National Committee (the "DNC") is a not-for-profit corporation organized under the laws of the District of Columbia, as the operating body of the United States Democratic Party.

34.    MoveOn.org Civic Action is a corporation incorporated in Berkeley, CA. Individuals involved include Senior Developer Skyler Duveen and CTO Ann Lewis.

35.    Netroots Nation is a corporation with its principal place of business in San Francisco, CA. Individuals involved include Executive Director Eric Thut and Mary Rickles. Netroots Nation is the largest industry conference in the market. It began in 2006 as a meetup of bloggers who blogged at DailyKOS, MyDD and other progressive blogs, including Rosenbaum. Netroots Nation also hosts "New Tools Shootout" in partnership with VC's like New Media Ventures and Higher Ground Labs, where new applications compete for awards. Netroots Nation also includes a "Town Hall", which is an expo hall where vendors rent booths to engage in sales and marketing. It is a venue for commerce. Netroots Nation can use its ministerial role to affect competition by including or excluding vendors and products based on its own self-interest or that of its allies.

## III.B    Co-Conspirators

36.    Defendants recruited funders within the Gay Rights Movement to ensure Plaintiff could not escape their extortion and women to use as proxies in their efforts to coerce and defraud him.

### III.B.1    Proxies

37.    RagTag: RagTag evolved from a volunteer developer team serving the DNC and Hillary for America in 2016 into a standalone group. Its leader, Brady Kriss served as a proxy during the conspiracy to operate OSDI. According to her LinkedIn, she served as leader of RagTag 2016-present and holds a LLM Intellectual Property Law and Policy. RagTag joined OSDI in 2017.

38.    Sonya Reynolds: Reynolds joined OSDI in 2017 as a sole-proprietor. She acted as a proxy during the conspiracy to operate OSDI and according to her LinkedIn, began employment at The Movement Cooperative (TMC) at the end of the operate phase in early 2019. According to OpenSecrets, TMC's largest funder is MoveOn.

39.    BroadStripes: BroadStripes is a vendor of organizing tools, who's largest customer base is Labor. According to his LinkedIn, Tim Holahan is founder and CEO of BroadStripes. Holahan served as a proxy during the operate OSDI phase.

40.    Beth Becker: According to her biography on Netroots Nation's website, Becker is a regular trainer at Netroots Nation on digital fundraising and social media tactics. The

New York Times published an article titled "Democrats Faked Online Push to Outlaw Alcohol in Alabama Race", where Becker acknowledges her role running social media campaigns for disinformation campaigns designed to copy tactics used by Russians to interfere in US elections.

41. Robyn Swirling: According to her LinkedIn, Swirling and Rosenbaum were colleagues employed at Action Network 2014-2015 and Progressive Change in 2012. At Action Network her responsibilities included training people using Action Network to segment audiences and write fundraising emails. Audience segmentation was an essential tactic used for Defendants' concealment.

### III.B.2    Gay Rights Movement

42. Kevin Jennings: Jennings joined the conspiracy on or before the DNC convention in summer 2016. According to his LinkedIn, he served as Executive Director of Arcus Foundation, one of 2 dominant funders of the gay rights movement 2012-2017. 2009-2011 Jennings served as Assistant Deputy Secretary, Department of Education in President Obama's administration. His responsibilities included Directing the Office for Safe and Drug Free Schools (OSDFS). In late 2019, Jennings became CEO of Lambda Legal.

43. James McGonnigal: According to his LinkedIn, 2015-2016 McGonnigal served as Special Advisor - Community and RootsCamp for Wellstone Action. McGonnigal is also a gay male and Broadway producer.

# IV FACTS OF THE CASE

## STRUCTURE OF FACTS

- Market Background: Documents the concentrated state of the market at the outset of Defendants' racketeering.

- Procompetitive Effort: Documents the progress OSDI and its level playing field made and how it became a threat to Defendants' concealed motive.

- Plaintiff's Sole-Proprietorship: Describes Plaintiff's products which Defendants excluded from the market.

- Racketeering: Defendants' racketeering which occur in parallel to OSDI's growth to gain control, operate it, and destroy it, and invest OSDI's IP and ecosystem into their enterprises.

- Data War: The context of the Data War which led Defendants to engage in extraordinary tactics.

- Copyright: Information on Copyright Registration

## IV.A    Market Background

### IV.A.1    Plaintiff's Experience

44.    While studying for his BS in Computer Engineering at Lehigh University, in 1993 Plaintiff came out of the closet in the university newspaper "The Brown and White".

45.    Plaintiff quickly found a passion for the craft of interoperability standards and the fairness component of the work. He spent 1996-2012 while employed at UPS, Netscape, Microsoft et al, working within Standards Development Organizations (SDOs) such as IETF, DMTF, ISO, and others. Plaintiff's contributions to the collaborative works of Internet and Web Standards include:

- Co-author with P. Gauthier, M. Dunsmuir, and C. Perkins, of "Web Proxy Auto-Discovery Protocol (WPAD)" [2], which since 1999 has been used by major Web Browsers to detect Proxy Servers in enterprise networks.

- Co-author with Y. Goland, and S. Aggarwal of "General Event Notification Architecture (GENA)" [3], which became chapter 4 of "Universal Plug and Play (UPNP)" [4], now an ISO Standard implemented by most home routers and many Internet of Things (IoT) systems.

- Plaintiff served as the leader of Microsoft's effort to standardize WS-Management in the Distributed Management Task Force (DMTF.org) and Project Lead in ISO/IEC JTC1 SC38 to standardize WS-Management, negotiating with delegations from Japan, China and other countries to come to consensus on an international standard which was published as an ISO standard in 2012 . Since 2006, WS-Management served as remoting protocol for PowerShell, ""Windows Management Infrastructure (WMI)" [5],

- Plaintiff is a contributor to HTTP/1.1 including functionality for Proxy Server support and OPTIONS method.

46.    Plaintiff served as DMTF Liaison, and member of the American Delegation, Plaintiff served as project lead in SC38 for the standardization of WS-Management. [6] Plaintiff personally led negotiations with delegations from China, Japan, Germany and other countries to come to technical consensus for publication of WS-Management as ISO/IEC 17963.

47.    Plaintiff's negotiation skills allowed him to de-escalate conflicts Defendants would later incite in their efforts to undermine OSDI negotiating compromises to keep its democracy intact.

48.    When the government filed US v Microsoft in May 1998, Plaintiff was newly hired

---

[2] [D645] Document Gauthier, P. (1999). Web Proxy Auto Discovery Protocol, Paul Gauthier, Jo... [D645]

[3] [D1072] Specification Draft Cohen Gena P Base 01. (1999). [D1072]

[4] [D1068] Document Universal Plug And Play Wikipedia. (2021). [D1068]

[5] [D1501] Web Page Ws Management Wikipedia. (2006, November 28). wikipedia.org. wikipedia [D1501, pt windows] ↗

[6] https://en.wikipedia.org/wiki/ISO_IEC_JTC_1/SC_38

Microsoft employee serving as Program Manager for WinInet component, who's APIs were relevant to the case, which served as the HTTP engine used by Internet Explorer and Windows. Having paid attention, Plaintiff was able to spot parallels between in Defendants' behavior and that of Microsoft's.

49.  That experience allowed Plaintiff, in 2017, to recognize the anticompetitive effects of NGPVAN's vertical exclusive agreements with telephony provider A, which he confronted on listserv progressphiles, leading NGPVAN to change its behavior and allow telephony provider B and others to integrate with NGPVAN's platform.

## IV.A.2    Market Background



50.  In the late 2000s, the market for World Wide Web Based Political Microtargeting systems emerged as the Web became mainstream. Political Microtargeting systems function similarly to a Customer Relationship Management (CRM) system that is connected to a Data Warehouse comprised of Voter Files and other marketing data about voters. Voter Files are procured from each state, normalized and integrated, and each year a Voter's registrations, voting history is updated. This is a costly and time consuming task, and as such is an economy of scale.



In 2012 The market was dominated by a single dominant player, NGPVAN. Exclusive vertical agreements with the DNC, who served as data broker, created a virtual monopoly in the US, with the main exception being California which was dominated by Politcal Data Inc (PDI).

While chair of the DNC, Howard Dean implemented a plan called "50 State Strategy", which ensured that all state parties had access to a voter file and up to date technology.

54.  Howard Dean explains the 50 State Strategy on a podcast with NPR on November 13th, 2008.

55.  🎙 Podcast ⏱ 11/13/08 ⏱ 2008-11-13 12:39pm "Dean Explains The Democrats' '50-State Strategy'" [T205] 🎙 Andrea Seabrook, Howard Dean, NPR This is Talk of the Nation; 👤 Andrea Seabrook; 👤 Howard Dean

56.  🎙 👤 Howard Dean +03:10 [T205]

what it means is you have a Democratic presence there, You work hard and you support elected officials there and you have up to the day up to date technology, we put $40,000 in every state every year To make sure they have a voter file... We have a national party again, because we've competed in every single state.

57.    To achieve the goals of the strategy, vertical agreements were created with NGPVAN, which served as they way for campaigns to interact with the voter file and other commercial data.

58.    Mike Conlow, who worked at the DNC when the national contract with NGPVAN was signed, discusses this on "The Great Battlefield" Podcast in April 2019, hosted by Nathaniel Perlman, one of the founders of NGP, which was later merged with VAN to become NGPVAN.

59.    During the Data Breach in late 2015, this agreement and its effects are discussed.

60.    📰 News  🕒 12/20/15 "Sanders data controversy spotlights powerful gatekeeper" [D88] ⊙ POLITICO

61.    📰 👤 Nancy Scola [D88]

> Nearly every Democratic campaign across the U.S. uses NGP VAN in some fashion, though critics say that's due in some part to the fact that the DNC and state Democratic parties force candidates do so as part of the package of receiving party support. The arrangement leaves it up to the Democratic Party to decide which campaigns get access to the software, giving it an enormous gatekeeping power of which the Sanders' campaign felt the force during its temporary suspension of access to the data file.

## IV.A.3    Gatekeeper Powers

### IV.A.3.a    DNC

62.    During the course of Defendants racketeering, there are a series of complaints from candidates regarding the use of gatekeeper powers to deprive or degrade primary challengers and disfavored candidates access to essential resources for candidates running for election.

63.    📰 News  🕒 09/03/19 "Progressive Primary Challengers Hold The Moral High Ground,Progressive Primary Challengers Hold The Moral High Ground | Crooks and Liars" [D1468] ⊙ Crooks and Liars

64.    **Pro Se note** The shaded header "Progressive..." is a clickable link to source

65.    📰 👤 Rachel Ventura [D1468]

> 2 1/2 weeks after I announced, I was denied access to Votebuilder. I was given this reason: 'I've heard from our Executive Director. Your request for Votebuilder for Illinois' 11th Congressional District through the Democratic Party of Illinois has been denied due to our regulations that we don't issue subscriptions to candidates challenging an incumbent.'

66.    This problem also came to a head during the Data Breach during the 2016 Election, a few days after the Sanders campaign secured the endorsement of a major labor union. As reported in the news:

67.    📰 News  🕒 12/22/15 "The real scandal in the Bernie/DNC feud is the one nobody is talking about" [D853] ⊙ Salon

68.    📰 ⊙ David Dayen [D853]

But there s a crater-sized hole in this reporting. The reason this controversy sprung up in the first place is that the DNC has been facilitating a monopoly, with all the usual results from that decision. In fact, it s a case study in why policymakers should aggressively protect against monopolies.

69.    In 2017, the DNC degraded data and services to primary challengers including Anthony Clark.

70.    📰 News 🕐 12/11/17 "Justice Democrat Candidates Have Been Denied Access to DNC Voter Data | WIRED,Progressive Democrats Fight For Access to the Partys Voter Data" [D90] 🌐 WIRED

71.    📰 👤Issie Lapowsky [D90]

VoteBuilder has become the central nervous system of every Democratic campaign, housing years of information on just about every contact the party has ever made with every voter.
Developed through a partnership between the DNC and a company called NGP VAN, the tool gives campaigns the inside track on potential donors, volunteers, or voters out of a pool of thousands or, in the case of a presidential election, millions of people

72.    📰 👤I. Lapowsky [D90]

But thanks to an intricate system of state-by-state rules governing who gets access to that data---a system critics say is tailor-made to protect incumbents---some Democratic primary challengers, like Clark, are being denied access to this critical pool of information by their own party.

73.    📰 👤I. Lapowsky [D90]

Rather than allow access to VoteBuilder, the state party instead directed Clark to a tool called SmartVAN, another NGP VAN product that lacks proprietary DNC voter data.

## IV.A.3.b   AFL-CIO

74.    This did not sit well with AFL-CIO, who partnered with the Clinton cohort to build their own Data Warehouse called Catalist, with its first customer being a labor endorsed primary challenger.

75.    📰 News 🕐 01/30/12 "Forget the Super-PACs: The Parties Data Mining Operations Might Be More Influential in 2012" [D590] 🌐 Slate Magazine

76.    📰 👤Mike Podhorzer, political director of the AFL-CIO [D590]

"We are not Democrats and not all of our members are Democrats," says Mike Podhorzer, the political director of the AFL-CIO, which was one of Catalist's first customers and relied on the company's data when it backed a liberal challenger to dislodge incumbent Democratic Sen. Blanche Lambert Lincoln in a 2010 Arkansas primary.

77.    📰 🌐Sasha Issenberg [D590]

In 2006, former Clinton aides Laura Quinn and Harold Ickes among a cadre of old party hands suspicious of Dean and his 50-state strategy raised $5 million from private investors, including George Soros, to build a private data warehouse [Catalist]

## IV.A.3.c   The Netroots

78.    The "Netroots" a term coined during the Howard Dean campaign, evolved from blogs

MyDD and DailyKos. By 2005, the Netroots had gained enough power to influence the DNC Chair election, swinging it towards Howard Dean as the new Chair.

79. Netroots Nation began as YearlyKos which were DailyKos meetups starting in 2006. The Netroots itself weighed in on essential technology resources for candidates running for election.

80. A controversial topic was NationBuilder, a bipartisan platform that served both Republicans and Democrats.

81. 📰 News ⏱ 07/12/12 "Nation Builder Signs Software Deal With Rslc" [D1155]

82. 📰 👤 SARAH LAI STIRLAND [D1155]

> A core group of progressive political strategists are in some cases boycotting the political software firm NationBuilder and in others are steering business elsewhere after the company announced it had reached a deal with the Republican State Leadership Committee.

83. 📰 👤 Raven Brooks, Netroots Nation [D1155]

> "At this point, I don't think it's in the interest of progressive causes and candidates to keep supporting a platform that's basically taking a side," Raven Brooks told techPresident. Brooks is the executive director of Netroots Nation

84. 📰 👤 R. Brooks [D1155]

> Brooks notes that campaigns continually provide feedback to software providers in order to improve their product, which means that progressive campaigns that use NationBuilder to provide feedback are ultimately improving the product for their opponents as well.

85. Raven's point about feedback improving products and resulting intellectual property leaking to Republicans/Conservatives by their use of the product is one of the failure modes of previous attempts to create standardized APIs in this market.

86. 📰 👤 Jason Rosenbaum, Progressive Change Campaign [D1155]

> Jason Rosenbaum, the Progressive Change Campaign Committee's senior online campaign director, calls what NationBuilder is doing "evil." "As it stands now, progressives should think carefully about who they're helping when they use NationBuilder -- every dollar you spend directly aids your opponents,"

87. Jason Rosenbaum has a Music Technology degree, and was a blogger on MyDD. He and Brian Young subsequently founded Action Network.

## IV.A.4    Evolution To A Digital Platform Market

88. In the early 2000s, Microsoft and Sun Microsystems resolved their differences and agreed on SOAP/XML as a protocol to interoperate between Java and .NET, which were the two dominant development frameworks. SOAP/XML became a substrate layered on HTTP, enabling web based systems to communicate programmatically and thus enabled Web Based Digital Platforms.

89. By leveraging SOAP/XML the market for political technology evolved to become a Digital Platform Market.

90.    Many Americans have received text messages from political campaigns which ask questions. These text messaging applications (aka Peer to Peer texting) are part of a category of applications which integrate with a Digital Microtargeting Platform. These platforms are connected to a political data warehouse that includes  Voter Files enriched with marketing information an other data sources which create profiles of voters.

### IV.A.5    Application Ecosystems Become A New Economy of Scale

91.    The effect of this evolution was that Application Ecosystem were a new economy of scale. When functioning as external network effect as OSDI did, market players compete based on functionality and innovation. However, if laundered into proprietary walled gardens aka a proprietary App Stores, then big gorillas can use dominant control as gatekeeper powers over essential resources for candidates running for election.

## IV.B    OSDI Procompetitive Effort

### IV.B.1    OSDI Ideation

92.    Plaintiff was employed at Microsoft, specializing in Standards work 1997-2000, 2003-2012. Plaintiff left Microsoft in 2012 to serve as Director of Technology for the 2012 Washington gay marriage campaign. After the victory, Plaintiff decided to use his proficiency, labor, funded by retirement savings to found Open Supporter Data Interface (OSDI) which functioned like an SDO, adopting best practices he learned from his experience and governed as a democratic level playing field to build an external network effect.

93.    Plaintiff began discussing the idea at the beginning of the campaign in February 2012 with ActBlue founder Matt DeBergalis, who's position was an example of the common wisdom at the time, which was that the task was infeasible. Via email on 2/8/2012 DeBergalis stated "Folks have been talking about interop standards for progressive tech for at least as long as I've been around, but rarely does it come to anything -- the big impediments are political (surprise!), not technical."

### IV.B.2    VC New Media Ventures

94.    Plaintiff was introduced to Nathan Woodhull in 2012 through recommendation by Venture Capitalists New Media Ventures. Nathan Woodhull was previously employed at the DNC and Act Blue. Brian Elliot forwarded Plaintiff's email with Matt Debergalis to VC New Media Ventures.

95.    ✉ Email Subject ⏱ 02/15/12 ⏱ 2012-02-15 7:00pm "Fwd: Matt <-> Josh" [D1057*] 👤 Brian Elliot

96.    ✉ 👤 Christina George, NMV ⏱ 5:11p [D1057]

> YES PLEASE to connecting me with Josh (and if you can ask permission to intro us by fwd'ing the thread even better, so we don't start from scratch). Everything he articulates has been among my biggest learning from this year. There are a few other people (Nathan Woodhull, Josh Hendler, Anthea Watson that have also been thinking along similar lines).

97.     On 4/2/2012, Plaintiff became Director of Technology for the Washington State Gay Marriage campaign, working until December 2012. While there, he saw the negative impact of proprietary APIs on customers and competition. After the campaign, Plaintiff decided to use his experience to build a project functioning as a Standards Development Organization (SDO).

### IV.B.2.a    OSDI Founding

98.     OSDI began with a kick-off panel at RootsCamp 2012, discussing interoperability issues and costs driven by proprietary APIs. Plaintiff moderated panel, which included NGPVAN, Nathan Woodhull, Amicus, Nationbuilder.

99.     Committee meetings began in early 2013, including NGPVAN, Amicus, Salsa, Nathan Woodhull/ControlShift. Plaintiff authored a baseline specification and shared it with the group via the OSDI Google group on 4/3/2013.

100.    Plaintiff travelled to industry conferences leading talks on the benefits of a standardized API and the external network effects that serves as a tide that lifts all ships including RootsCamp 2012-2016, Netroots Nation 2013-2017 (Plaintiff had attended every Netroots Nation since it's beginning in 2006).

101.    By Netroots Nation 2013 in June, Plaintiff built a prototype platform implementation and a Developer Preview of the specification was released at the conference.

102.    The bulk of the labor to build the ecosystem and authorship of the essential IP in the spec are Plaintiff's contributions. If the contributions of all other contributors are removed, the specification core and primary resources are still sufficiently well specified for interoperable implementations.

103.    Plaintiff's contributions were based on terms of democracy as a governance model, "one company one vote" level playing field to build an external network effect so market players can compete at the level of the market.

104.    The most commonly used parts of the specification are the OSDI Helpers, in particular Person Signup Helper, originally authored by Plaintiff in June 2014.

### IV.B.2.b    OSDI Governance Policy

105.    Plaintiff used his experience to create the OSDI project that functioned as an Standards Development Organization (SDO), using industry practices commonly used in consensus-based standards organizations. Those rules are contained in the OSDI Governance policy document, which itself was approved by majority vote in August 2013. Those specified that democracy and Roberts' Rules of Order were used within technical and governance committees to approve changes to the OSDI Specification (derivative works), approve new members, elect officers, change its governance policies and structure and make other decisions.

106.  Each member organization had 1 vote, so small companies or customers had the same level of control as large organizations like NGPVAN, DNC, MoveOn or AFL-CIO who couldn't use their outsized wealth and power to their advantage. It was a level playing field that couldn't be controlled and used for anyone's proprietary advantage.

107.  Regular committee meetings began in 2013 and Plaintiff authored the original version of the OSDI specification Txu 2-249-951. Plaintiff served as the leader of the project, as chair of the committees. Plaintiff built an example OSDI platform implementation and OSDI client application. He used his labor and retirement savings to travel to conferences including Netroots Nation, RootsCamp and others, leading sessions on OSDI, the value of an external network effect, and evangelizing adoption.

108.  The project was not public domain, nor was that ever proposed. Plaintiff would never have agreed to the work being in the public domain because it would enable the kind of embrace, extend, extinguish tactics that Defendants used.

109.  By January 2014, it was obvious that OSDI had already exceeded past efforts progress. In an interview by Washington Post on 1/13/14 it was recognized that Plaintiff brought unique expertise to the table. OSDI member Seth Bannon stated ""We've never had someone like Josh. He's like, in love with standards in a really bizarre way... I don't think we've had someone who's so purely a standards person. And he's seen as impartial, because he doesn't come from any of the providers in this space.""



*337 meetings functioning as democracy*

## IV.B.3    Action Network Joins

110.  Action Network was founded in 2013 as a digital toolset jointly developed by Action Network and AFL-CIO. Beth Becker introduced Action Network to Plaintiff and they joined the project in November 2013, agreeing to OSDI Governance policies. Action Network implemented the specification using source code provided by plaintiff (copyright registration Txu 2-386-143), and copied parts of the specification into its product documentation.

111.  In March 2014, OSDI's Governance Policy was evolved to create a new Executive Committee, which was a subset of the Governance Committee, with the purpose of sharing power, workload and leadership positions. Jason Rosenbaum/Action Network was elected as VP of Outreach, which had responsibility for outreach within the community. This gave Action Network the power to control perceptions within the community, which they abused by misrepresenting the effort. Plaintiff served as Chair.

112.  Motions and votes within OSDI Governance committee were carried out via email.

## IV.B.4    Action Network Implements

113.  Action Network launched their OSDI platform implementation in April 4, 2014. Via email,

Rosenbaum stated: "Hey folks, wanted to let everyone know that we officially launched our OSDI API last week!Check out the documentation..."

### IV.B.5    Broadstripes Joins

114.    On 4/21/2014, Broadstripes joins, who stated that they became aware of OSDI through the AFL-CIO. Broadstripes would later serve as a proxy during the racketeering and extortion.

### IV.B.6    Netroots Nation Joins

115.    With Action Network Having benefited from the existing work, the vulnerability identified (OSDI's progressive keel) which they would use in their attempt to undermine the coalition and misappropriate the work, Netroots Nation joined the conspiracy, waiting for that to happen.

### IV.B.7    New Media Ventures Partners with Netroots Nation

116.    On July 2, 2014, Plaintiff received email [**D1992?**] from Mary Rickles of Netroots Nation announcing "New Tools Shootout" in partnership with New Media Ventures, which was to take place at Netroots Nation 2014. OSDI was a contender for the category "Best Startup Technology".

### IV.B.8    OSDI is Coveted

117.    Already in December of 2014, OSDI had 1 platform in an adjacent market, and its ecosystem was bigger than NGPVAN's REST API ecosystem. NGPVAN's VP of R&D, Drew Miller stated: "I did get a question from Aharon that was basically "why don't we just take over OSDI"... he wants to be the leader on things"

### IV.B.9    Platform 2 NGPVAN

118.    In 2015, OSDI had platform implementations from the dominant player, NGPVAN, and new entrant in an adjacent market, Action Network. Plaintiff contributed source code in order to mitigate a self-preferencing technical architecture.

119.    The effect of this was that an application vendor could write an OSDI connector, and gain a 2x ROI for interoperability with the dominant player, which was a requirement, as well as a fledgling new startup that was starting from zero.

120.    In September 2015, NGPVAN launched OSDI their implementation.

### IV.B.10    AFL-CIO Joins

121.    AFL-CIO's membership was approved by vote 2/3/2016.

### IV.B.11    Action Network/AFL-CIO Benefit

122.    Action Network itself used NGPVAN's OSDI endpoint to integrate with NGPVAN, to support required scenarios for customers including the AFL-CIO. This was documented

on their documentation website as recently as 3/4/2019.

123.    In May 2016, ActBlue's implementation came online, allowing it to integrate with Action Network or any OSDI compliant Platform.

124.    In October 2016, in an OSDI blog post, Rosenbaum comments on the development cost benefits of the standard.

125.    📢 Osdi Pr ⏲ 10/12/16 ⏲ 2016-10-12 "Progressive Tech Edge Grows with Increased OSDI Adoption" [D390]

126.    📢 👤 Jason Rosenbaum, Action Network ⏲ 12:00p [D390]

> Jason Rosenbaum, Director of Technology at Action Network, recently worked with NGP VAN's OSDI hooks for events to provide a solution that lets the AFL-CIO work more nimbly between the two systems.

127.    📢 👤 J. Rosenbaum ⏲ 12:00p [D390]

> "OSDI's interoperable API specification really saved us time and money, cutting expected development time for VAN events integration from two weeks down to one," Rosenbaum said. "Being able to get features like this into the hands of our partners more quickly is a big win for us and for them."

## IV.B.12   2X ROI External Network Effect

128.    This created a 2x ROI for application vendors, who could create one connector and gain interoperability with the dominant platform and new entrant Action Network.

129.    Plaintiff is aware of the following OSDI implementation.

130.    NGPVAN, Action Network, CallHub, Accurate Append, Mobile Commons, Act Blue, New/Mode, CiviCRM, New/Mode, Mobilize, MoveOn Spoke, MoveOn Internal Tools, ProgCode Resistance Calendar, ProgCode National Voter File, ProgCode Maps for Change, RiseUp.

131.    OSDI also had momentum and was considered the default approach for APIs in the market.

132.    The effect of this was that when the third platform implemented OSDI, they would also have the largest application ecosystem, and application developers wouldn't need to code a connector specific to the new platform.

133.    The size of the ecosystem also made it an attractive target for those who sought to misappropriate the ecosystem and use it for their own competitive advantage (Action Squared and Civitech) and personal enrichment (Woodhull and Niemira).

## IV.B.13   Netroots Nation 2017

134.    The following events occur during the run-up to, or at Netroots Nation 2017 and continued forward.

### IV.B.13.a Platform 3 PDI

135.    At Netroots Nation 2017, PDI released its new national platform meant to pursue the national market beyond California. It subsequently attempted to join OSDI and imple-

ment, allowing PDI to compete at the level of the market. However, it was locked out as a result of Defendants' racketeering activity.

136.    On February 1, 2018, PDI had become ready to join OSDI. CallHub, an phone and text application was eager to see PDI implement, as it would allow CallHub to integrate with 3rd platform PDI with little or no engineering work.

137.    On 5/7/2018 Via email, Sonya Reynolds stated "PDI is actually looking to hire someone to build them an OSDI compliant API."

138.    Sonya never followed up with Plaintiff. At RootsCamp 2018, Plaintiff made contact with PDI again and referred them to Sonya and Brady Kriss on 12/1/2018. There was no further activity and PDI was locked out.

139.    In 2019, Plaintiff provided source code for MoveOn's Spoke text messaging tool implementing OSDI. He also provided source for a CiviCRM connector.

140.    At this point, Applications that supported OSDI could interoperate with Action Network, NGPVAN, and CiviCRM, providing a 3x ROI. Once PDI implemented that would be a 4x ROI.

141.    Defendants racketeering activity locked out PDI.

## IV.B.13.b Mitigate Vertical Agreements

142.    In July 2017 Raffi Krikorian, newly hired DNC CTO reached out to Plaintiff and through February 2018 they negotiated a plan to reduce support costs in DNC's marketplace of products and increase customer choice by making OSDI compliance a preferred criteria for participation. This reduces the anti-competitive effects of vertical agreements with product vendors, and helps democratize access to political technology resources.

143.    Plaintiff was introduced to Raffi Krikorian, DNC CTO on July 21st, 2017. Plaintiff met with Raffi Krikorian and Liz Jaff on July 27th, 2017 at Civic Hall in New York City. Raffi asked Plaintiff to prepare a proposal for how OSDI can benefit the DNC and progressive customers. and this conversation continued through 2/1/2018, when Defendants racketeering gained control of OSDI.

144.    Plaintiff reviewed the proposal with OSDI committee members, and it was approved by vote for sending to the DNC on February 1st, 2018. On 2/1/2018 at 7:28am, Krikorian emailed Plaintiff, cc'ing Sally Marx, stating "the tech team is about to launch a marketplace of progressive technology that campaigns and state parties should know about. effectively democratizing access to this data. sally, CCed, who is running the program has been working hard to catalog everything and also negotiating prices with people who should up in the catalog. id like to chat about the role of OSDI and how we can highlight applications that comply in the market." D516

145.    At 1:18pm, Plaintiff sent the approved proposal to Raffi Krikorian by email, he replied "hi josh (and everybody else on this committee). first thank you so much for everything you re doing. as i ve mentioned many times in the past, i feel interoperability in this space is extremely important, and the work that youre doing is helping push that forward. i just wanted to acknowledge that sally and i have received this, and we will respond shortly. thanks again."

146.     Had this continued to its logical conclusion, the DNC's support costs, customer switching costs, barriers to entry for platforms would be decreased. However, due to Defendants' conduct it did not. On 4/20/2018, on Medium, DNC's Sally Marx announced "a marketplace filled with tech tools", without inclusion of OSDI compliance D824.

147.     DNC launches tech marketplace for Democratic candidates

### IV.B.13.c Pitch from Reid Hoffman's Political Director

148.     On August 15, 2017, Plaintiff was introduced to Dimitri Melhorn, Political Director for Reid Hoffman by Brady Kriss/RagTag, via email D676 & D672. who suggested Plaintiff meet with Dimitri for an OSDI briefing, and to listen to Dimitri's funding ideas. Kriss stated "I personally think it would be rad to get some funding into OSDI itself, or to get some funding for Ragtag to manage people to work on OSDI stuff" demonstrating that controlling OSDI could be used to secure funding from Hoffman. On August 8/15/2017, Plaintiff met via conference call with Dimitri, who offered to make Plaintiff rich if he would agree to use OSDI as a proprietary walled garden.

149.     In the context of these discussions, Dimitri forwarded via email to Plaintiff on 8/15/17 a paper he had co-authored at Harvard analyzing Microsoft's platform behavior, which is generally viewed as anti-competitive. It is a picture of what Dimitri wanted to create, and what was ultimately created by Higher Ground Labs.

150.     Plaintiff refused because he wasn't using retirement savings to build anyone's proprietary API, and he wasn't doing the work for money.

## IV.B.14  External Network Effect and Peak Growth

151.     By 2018, OSDI served as 2x ROI platform external network effect. Once PDI implemented it would be 3x. Any OSDI compliant application could interoperate with any OSDI compliant platform.

152.     After Netroots Nation 2017 the last Netroots Nation Plaintiff attended, OSDI's membership and supporter list stopped growing.

## IV.C     Plaintiff's Sole-Proprietorship

153.     Since the OSDI work took up a significant amount of time, Plaintiff built a sole-proprietorship build-ing products that depended on OSDI and its level playing field. Plaintiff's investment of his labor, expertise and savings to build the OSDI specification, support tools, and evangelize adoption paid off. In 2017, With adoption crossing the tipping point, Plaintiff could build tools and spend his engineering resources building features instead of writing N proprietary connectors for N platforms.

154.     Plaintiff's approach was generous because everyone benefited from the work as anyone could leverage the growing ecosystem of OSDI products. This is the opposite of Woodhull's approach. Woodhull spent engineering time writing code to build N connectors for N platforms.

155.     Plaintiff's products were inspired by the tools he and his team at Washington United for Marriage had created during the 2012 marriage campaign.

156.     Hero Volunteer Management which integrated with NGPVAN's OSDI endpoint to provide calendar invitations, reminders and follow-up via text messaging and allowed email and text communications with field organizers. One of its innovations was the ability to include images in text messages.

157.     Another was the first "ballot chase" application, "Did They Vote?" In Washington State, the 2012 election was an all mail-in ballot election. The application integrated with the Secretary of State records that indicated which voters had mailed in their ballots and integrated with Facebook so supporters could mes-sage their friends who had not yet voted to mail in their ballots. This application was used in 2014 by campaigns in Oregon and Colorado.

158.     In 2017, Plaintiff's volunteer management application was the province-wide solution for the Canadian New Democratic Party (NDP) in the British Columbia provincial elections. Over 60 campaigns used the application in their ridings (districts in US terminology). NDP implemented OSDI connectors on their infrastructure, which Plaintiff integrated with to push the relevant data into their Microtargeting Platform. Plaintiff did this as a sole-proprietor.

159.     In 2018, Plaintiff released Hero Sync[7], which synchronized data between systems using OSDI. Customers used it to synchronize data to OSDI compliant Digital Political Mi-crotargeting Platforms from products like Salesforce, Salsa Engage, VolunteerHUB. The product was compatible with OSDI compliant platforms like Action Network, NGPVAN, and but for Defendants' conduct would also have been compatible with PDI BlueVote and any other subsequent adopter.

160.     Plaintiff took the risk of investing his own labor, expertise, and savings to build these things without seeking or accepting venture capital. Defendants could not control him.

## IV.D     Racketeering and Extortion

161.     Over time Defendants racketeering escalated with the following predicate acts:



*Predicates*

7 https://marriagehero.org/sync.html

162.    For Defendants to achieve the outcomes they are profiting from, they needed to:

- Separate the OSDI application ecosystem from its governance structure and policies (which Action Network agreed to when it joined) which prevented them from using it as a proprietary asset.

- Gain control of the essential IP in the specification, which is primarily Plaintiff's authorship, which meant Defendants needed a pretext for aggression to separate Plaintiff from his property rights.

- Destroy the governance structure itself to prevent competitors, including PDI, from gaining the same benefits as Defendants did.

- Prevent PDI from joining and gaining an equal vote, which would have closed the window for Defendants' to achieve their goals.

- Prevent the DNC from adopting OSDI compliance as a preferred candidate in their market-place, which would have closed the window for Defendants' to achieve their goals.

- Manufacture a pretext to isolate Plaintiff from the market to conceal their extortion and fraud, conceal their actions from Plaintiff, and shield their competing products from competition by Plaintiff.

- Avoid appearing homophobic or expose the fact that the powerful were destroying the weak by shifting to use women as proxies.

- Destroy Plaintiff's economic viability so the external network effect could not return, and competitors wouldn't hire Plaintiff and gain similar benefit from his expertise.

- Manufacture new origin stories for Defendants' OSDI relate gains. Action Squared's is referred to as "Cooperative Development" and Civitech's involved renaming Lightrail, created by Niemira as Bluelink and assigning the invention to a woman Irene Tollinger.

163.    With an abundance of evidence, Plaintiff will prove that Defendants and their proxies were the aggressors, attempting to coerce or defraud Plaintiff in service of their profit motive.

## IV.D.1   To Gain Control

### IV.D.1.a   Early Racketeering

164.    On 5/14/2013, via email, Bryan Whittaker, COO of NGPVAN, informed Plaintiff that NGPVAN was unhappy that multi-partisan entities were being considered acceptable members.

165.    ✉ Email Subject ⏱ 05/14/13 ⏱ 2013-05-14 5:03pm "connecting on open standards" [D1138*] 👤 Bryan Whitaker

166.    ✉ 👤 Bryan Whitaker ⏱ 5:03p [D1138]

> it's become apparent NGP VAN might need to tailor our engagement on this project
> going forward... conversation are trending towards a non-partisan or multi-partisan
> approach... Any discussion about interoperability between Democratic/progressive
> products and those use by political opponents is not one we're likely to spend our
> time on.

167.    NGPVAN took a stricter position seeking to restrict participants to progressive or Democrats only. When Action Action Network subsequently joined OSDI, it took a position on the opposite side of that spectrum. This tension would be exploited by defendants to incite conflict in their attempts to undermine the project.

### IV.D.1.a.1    Adoption of democracy and progresive keel

168.    As a result of NGPVAN's concerns, Plaintiff was able to negotiate a compromise that protected Progressive or Democratic intellectual property while allowing broader membership. This was included in OSDI's governance policy, which was approved by majority vote on 8/1/2013.

169.    The purpose of the "Progressive Keel" was to protect "Progressive" or "Democratic" intellectual property from leaking to political tools that serve conservatives and republicans.

170.    Like an onion, inner rings were restricted to participants who strictly served progressives and Democrats. Outer rings were for mainstream technology companies like Microsoft, Google, Twilio et al which are non-political general use tools, and those serving bipartisan customers.

171.    So, for example, a bipartisan vendor which some progressives used such as NationBuilder, could participate in an outer ring. The definition of the policy is expressed as a 6x7 matrix where the axes are progressive ideology and type of participant and the values are which committees were appropriate.

### IV.D.1.a.2    Nathan Woodhull links MoveOn and ActBlue to conspiracy

172.    Via email on 8/6/2013, Woodhull links MoveOn and ActBlue to the conspiracy.

### IV.D.1.a.3    Action Network Joins

173.    When Action Network joined OSDI in November 2013, they were provided with the organization's policies, which were discussed during a conference call. Action Network agreed to those policies and began participation.

174.    Action Network is provided with the Governance policy, which it agreed to in order to join.

175.    ✉ Email Subject ⊘ 11/04/13 ⊘ 2013-11-04 1:09pm "Re: OSDI" [D208] 👤 Tim Anderegg

176.    ✉ 👤 Josh Cohen, OSDI ⊘ 1:09p [D208]
          | Re: OSDI

177.    ✉ 👤 Tim Anderegg, NOI ⊘ 10:09a [D208]
          | We've officially made the motion to induct CAN into OSDI (no one has raised any objections yet, and I don't anticipate any), and Josh Cohen would like to have a call

with you to give you an overview of the structure, process, and what not. Would you have time to have a chat with us tomorrow at 4pm, or sometime on Wednesday?

178.    ✉ 👤 Jason Rosenbaum, Action Network ⏱ 10:26a [D208]

Tomorrow is busy but Wednesday is largely free outside of 5:30pm. So pick a time on Wednesday?

179.    ✉ 👤 J. Cohen ⏱ 1:57p [D208]

Jason, I've attached a few docs for you to skim that we'll touch on in the call. 1: Governance: the description of the informal org structure, roles/taxonomy of membership, 2: the one pager 2 attachments osdi-governance..v3-final.docx 21K one-sheet.pdf 306K

180.    Plaintiff met with Rosenbaum/Action Network via telephone and reviewed the governance policy with Action Network, which they needed to agree to in order to join.

#### IV.D.1.a.4    VC New Media Ventures / Universal Adapter Proposal

181.    Via email on December 11th, 2013, Woodhull communicated a plan where he and partners applied for funding from New Media Ventures to build a "universal adapter".



182.    ✉ Email Subject ⏱ 12/11/13 ⏱ 2013-12-11 10:36pm "activity" [D1991*] 👤 Nathan Woodhull

183.    ✉ 👤 Nathan Woodhull ⏱ 10:36p [D1991]

applied for funding from New Media Ventures for a bunch of things, a small chunk of which was funding to write a "universal adapter" to provide a common API binding to a few CRM vendors that their member organizations use... we'd likely do the implementation work if they were to get funding... I'd look to OSDI spec for a common interface.

#### IV.D.1.a.5    Action Network Undermines

184.    Once Action Network implemented, they attempted to undermine the project using parallel conduct with Nathan Woodhull and the DNC to antagonize the dominant player, NGPVAN, while the DNC lured NGPVAN away with support for NGPVAN's proprietary API and attempted to recruit Plaintiff to their cause.

185.    The evening of August 20th, 2014, Plaintiff chatted with Jason Rosenbaum via chat.

186.    💬 Chat ⏱ 08/20/14 ⏱ 2014-08-20 8:53pm "NGP VAN's Innovation Platform Event" [D420]

187.    💬 👤 Josh Cohen ⏱ 8:53p [D420]

Did u watch the van event?

188.    💬 👤 Jason Rosenbaum ⏱ 8:53p [D420]

Yep

189.    💬 👤 J. Cohen 🕘 9:30p [D420]

> Imho we want the ecosystem api to be controlled by community/democracy not the party+van

190.    💬 👤 J. Rosenbaum 🕘 9:30p [D420]

> True. Though that's a long term project. I'd settle for being one of two for now...

191.    💬 👤 J. Cohen 🕘 9:31p [D420]

> One of two?

192.    💬 👤 J. Rosenbaum 🕘 9:31p [D420]

> Two widely used progressive Apis

193.    Jason Rosenbaum then attempted to convince Plaintiff that the project had "failed" and recruit Plaintiff to work at Action Network to build their proprietary API and ecosystem.

194.    Plaintiff declined and decided that he would either secure an implementation commitment from NGPVAM, or abandon the project.

195.    This attempt failed, Plaintiff declined and decided he would either secure an implementation commitment from NGPVAN, which he did, or abandon the project. and Plaintiff also insisted that Action Network promised to respect OSDI's democracy and not undermine it, which they affirmed on stage at SXSW 2015.

196.    Plaintiff spent between August 2014 and February 2015 diligently working to reverse the damage, succeeding and securing an implementation commitment that NGPVAN followed through on.

197.    NGPVAN had gone down the proprietary API route.

198.    Plaintiff worked his way up NGPVAN's management to meet with CEO Stu Trevlean and negotiate. Plaintiff prepared for the meeting by discussing it with Drew Miller, NGPVAN's VP of Research and Development over Google Chat:

199.    💬 👤 Josh Cohen 🕘 2014-12-13 12:13pm [D1505]

> should we prep at all before I meet with stu tomorrowq?

200.    Drew Miller, VP of Research and Development, cited the DNC support as a justification.

201.    💬 👤 Drew Miller 🕘 12:29p [D1505]

> the NGP VAN Next stuff and API portal for us / DNC got a pretty good response

202.    💬 👤 D. Miller 🕘 12:32p [D1505]

> DNC wants to do another panel talking about it

### IV.D.1.a.6    Exploiting Vulnerabilities to Incite Conflict

203.    The above racketeering patten is an example of repeated behavior from Defendants to sow discontent in order to undermine the project or undermine their platform competitors' ability to similarly benefit in the way Action Squared benefited. It is also an example of how Defendants treated OSDI's progressive keel policy as a vulnerability to be exploited to achieve these goals.

204.    Plaintiff met with Stu Trevalyan in December 2013, securing an implementation

commitment from NGPVAN. Plaintiff learned from Trevalyan that the reason NGPVAN stepped back from OSDI was because Action Network antagonized them by misrepresenting OSDI's Progressive Keel policy by stating "NationBuilder is Welcome!" in front of an audience and treated OSDI as its own proprietary API.

205.    Plaintiff insisted that Action Network promise not to undermine the project and to respect OSDI's democracy. Action Network made these promises and affirmed this in public, on stage at SXSW 2015 on March 13th 2015.

206.    🗓 Conference Session ⏱ 03/13/15 ⏱ 2015-03-13 11:00am "Turbocharging Social Activism with Data Standards,Turbocharging Social Activism with Data Standards | SXSW 2015 Event Schedule" [D482] 🎙 SXSW Schedule 2015, 🎤 sxsw; 🔏 Sxsw

207.    🔊 Audio ⏱ 03/13/15 ⏱ 11:00a "Turbocharging Social Activism with Data Standards" [T105] 🎙 ; 👤 Jason Rosenbaum, Action Network; 👤 Gayatri Bhalla, Catalist; 👤 Josh Cohen, Self; 👤 Tim Anderegg, Independent

208.    🔊 👤 Jason Rosenbaum ⏱ +18:21 [T105]

> I think the way the way people implement is really within the standards process. We are very intentional about the process. It's a democratic structure and where most of the work gets done in the tech committee. We have people who make proposals and make motions and we vote on it.

## IV.D.1.b   Wire Fraud / DMCA 1201

209.    Beginning in Q4 2014, Jason Rosenbaum/Action Network engaged in wire fraud to misrepresent Plaintiff's copyright authorship as his own, making commits that cause GitHub's metrics to make the work appear to be his. Robyn Swirling was employed at Action Network May 2014 - Sep 2015, while this was occurring.

210.    An example of this fraud is OSDI Person Signup Helper, which along with the other helpers are the most commonly used parts of the specification.

### IV.D.1.b.1   Person Signup Helper

211.    Person Signup Helper was originally authored by Plaintiff in April 2014 as Github commits D1525 D1526. On 12/31/2014, Jason Rosenbaum copied the definition of Person Signup Helper, which was Plaintiff's authorship into a new file. The Github "blame" view attributes each line of the file to the committer who last touched line.

### IV.D.1.b.2   Other Patterns of Fraud

212.    Examining the commit history of the essential IP in the specification reveals similar fraud. In other cases, Jason Rosenbaum changed the indentation, added formatting changes, punctuation, other deminimis changes, or used "revert commits" to game GitHub's analytics and pad his score.

213.    Revert commits can create an effect similar to one using a word processor to add a paragraph, then undo to remove it, then undo the removal, which gives credit for additions and deletions of each line, effectively "padding" commit credit 3x.

### IV.D.1.b.3   Concealment

214.    To conceal the wire fraud, Jason Rosenbaum often buried the fraudulent commits

within his assigned committee tasks. In other cases he would provide a fraudulent justi-fication, such as proclaiming a need to reformat section of the specification in prepa-ration for a proposed Labor Committee.

#### IV.D.1.b.4    Effect

215.    In addition to misrepresenting the copyright authorship, the effect of the fraud "gamed" GitHub's contribution metrics. The period with the most significant commits is 4Q14-1Q15.

### IV.D.1.c   VC New Media Ventures Partners with Netroots Nation

216.    New Media Ventures partners with Netroots Nation on their yearly "New Tools Shootout", where OSDI was a contender, beginning on or before Netroots Nation 2014. Plaintiff has email announcements from Mary Rickles.

### IV.D.1.d   Self-Preferencing / Monopsony / FUD

217.    From that point, Defendants used Plaintiff as a shield to protect their platform disintermediation scheme; the dominant player nor the DNC couldn't destroy OSDI without appearing homophobic, monopolistic and hypocritical compared to the posi-tions of Democrats on the House Subcommittee for Antitrust.

218.    On the back stage, Defendant's used parallel conduct to:

- Induce a self-preferencing technical architecture in NGPVAN's implementation

- abused the AFL-CIO's monopsony power to control NGPVAN's resource allocation to favor its proprietary API

- promulgated Fear, Uncertainty, and Doubt (FUD) to discourage application vendors from trust-ing NGPVAN's OSDI endpoint in their integrations.

#### IV.D.1.d.1    Self-preferencing Technical Architecture



*Self-Preferencing Architecture*

219.    Chaining the OSDI enpoint through the proprietary endpoint ensured that the proprietary API endpoint could not fall behind the OSDI endpoint in functionality. In the event of resource constraints, the proprietary endpoint would get priority and the OSDI

endpoint would fall behind.

### IV.D.1.d.2    Monopsony Power

220.    Action Network and the AFL-CIO were influencing NGPVAN's resource allocation.

221.    ✉ Email Subject ⏱ 03/16/16 ⏱ 2016-03-16 9:46pm "van" [D407*] 👤 Josh Cohen

222.    Jason Rosenbaum/Action Network was profiting by exploiting Plaintiff's labor, proficiency and retirement savings. As a diversion, he falsely portrays NGPVAN as the profiting from exploited labor.

223.    ✉ 👤 Jason Rosenbaum ⏱ 9:48p [D407]

> Cool. As good as can be expected I guess. I had a call with the AFL yesterday, so they're prepped to put on pressure to accept the PR if we need it. Gotta figure out the free work problem though, but maybe adoption will help with that.

### IV.D.1.d.3    FUD

224.    In parallel, Defendants were criticizing NGPVAN's OSDI endpoint, using proxies, to discourage application integrators from depending on the OSDI endpoint, and instead choosing the integrate with NGPVAN's proprietary API endpoint.

## IV.D.1.e    Mitigate Self-Preferencing Architecture

225.    To mitigate the self-preferencing architecture, Plaintiff contributed source code to NGPVAN's OSDI implementation which added functionality to the OSDI enpoint that the propprietary API endpoint did not have.

226.    Plaintiff achieved this by including code that routed to NGPVAN's legacy SOAP/XML based endpoint which had fuller functionality than the proprietary API endpoint which was newer and had fewer applications using it.



*Mitigate Self-Preferencing*

227.    For example, the SOAP/XML endpoint supported *Script* resources while the proprietary REST API did not. So Plaintiff submitted code in the OSDI endpoint that integrated with the SOAP/XML to expose Script resources via OSDI.

### IV.D.1.f   Origin of Data War

228. On 7/23/2016, The Unity Reform Commission was created at the DNC 2016 Convention. It's goals including addressing tension over the DNC's use of gatekeeper powers to lock the Sanders campaign out of NGPVAN during the Data Breach in December 2015, laying the seeds of the Data War.

229. It was foreseeable, from his point, that Action Network and AFL-CIO window to gain dominant control over OSDI without competing interests was going to close.

### IV.D.1.g   Extortion Begins

230. To disguise their extortion, Defendants used subterfuge to wrap themselves within a #metoo frame and portray their actions as supporting women. This is a practice that results in Disparate Impact between protected classes.

231. This scheme began in summer 2016 2ac beginning. Defendants, via proxy Beth Becker, lured Plaintiff onto the Working our Values Google group, led by Swirling and another person. They did this by telling Plaintiff that his ex-boyfriend's name was already on a list of abusive men within the community and they knew at least one other victims. This worried Plaintiff, Becker then suggested Plaintiff attend a session at Netroots Nation 2016, which he did, and joined the follow-on Google group.

232. At this point, the leaders (including Swirling) were strangers to Plaintiff. Had Plaintiff known that Swirling and Rosenbaum were employed at Action Network 2014-2015, that her role involved training people using Action Network to segment audiences and write fundraising emails[8], colleagues at Progressive Change in 2012, and that the "Brian Young" in the attendance list was Action Network's founder, he would have seen the situation as a scheme of some kind and left the group. Plaintiff attributed Swirling's deceptive language and behavior to a woman who appeared to be scared by the argument rather than language choices made by someone who trains others in the use of language carefully chosen to evoke emotional responses to raise money.

233. Defendants then used Swirling as a proxy to make the original extortion threat, which was to publicly portray Plaintiff as an example of sexual harassment and violence towards women by concealing his sexual orientation and misrepresenting his actions and motive on the Google Group. At rootscamp 2016, when Plaintiff attempted to have a dialog with Swirling on why that was dangerous and homophobic, Swirling ambushed him, announcing, in front of an audience, "A man has entered the room who has engaged in repeated violence, persistent harassment, and invading our spaces!". The conference organizers asked Plaintiff to cede the physical space (to the women), which Plaintiff did. Defendants exploited Plaintiff's absence at the OSDI session, the following day, to attempt to oust Plaintiff based on Swirling's deceptive language.

234. Defendants and their proxies engaged in a repeated pattern of using fear to try to coerce him to resign, abandon his copyrights, abandon the project or agree to other

---

[8] https://web.archive.org/web/20150711001148/http://www.netrootsnation.org/nn_events/nn-15/master-class-action-network-2/

[9] https://web.archive.org/web/20240418132926/https://www.netrootsnation.org/nn_events/nn-14/master-class-action-network/

demands. In the alternative, they would induce responses from Plaintiff that Defendants would misrepresent. They used false-hope of saving the project to keep him engaged. Induced grains of truth would be combined with lies of omission and fabrications, which were fitted to the script they were using to incite hatred towards Plaintiff to justify their actions.

235.    Since Plaintiff didn't realize Defendants were essentially stealing from him, he didn't understand why it was happening, and Defendants were able to defraud the court and ultimately terrorized Plaintiff to the point of suicidal ideation.

236.    The following diagram depicts Defendant's scheme:



*Using fear and false hope as puppet strings*

237.    Defendants and their proxies continued this pattern of extortion through 2017, inflicting enough unjust harm to justify Plaintiff's filing of Cohen v. Swirling.

238.    One of the assertions in the tweetstorm was that Plaintiff harassed Swirling for a year and a half. That fraud was a diversion to conceal that Defendants were engaged in extortion against Plaintiff for a year and half. By putting that assertion to the female voice, Defendants knew that others would assume it to be true.

239.    Plaintiff's only interactions with Swirling are the verbal policy arguments on the Google group and at RootsCamp 2016 and the settlement conference with your honor.

240.    The tweetstorm also falsely portrayed Plaintiff as a man who tried to take over a project run by women's, in order to create a pretext for them to take over a gay male's project, which they had been unsuccessfully trying to since at least summer 2014.

241.    Once Defendants succeeded in provoking Cohen v. Swirling, they used it as a pretext to act in concert, combining their power, and tried to coerce other members to oust Plaintiff, resign and help destroy the project, or face retaliation for not supporting women. The AFL-CIO's monopsony power was also used to implicitly threaten others to follow the AFL-CIO's own resignation.

## IV.D.1.h  Inception

242.    On 11/20/2014 Plaintiff forwarded the a news article regarding the arrest of DNC donor and Human Rights Campaign (HRC) founder Terry Bean to listserv InsidersOut, which is a coordination point within the gay rights movement. This triggered a 127 page thread where many criticized the way Gay Rights fundraisers behaved to protect wealth and

power. Plaintiff was contacted by Phil Attey, who identified himself as a close friend of Bean's and communicated anger towards Plaintiff. D1251

243. Defendants communicated their initial threat via email on 9/16/2016 on the Google Group "Working Our Values", which Defendants subterfuge to lure him onto, using Action Network's former employee Robyn Swirling. Defendants then engaged in a repeating pattern of using deception to inflict unjust harm, making property demands (often using subterfuge to disguise their property motive)

244. The threat was to conceal Plaintiff's sexual orientation, and publicly portray him as an example of violence and sexual harassment towards women, which creates a foreseeable risk of inciting violence

245. This allowed Defendants to conceal their role as aggressors and apply the #metoo lens allowing them to induce bias in their audiences to apply calibrations including "the man's side doesn't matter" and "holding another man accountable" to disguise their racketeering as protecting women, holding another man accountable, and apply "the man's side doesn't matter" to Plaintiff's property, contract and civil rights.

246. Fear Defendants lured Plaintiff onto the google group. At Netroots Nation 2016, proxy Beck Becker told Plaintiff that his ex-boyfriend's name was already on a list of abusive men within the community and knew at least one other victim of his ex-boyfriends. Plaintiff shared what he learned from Becker with Rosenbaum on 7/16/2016. Plaintiff later confirmed this with Becker via Google Chat on 7/25/2016.

247. The DNC convention takes place July 25-28 2016. At the Equality Forum event, Plaintiff sought help from Kevin Jennings, Executive Director of Arcus Foundation (one of two dominant funders of the Gay Rights Movement). Via email in 2016, Plaintiff shared detailed information on OSDI and the need to protect it from profit or proprietary motives. Multiple times through 2019, Plaintiff sought help from Jennings to stop the dangerous extortion from escalating, but received no help. Jennings's actions helped Defendants achieve their racketeering goals.

248. Plaintiff was added to the follow-on "Working our Values" Google Group by Swirling on 7/25/2016. Brian Young was present on the Google Group; his name is first on the attendance list in the kick-off email sent by Swirling, via email, on 8/25/2016

249. 9/2/2016 Plaintiff's first therapy session occurs. Though he didn't understand that he was being lured into an extortion scheme, he was already anxious, depressed, and having trouble managing his sleep schedule, so he started therapy and was prescribed anti-depressants and sleep management medication.

250. Trap & Misrepresent On 9/16/2016, Swirling communicated the initial extortion threat to conceal Plaintiff's sexual orientation and falsely portray him as an example violence and harassment to women using distortions that were blatant enough that Plaintiff felt Swirling was threatening to lie in public. However, there was no visible motive for a female stranger to do this. Plaintiff decided he would try to discuss this with her at RootsCamp 2016. The subsequent abuse of litigation privilege on Twitter during Cohen v. Swirling is essentially the same content as the original threat.

251. From this point, Brian Young and his co-conspirators could use Swirling as a proxy to endanger Plaintiff's business, property, and safety in plain sight, while trying to coerce

Plaintiff to resign.

252. Defendants continued this pattern through 2017, until they knowingly provoked Cohen v. Swirling as a false flag, allowing them to amplify their deception and unjust harm by abusing litigation privilege, create a pretext to act in concert and gain control of OSDI.

## IV.D.1.i   Rootscamp 2016

253. Prior to Rootscamp 2016, Plaintiff contacted an acquaintance affiliated with Rootscamp, James McGonnigal to make sure Swirling knew Plaintiff was coming and why, and ensure he understood the code of conduct, which does allow disruptions for inequality.

254. Misrepresent  At Rootscamp 2016, unaware that he was being lured into an ambush, Plaintiff attempted to have a dialog by attending the next session on the topic. While sitting quietly waiting for an opportunity to politely raise the issue, Swirling announced to the room that "A man has entered the room who has engaged in repeated violence, persistent harassment against women, and invaded our (women's) spaces!"

255. These false accusations, which were gross distortions of a verbal policy argument on the WOV group, resulted in Wellstone asking Plaintiff to "cede the physical space" to women, resulting in him being excluded from the OSDI session the following day.

256. While absent during the OSDI session the next day, a second attack took place attempting to have Plaintiff removed from his position, so that Action Network could gain dominant control. The above attempt failed, so Jason Rosenbaum insisted on invoking OSDI's escalation process in another attempt to have Plaintiff removed by attempting to incite others to make a motion to that effect, concealing their role as aggressors.

## IV.D.1.j   Military Soldier

257. Fear  On 3/17/2017, Plaintiff received a Facebook friend request from an ex-military soldier, Josh Seefried, who had been active within the gay rights movement, and who Plaintiff believed was part of the same co-hort as his ex-boyfriend, which Plaintiff emailed Rosenbaum about D157. It felt like a threat to Plaintiff either from his ex-boyfriend, Bean, or others in the gay rights movement that they wished to do Plaintiff harm.

258. Trap  Plaintiff then sent email seeking help to Russ Rampersad, Catalist D635. Cristina Sinclaire, a leader of Data Ladies Alliance replied "Hi Josh - I'm sorry to hear you're having a hard time." Defendants were ignoring the danger Plaintiff felt he was in, and instead focused their efforts on their property motive. D635

259. Coerce  On 3/20/2017, two days later, via SMS D143, Jason Rosenbaum attempted to coerce Plaintiff to confess to "abuse of chair power", using a fraudulent pretext which Rosenbaum described as "If you don't understand why asking random people for input on our process was the wrong thing to do..."

260. Due to the escalating danger, Plaintiff retained counsel (Glen Ackerman) for the first time since fighting a speeding ticket 30 years ago.

261.    5/04/2017 RagTag joins OSDI D1999 and would serve as a proxy for Higher Ground Labs

262.    5/09/2017 Sonya Reynolds/Colibri joins OSDI D1998 and would serve as a proxy for MoveOn and The Movement Cooperative

263.    5/25/2017 Vox news reports on the founding of Higher Ground Labs in early 2017 stating "Higher Ground Labs is a new attempt by some of former President Barack Obama's digital aides" D1599

264.    5/11/2017 D323 Counsel negotiated with Wellstone/Rootscamp to de-escalate the situation and was successful.

## IV.D.1.k    Netroots Nation 2017

265.    The following events occur at or around Netroots Nation 2017, in parallel to the events described in the Netroots Nation 2017 section of the Procompetitive Effort section including the PDI and DNC conversations.

266.    On 8/2/17, Higher Ground Labs announced its first cohort of funded companies which included Niemira's GroundGame, a platform, and Mobilize, an event management application.

267.    Netroots Nation 2017, on August 10-13 2017, was the last Netroots Nation conference Plaintiff attended. Plaintiff was refused attendance at subsequent Netroots Nation conferences. In Plaintiff's subsequent civil rights complaint against Netroots Nation 2019, Eric Thut responded "Cohen was denied access because of a pattern of behavior dating back to 2017 at our conference, where he harassed other members of our community and violated our community standards. His credentials were revoked in 2017 because of his conduct, denied in 2018, and denied again in 2019."

268.    On the eve of the conference, Plaintiff was chatting with Jason Rosenbaum to discuss how to approach PDI. During that chat, Plaintiff received Facebook RSVP notifications for the OSDI session from Robyn Swirling and Jamie McGonnigal.

269.    Plaintiff feared they were planning another attack, and didn't want anything to do with either of them. Plaintiff made a complaint, via email, to Eric Thut asking to meet. Plaintiff asked Eric to ask Jamie and Robyn to not interfere with the OSDI session or Plaintiff's participation at the conference. If either of them were planning to participate in a constructive manner, they were welcome to attend.

270.    On 8/11/2017 at 9:30am, Plaintiff met with Netroots Nation Staff Eric Thut and Mary Rickles, who refused Plaintiff's request stating "It's a little difficult to ask people to stay away from each other. You know, that's not the business we want to get into. As the official people in some ways we're taking a side of something, that we were not part of. What if I sat in on the caucus and just make sure it went well."

271.    After the OSDI on 8/11/2017 session, while alone with Plaintiff, Eric Thut instructed Plaintiff was prohibited from attending 3 sessions specified only by time and location, and if Plaintiff disobeyed this, his credentials would be revoked. During Cohen v. Swirling, the Defendant's motion to dismiss correctly stated that the leaders of Netroots Nation 2017 prohibited Plaintiff from attending 3 unspecified sessions. Had they removed him from the conference, Netroots Nation would have been a co-defendant in Cohen v. Swirl-

ing.

272.  Plaintiff informed Eric That that his refusal to prevent aggression from Swirling and McGonnigal, his prohibitions, behavior in the OSDI session combined with their use of the ex-military soldier made the situation harmful enough to warrant legal action. Thut responded by saying "Don't sue us, sue her" (Swirling). At this point, Defendants knew they had succeeded in provoking Cohen v. Swirling.

273.  Defendants paralyzed the DNC and PDI conversations until the provoked complaint was served, prepared for their Abuse of Litigation Privilege. Via an email thread that began on 8/27/2017, DNC staffers Liz Jaff, Sally Marx strung Plaintiff along without making progress on the DNC conversation through 10/4/2017. D329



*Paralysis*

## IV.D.1.l    Abuse of Process - False Flag

274.  New/Mode joined OSDI in June 2017 and implemented a client side OSDI implementation to integrate with Action Network's platform implementation. On 10/17/2017, New/Mode communicated its intent to create a platform implementation. Woodhull interjected "I recently spent a week on a remote Canadian island with Steve Anderson, new/mode's CEO... we actually talked for a long time about profit & purpose" D592. New/Mode did not continue to participate in OSDI. Plaintiff would later discover that their implementation was released after the end of the operate conspiracy, and it used embrace, extend, extinguish tactics.

275.  On 10/23/17 MoveOn joined OSDI.

276.  The only discoverable root cause for this was the false accusations made by Swirling at Rootscamp 2016. Plaintiff filed the complaint on November 11th, 2017.

277.  In Q4 2017, Plaintiff liquidated IRA savings account so the funds would be available to fund his time and labor during the struggle save OSDI.

278.  In December 2017, after the complaint was provoked and filed, Alison Schary who would serve as Defense Counsel for Robyn Swirling appeared Pro Hac Vice in Gubarev v Buzzfeed, a matter related to the "Trump Dossier" authored by British Intelligence agent Christopher Steele and published by Buzzfeed.

## IV.D.1.m  Defendants Wanted Legal Action as a Pretext to Gain Control of OSDI

279.     On December 27, 2017, Plaintiff's counsel sent letters D52 D53 to Netroots Nation and Rootscamp requesting dialog to de-escalate the conflict, or in the alternative, litigation hold, which stated:

> our hope was that continuing harm to our client could have been stopped through dialog... Should you have similar concerns, we invite you to meet and confer with us about alternative resolutions and compliance

280.     Plaintiff waited for a response, which never came. Defendants made a decision not to de-escalate the conflict, and to ensure legal action continued.

281.     On 1/25/2018, Swirling was served. On January 31, 2018, Defendants unparalyzed the PDI and DNC conversations.

282.     At 7:28am on 2/01/2018, Plaintiff received email from Raffi Krikorian, DNC CTO stating "the tech team is about to launch a marketplace of progressive technology that campaigns and state parties should know about. effectively democratizing access to this data. ... id like to chat about the role of OSDI and how we can highlight applications that comply in the market. i still believe strongly in interoperability, so i want to use this as a venue to continue to nudge the ecosystem... i wanted to revisit whats the best ways that i, and the DNC, can be involved in OSDI."

283.     At 7:43pm on 2/01/2018, Plaintiff received email from Joe McLaughlin regarding PDI, stating "I'm meeting Gary Brown, the CEO of Political Data Inc AKA PDI a week from Saturday for breakfast re some Dem and Working Families stuff. Met him at Netroots Nation too and have been trying to get together since. Don't know where we ever got with PDI joining OSDI, but seems like now is the time."

284.     On 2/12/18, Defense counsel Schary filed a motion to dismiss. In parallel, Swirling posted a tweetstorm which abused litigation privilege, misrepresenting the two policy arguments in 2016, which was an evolution of the original extortion threat on 9/16/2016, with the additional false claim that Plaintiff was harassing her "for a year and a half".

285.     On or before 2/18/2018, the Twitter account for ClinicEscort, an organization Swirling participates in, stated "My friend, and all-around good human, has been harassed for a year and a half by a man who has just doubled down by suing her (suing HER!)" at 11:51am, and retweeted at 5pm.

286.     As a result of the abuse of litigation privilege, members began resigning from OSDI. An example from Chuck Hagenbuch who repeated the harmful fraud via email "I do not want to support or be affiliated with an organization run by or attached to Josh Cohen's name or his harassment." and Tweeted "I have no wish to be associated with the conduct of the chair" on 2/12, which Swirling retweeted.

287.     Having used Swirling as a proxy and provoked the false flag, Woodhull, Rosenbaum, Duveen and co-Defendants created a pretext for themselves to coerce, manipulate and defraud Plaintiff without appearing as homophobic or the aggressors.

288.     At 7:30pm, Plaintiff received email from Adriel Hampton, an OSDI member, stating "There is an organized campaign to get OSDI affiliates to repudiate you - a former colleague contacted me asking me to call for your ouster as chair."

289. Plaintiff later followed up with Adriel Hampton via phone, asking him to elaborate on the the threat Plaintiff memorialized Adriel's description in email and asked him to confirm it, which he did.

290. ✉ Email Subject ⏱ 10/19/18 ⏱ 2018-10-19 10:00am "could you document" [D4] 👤 Josh Cohen

291. ✉ 👤 Josh Cohen ⏱ 10:00a [D4]

> could you commit to email a description of the bullying behavior you experienced? Here's what I recall, could you edit/clarify/confirm?
> A female friend X of Robyn's contacted this OSDI member by phone. X told the member that they needed to either kick Josh out of OSDI or resign from OSDI themselves. X also said that if this member didn't go along, "it would not be forgotten", which was received by the member to be a threat of retaliation.
> When this member told X that Josh's actions were to confront discriminatory behavior, and that he is also a victim of sexual misconduct seeking to avoid retaliation, X replied that they didn't care.

292. ✉ 👤 Adriel Hampton ⏱ 11:37a [D4]

> That's accurate, except it was Facebook Messenger, not phone.

293. To Plaintiff, this appears to be a threat to reduce Plaintiff's finances to zero.

294. ✉ Email Subject ⏱ 02/12/18 ⏱ 2018-02-12 9:30pm "Invoice from Netroots Nation" [D983] 👤 Netroots Nation

295. ✉ 👤 Eric Thut, Netroots Nation ⏱ 9:30p [D983]

> Your invoice is attached. Please remit payment at your earliest convenience.
> Netroots Invoice Balance Due $0.00

296. ✉ 👤 E. Thut ⏱ 2018-02-13 1:50pm [D983]

> Please ignore this invoice that was sent out. We had a ghost in the machine that decided to send invoices out to everyone who received one last year. I apologize for any inconvenience or confusion that this has caused.

297. On 2/13/2018, via email, Action Network changed its representation from Rosenbaum to Martha Grant, a woman. D255

298. In february 2018, Woodhull is 4 years overdue from the December 2013 when he expected to secure venture capital for a universal adapter using OSDI. On 2/14/2018, via email D41, Woodhull begins to manipulate Plaintiff with the following exchange. He falsely portrays himself as being helpful.

299. ✉ 👤 Nathan Woodhull ⏱ 2018-02-14 12:31pm [D41]

> Josh, It seems, as an outsider, wholly unaware of the particulars, that my advice would be to try and find a way through mediation or human connection to resolve this issue whatever it might be outside of the courts. It seems like that would be the best option for you, Robyn, the issues you cared about raising, and OSDI.

300. ✉ 👤 N. Woodhull ⏱ 12:31p [D41]

> I get that whatever happened must have felt incredibly hurtful and personally damaging to take the steps you have but surely there are more constructive ways to resolve things?

301. ✉ 👤 N. Woodhull ⏱ 12:31p [D41]

> I know you both to be very passionate people who care a great deal about many of the same things -- but to me -- again not being aware of any of the exact particulars -- escalating to a lawsuit versus all of the other mechanisms available for dispute resolution...

302.    Woodhull falsely portraying the situation as if Plaintiff had a romantic or person conflict with Swirling, when it was a policy argument he was lured into. He is implying that Plaintiff didn't make reasonable efforts to de-escalate the conflict, however Plaintiff made repeated concessions and retained counsel to negotiate with Wellstone after the ambush at RootsCamp 2016. When Woohull states "It seems like [alternate approaches] that would be the best option for you, Robyn, the issues you cared about raising, and OSDI", he is drawing the connection between the conflict and OSDI and setting up Skyler Duveen/MoveOn who would propose the alternative which involve surrendering the project.

303.    ✉ 👤 Josh Cohen 🕐 1:15p [D41]

> Does it strike you an accident that someone of her caliber that in her comprehensive attacks she completely airbrushed out my identity as a gay male and antidiscrimination activist?

304.    ✉ 👤 N. Woodhull 🕐 2018-02-25 1:41pm [D41]

> Of course she's not being fair, you're suing her. You've decided to escalate a conflict with a professional activist who is better at comms than you are.

305.    When Plaintiff pointed out the harm from deception (concealing Plaintiff's sexual orientation), Woodhull is aware of the harm and implies that Plaintiff deserved to be harmed. Woodhull was not helping Plaintiff.

306.    On 2/19/2018, Woodhull sent email to OSDI resigning, stating "I would like to resign my Governance role as part of OSDI and all other official participation by myself and ControlShift." injuring the project. D562

307.    On 2/20/2018 at 9:30am, Martha Grant communicated Action Network's resignation, stating "Action Network will no longer be participating in OSDI..." D1436

308.    The next email on the thread, at 12:24pm, came from Jeff Mann/AFL-CIO stating "Please remove AFL-CIO as well." This was followed by Beth Becker at 12:28pm stating "Me as well please." D1436

309.    A few minutes later, Plaintiff sat down to lunch with Skyler Duveen/MoveOn.org who attempted to convince Plaintiff to resign and make a blanket apology to the allegations in the tweetstorm. The timing of this relative to the resignations and the damage being done by the abuse of litigation privilege combined to have the effect of coercion. Plaintiff refused to resign or make a false confession. Instead Plaintiff recused himself.

310.    On 2/20/2018, Plaintiff sent email to OSDI members stating "Our organization operates by parliamentary procedure in the form of Roberts Rules of Order... Therefore, effective immediately, I'm exercising the right of the Chair to delegate that authority to the Sonya Reynolds, Vice Chair as Chair Pro Tem." D309

311.    The following diagram depicts the coercion:

*eec0_Grico_gainPcoerce_resigns_simple*

312.  On 2/21/2018, Skyler Duveen/MoveOn opened an issue on OSDI's GitHub repository proposing the adoption of an open source Copyright License, and via email 2/22 D537 citing the lack of one as an obstacle to MoveOn's participation "We can't responsibly participate in open source projects without licenses". Plaintiff refused and instead proposed a license based on the W3C Document license.

313.  On 2/21/2018 Cohen v. Swirling is referred to magistrate judge for settlement conference.

314.  On 2/25/2018, Duveen/MoveOn via email, repeated the demands from lunch on 2/12 including "Stay recused from the OSDI chair position and make sure you are not a controlling entity of that body in any way... Write a confessional blog post about why you are dropping the lawsuit... It should not be defensive. At most, it can have a one-sentence 'I was scared for my career and my community, but that is no excuse'" and to admit that Plaintiff was "wrong to file the lawsuit." D1048

315.  Duveen/MoveOn is following Woodhull's lead, suggesting that the way out of the conflict is for Plaintiff to surrender leadership of OSDI, make a false blanket confession to the distortions in the tweetstorm, which would be fatal for his career, and admit that filing Cohen v. Swirling was wrong. Plaintif was right to file Cohen v. Swirling, Defendants were engaged in defamation which was unjustly harming Plaintiff, and delibrately provoked it to create a pretext to gain control of OSDI.

316.  On 2/28/2018, Plaintiff met with Sonya Reynolds via telephone, where she stated that Brian Young had offered to recruit Woodhull/ControlShift back into OSDI T48.

317.  On 4/4/2018, On its website, Higher Ground Labs announced its second cohort of funded companies which included New/Mode. D1638

318.  On 4/19/2018, during the OSDI committee meeting, the copyright license was approved. This was MoveOn's last participation in OSDI.

319.  On 4/27/2018, after the Order of Discontinuance for Cohen v. Swirling, Plaintiff attended a meeting requested by Brian Young with the topic "Call to discuss VAN" D6. When Plaintiff dialed in, Young attempted to coerce Plaintiff to resign. Plaintiff insisted that Action Network honor the commitments it made when it joined the project and induced Plaintiff's labor.

320.  On 4/20/2018, on Medium, DNC's Sally Marx announced "a marketplace filled with tech

tools", without inclusion of OSDI compliance D824.

321.  On 5/30/2018, Plaintiff met with Rosenbaum via telephone T23. Rosenbaum attempted to coerce Plaintiff

322.  🔊 Audio  ⏱ 05/30/18 ⏰ 2018-05-30 11:11pm "Telephone Call Jason Rosenbaum, Josh Cohen" [T23] 🎤 My Recording; 👤 Jason; 👤 Josh

323.  🔊 👤 Josh ⏰ +11:00 [T23]

> To the extent I am guilty of anything it is unruly and disobedient behavior on a group in September 2016, and mostly silent protest for about a minute in a conference session (November 2016) I just two things completely within the norms of the community.

324.  🔊 👤 Jason ⏰ +11:00 [T23]

> I agree... It's not about the merits.

325.  🔊 👤 Josh ⏰ +11:00 [T23]

> Harassing her over a period of time, No.

326.  🔊 👤 Jason ⏰ +11:00 [T23]

> Again, it's not about the merits. I agree... I agree... It's not about the merits.

327.  🔊 👤 Josh ⏰ +11:00 [T23]

> Yeah, it is about the merits

328.  🔊 👤 Jason ⏰ +14:40 [T23]

> If you you are a leader of an organization. Your duty to the organization is to put the organization first. And if you can no longer put the organization first in good conscience and leaders of organizations resign, that's what they do.

329.  ==Extortion Property Demand== Using the unjust harm damage already inflicted, Jason attempts to pressure Plaintiff into resigning ostensibly for the good of the organization, but really it is so they can gain dominant control. He is also attempting to put himself in control of Plaintiff's career.

330.  🔊 👤 Jason ⏰ +17:06 [T23]

> I guess the last thing I would say it is just, appeal to you, I don't think you did right by the organization. I think you can still do right by the organization now, which is to step back. I don't think that's forever...

331.  🔊 👤 Jason ⏰ +17:06 [T23]

> I would hope that at this point when you've seen what happened to the organization you clearly care about, you would put it first and take that step back.

332.  🔊 👤 Josh ⏰ +26:30 [T23]

> The community left me to my own devices. The legal system is the way we resolve problems, and I think I used that responsibly.

333.  🔊 👤 Jason ⏰ +26:30 [T23]

> The merits hardly matter here.

334.  🔊 👤 Josh ⏰ +26:30 [T23]

> Yes, the merits do matter!

335.  ==Extortion Damage== Jason admits that he doesn't care about what is true.

336.    🔊 👤 Jason 🕐 +26:30 [T23]

    you are no longer able to be a leader of this progressive movement organization.

337.    🔊 👤 Josh 🕐 +26:30 [T23]

    Membership will need to decide. If they want to remove me, they can certainly do that

338.    🔊 👤 Jason 🕐 +25:59 [T23]

    We're not punishing you. We're trying to remove you from your position because you are no longer able to lead the organization...

339.    Conspiracy  Jason acknowledges that Action Network, MoveOn and the DNC are acting in conspiracy.

340.    🔊 👤 Josh 🕐 +31:00 [T23]

    Brian claimed that Action Network is also speaking on behalf of the DNC, MoveOn, maybe some others.

341.    🔊 👤 Jason 🕐 +31:00 [T23]

    A few organizations have called him to express their positions, so he's relaying that information. That's true. Yeah. We did not call them.

342.    🔊 👤 Jason 🕐 +36:33 [T23]

    MoveOn has adopted. I've seen their internal tools, most of their new stuff is using OSDI. ActBlue has adopted, though they don't engage in the committee.

343.    🔊 👤 Jason 🕐 +41:51 [T23]

    Going forward, you have a reputation in the community and you are unable to do the work of chairman and you know we don't have confidence in your judgment, that's our position. That's what we laid out on on the other week. And that's what we'll lay out in whatever process the committee comes up with.

344.    Plaintiff refused to be coerced to resign, and insisted that if Defendants wanted to remove him, they could make a motion and secure a majority vote, which was completely within their power.

## IV.D.1.n   Personal Democracy Forum 2018 (PDF)

345.    The next day, Plaintiff received email from conference organizers for Personal Democracy Forum 2018, revoking Plaintiff's registration.

346.    ✉ Email Subject 🕐 05/31/18 🕐 2018-05-31 2:25pm "PdF refund" [D145*] 👤 Pdf

347.    ✉ 👤 Andrew Rasiej 🕐 2:25p [D145]

    Dear Mr.Cohen,
    We are in receipt of your registration for the PDF Conference on June 7-8, 2018.
    We are unable to extend you an invitation for this event and we will be promptly refunding your full registration fee/ticket purchase.
    Andrew Rasiej
    Personal Democracy Forum

348.    Plaintiff replied sending the agreement negotiated by Judge Gorenstein, however, they didn't change their position. Plaintiff would later learn from PDF consultant Sherry

Hakimi, that the reason they didn't change their position was because they had been told that Judge Gorenstein issued a *restraining order* against Plaintiff to protect Swirling, who was presenting at PDF.

349. Had PDF asked for documentation on the order, which didn't exist, the fraud would have been exposed. Plaintiff contacted Andrew Rasiej via email to ask what, if any, documentation was asked for or provided. He responded "I can not respond without the advice of our counsel."

350. During his diligence, Plaintiff reviewed the conference agenda. Had he attended, he would have attended the following sessions. "Reverse Engineering the Tech Platforms to Win Campaigns for Change" moderated by MoveOn CTO Ann Lewis, which was part of the new origin story Defendants were creating. Presenters of "Product Demos and a Reverse Ragtag Pitch" included Sonya Reynolds and Brady Kriss. Defendants were using Swirling as a shield to prevent Plaintiff from attending PDF and discovering their actions.

## IV.D.1.o  Netroots Nation 2018

351. On 7/25/2018, an OSDI Diversity meeting was held to resolve the conflict. Defendants' proxies again attempted to coerce Plaintiff to resign. Plaintiff stood firm that if they wanted to remove Plaintiff they needed to do it democratically.

352. On 7/25/2018, Plaintiff sent email to MoveOn's CTO, Ann Lewis, skeptical about Action Network's assertion that MoveOn had asked Action Network to take the actions it did, and thus was in conspiracy. Plaintiff received no response from MoveOn.

353. On 7/29/2018, Netroots Nation revoked Plaintiff's registration.

## IV.D.1.p  Conspiracy to Operate OSDI

354. On 8/15/2018 Defendants' proxies portrayed themselves as working in support of OSDI's goals to get elected to leadership positions. Sonya Reynolds became Chair, Tim Holohan/Broadstripes became Vice Chair, Brady Kriss/RagTag became VP of Membership, Plaintiff became Chair Emeritus. They served in those positions until they resigned on January 31, 2019. During this time Kriss used her position to download OSDI's membership lists and proposed IP sublicensing clauses.

355.

| | | | | | | Conspiracy to | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 '17 | Q2 '17 | Q3 '17 | Q4 '17 | Q1 '18 | Q2 '18 | Q3 '18 | Q4 '18 | Q1 '19 | Q2 '19 | Q3 '19 | Q4 '19 |

356. At Rootscamp 2018, Plaintiff passed Woodhull in the hallway. Woodhull didn't speak, but stared at Plaintiff with a look of hatred and walked off.

357. On 2/01/2019, Plaintiff met with Tim Holahan/Broadstripes via telephone. Holahan told Plaintiff "you are now at a parting of the ways with people who are more important

than me, people less willing to talk to you about it." Plaintiff was at a parting of ways after he refused to agree to proposal that would facilitate the outcomes Defendants achieved. Plaintiff does not know who Holahan was referring to or how powerful they are.

### IV.D.1.q   End of Operate Phase

358.    01/17/19 VC Acronym acquires Niemira's GroundGame, and announces "a system that automatically syncs data between a volunteer management platform & SMS tool, and then moves the data to where it needs to go when it needs to go there, saving campaign organizers hours of manual data entry & reducing risk of mistakes." This would later become Lightrail. With the end of the operate phase of Defendants racketeering, Defendants felt secure enough to use venture capital to fund a "unversal adapter'

359.    02/27/19 New/Mode publishes its API which cites OSDI compliance. D711 stating "The New/Mode API is a fully RESTful API that allows developers to query Organization, Campaign, Tool and Service data, and to perform target lookups and actions against your tools.The API is OSDI compliant and all responses are available in HAL/JSON or JSON formats." However, when their API specification is examined, it obscures what parts are OSDI and what are New/Mode's proprietary API, which is embrace, extend, extinguish tactics.

### IV.D.1.r   Plaintiff focuses on Spoke

360.    Plaintiff then focused his attention on the MoveOn Spoke project and the OSDI related work items MoveOn added on 2/12/2018. He contributed code for an OSDI connector that allowed Spoke to interoperate with NGPVAN, Action Network, CiviCRM and any other platform that exposed an OSDI endpoint starting on 7/1/2019 D386.

### IV.D.1.s   Netroots Nation 2019

361.    Had Plaintiff attended Netroots Nation 2019, he would have attended these sessions, scrutinized them and discovered ActionBuilder, the new origin story, and Lightrail. He would have realized that Defendants were using the proceeds of their racketeering to enrich themselves.

362.    Friday, Jul. 12 4:30 PM "Tech for the Movement, Not the Billionaires" Panelists: Brian YoungFounder Action Network, Ann Lewis CTO MoveOn, Josh Nussbaum Founder The Movement Cooperative D493. The description states:

> Recently, a new generation of technology has been built using different, innovative models that put our movement first and sustainably fund themselves (and their organizations). Come hear from people building the technology backbone of our movement, using innovative new approaches to create tools that are built to amplify your work, not "disrupt" vulnerable industries for financial gain

363.    Friday, Jul. 12 4:30 PM "Don't put Digital in the Corner: Why every department should be using digital tools and tactics" panelist Gerard Niemira D1648. The next week, 7/22/2019, Niemira tweets "Last Week We Launched Lightrail And Shadow Messaging Learn More About Why We Built A Universal Adapter For Political Data And Technology" D1651.

364.    Thursday, Jul. 11 11:15 AM "This is how we win: a first look at Action Builder" D1759

365.    6/24/2019 Netroots Nation revokes Plaintiff's registration. D102 Plaintiff already had meetings arranged with colleagues, the event was in Philadelphia, and Plaintiff wanted to continue his diligence, so he kept his travel plans. He attempted to register in person and have a dialog with Eric Thut about why they were refusing him. Not only did they refuse Plaintiff, when Plaintiff began talking to people he knew in the lobby of the convention center, a public space, staffer Carolyn Duchesne coerced the police to remove Plaintiff from the lobby. Plaintiff has video recordings of this. They were excluding Plaintiff to prevent him from discovering ActionBuilder, Lightrail and other sessions that might have led him to discover facts sooner.

366.    Plaintiff set up a chair and poster on the sidewalk, talking to attendees passing by. At the time, the only thing he understood was they were portraying themselves as supporting women to conceal abuse of a gay male. While doing this, Defendants used Woodhull's subordinate Mikey Franklin to attack Plaintiff by repeating "You're Josh Cohen, you sexually harass women!" in front of an audience of attendees for at least 5 minutes.



*Attack at Netroots Nation 2019*

367.    In September, Franklin began employment at New/Mode, an opportunity for Woodhull to return the favor for Franklin terrorizing Plaintiff.

368.    According to Higher Ground Labs's website, on or before September 2019, Netroots Nation's board chair Cheryl Contee joined Higher Ground Labs' advisory board. This gives Netroots Nation influence into Higher Ground Labs's funding decisions, so it can steer money and favor allies that help Netroots Nation achieve it's own political goals. This was an opportunity for Higher Ground Labs to return the favor for Netroots Nation's assistance in the conspiracy.

### IV.D.1.t    MoveOn Continues Active Misleading

369.    On 7/16/2019, Duveen comments on the OSDI connector "This PR creates a fantastic external API that will help other programs interface with Spoke -- it's breadth is excellent, but also means we'll have to be very careful about the additional security surface it ex-

poses."

370.    On November 11th, 2019, Skyler Duveen/MoveOn updated Spoke's code of conduct, adding to the list of prohibited behavior, use of litigation or threats of litigation. On November 14th, 2019, Plaintiff published a blog post on the OSDI website announcing the Spoke OSDI connector which could interoperate with NGPVAN, Action Network, and CiviCRM

371.    On December 12, 2019, Plaintiff attempted to comment on an issue in the Spoke repository, but found that MoveOn had blocked him from the repository. A the following NYC Hack Night, Plaintiff asked Skyler Duveen why this was the case. Skyler indicated that Plaintiff had violated the code of conduct prohibiting the use of litigation.

## IV.D.2   Break Contact

372.    The coercion ended when Defendants broke contact at in Q1 2020. At the time, Plaintiff didn't understand what happened, or what Defendants goal was. The only thing Plaintiff understood was the use of Disparate Impact, but not what their goal was.

373.    On 3/11/2020, On its blog, Action Network announces the creation of vertical agreement with DNC and adds DNC as a development partner.

## IV.D.3   Civil Rights Complaint

374.    Plaintiff began the intake process to file a civil rights complaint against Netroots Nation 2019 with the Philadelphia Human Rights Commission on May 5, 2020. At that point, Plaintiff still did not understand what Defendants' goal was. The only thing he knew was that Defendants were aligning themselves with women to conceal their abuse of a gay male. This is an example of practices which result in Disparate Impact between protected classes.

375.    In response to the complaint, Eric Thut, Executive Director of Netroots Nation stated: "Cohen was denied access because of a pattern of behavior dating back to 2017 at our conference, where he harassed other members of our community and violated our community standards. His credentials were revoked in 2017 because of his conduct, denied in 2018, and denied again in 2019."

## IV.D.4   Netroots Nation 2020

376.    Plaintiff registered for remote attendance on 8/13/2020 and his order was refunded 19 minutes later. D256 D257 "Order REFUNDED for Netroots Nation 2020 (At Home)"

377.    Had Plaintiff been able to attend Netroots Nation 2020, he would have attended and scrutinized the following sessions.

378.    Action Squared's new origin story for its OSDI related gains is "Cooperative Development" whose roadmap is controlled by its "keystone" partners, now referred to as Product Development Committee (PDC). The session "How non-profit cooperative tech can help us win up and down the ballot" D502 on 8/13/20 is on this topic. Its description states

> While the progressive tech ecosystem has traditionally been dominated by a for-profit, vendor-based model of tech development, an alternative model has emerged that holds enormous potential to close the knowledge and resource gap for down-ballot campaigns in 2020. By embracing a nonprofit, cooperative model of tech development, Action Network, the DNC, ActBlue and others are working to de-liver the tools necessary for local and state-level campaigns to run robust email fund-raising campaigns to elect progressives up and down the ballot.

379.    Plaintiff would have attended session 8/15/20 "Action Builder NN20 Training" D2005, become aware of ActionBuilder and inquired about its API plans.

## IV.D.5    Plaintiff begins Dilligence

380.    On 5/6/2020 On GitHub, ControlShift (Woodhull's company) published their "Ruby client for interacting with the ActionNetwork REST API", which is an OSDI implementation dis-guised as Action Network's proprietary API.

381.    On 4/27/2020, On GitHub, Skyler Duveen closed the "OSDI action handler and server for import and people, questions, answers, messages" that Plaintiff created, essentially throwing away the work. Duveen's comment stated "contact-loaders sadly make this PR obsolete." Contact loaders are connectors for proprietary APIs.

382.    Between July and September 2020, Jeff Mann/AFL-CIO made a series of commits to MoveOn Spoke, to the Action Network API contact loader. This furthers the conspiracy because it erases the standardized connector, which lowered integration costs and creates a new connector for the Action Network API, which is really OSDI. As a result, developers who might have sought to build reusable OSDI skills don't realize they are us-ing OSDI, and are locked into Action Network's proprietary fork.

383.    07/14/20 Vox News reports "The Democratic Party's most hated startup cant change what happened in Iowa. But it can change its name". Shadow/Lightrail is divested from Acronym and renamed Bluelink. Niemira leaves Bluelink and is replaced by Irene Toll-inger. D1202

> What was once called Shadow Inc. is now called BlueLink, a recent restructuring that was almost certainly necessary after Shadow became embroiled in controversy for creating the flawed and hastily built app that sowed confusion and significantly de-layed the reporting of the results of Iowa's Democratic caucuses.
> "If there's ever a time for a rebrand," then-CEO, Gerard Niemira, told Recode in May, "this is it." Niemira and the company's majority investor, a constellation of pro-gressive political groups called Acronym, became some of the most despised forces in Democratic politics after the app's technical difficulties in February delayed results for a week and robbed the caucus winners of their momentum.
> just a few months later, on BlueLink's newly designed website, it is Tollinger listed as CEO — with Niemiera not listed anywhere on its "Team" page.

384.    On or before 11/23/2020, on its Medium blog, Action Network introduced its Integration Partnerships program. "Integrating your platform with Action Network is now easier than ever" D449 For the first time Plaintiff was aware of, Action Squared treats OSDI as its own property. The program announcement, which is the property element of extortion is at-tributed to a woman, Amy Chin-Lai.

385.    12/03/20 Chris Goddard, Data engineering and reporting director at the DCCC emails Plaintiff stating:

> My name is Chris Goddard and I'm currently the data engineering and reporting di-
> rector at the DCCC.
> I was talking to a friend yesterday about difficulties and challenges in the progressive
> tech space and the lack of consistent data standards. He mentioned OSDI, which I
> hadn't heard of before.
> Although it looks like it's not really a super active project anymore I would really love
> the opportunity to talk to you about your experience in creating it.

386.    Plaintiff replied on January 7th, but got no response, however 4 days later, on 1/11/21 A
        new issue is opened on OSDI's GitHub repository by user "hifalutin", whose profile picture
        is a literal sock puppet. Hifalutin states, "Hello, I'm currently working on an extension to
        CiviCRM which will allow for syncing with remote OSDI services." Rosenbaum responds
        "Hi there, this project is somewhat defunct, and there is no demo server to test against.
        That said, there's already a lot of Civi work that's been done that you probably should
        start with: civicrm.org/extensions/civicrm-osdi-contact-sync".

387.    On 2/15/2021, Joe McLaughlin replies to the GitHub thread "Unless and until you make
        a clean break from the OSDI project and the organization, such as it exists now, and I'm
        not sure that it does exist, I have little reason to believe that any additional organiza-
        tions will implement any of the OSDI spec."

388.    January 2021 According to LinkedIn, Gerard Niemira begins employment at PDI serving
        as Chief Product Officer D1377. When Plaintiff discovered Niemira's employment at PDI,
        he assumed that PDI would implement OSDI in its national product, since Niemira was
        aware of OSDI. BlueVote would have immediately gained an application ecosystem as
        large as Action Squared and HGL portfolio companies Bluelink, Mobilize and
        New/Mode, or it might acquire Bluelink to achieve the same goal. However, it didn't do
        either. The opportunity existed for Niemira to act contrary to his then employer PDI's in-
        terests, in order to help his future employer HGL who would provide funding for Civitech
        to acquire Bluelink. The opportunity also existed for PDI to knowingly act contrary to its
        own interests and agree to a conspiracy to geographically divide the market where it
        would keep California and Defendants would keep the rest of the US market.

389.    06/21/21 Higher Ground Labs announces their 2021 cohort including Bluelink. D1335

390.    On 6/22/2021, Action Network's blog reports that Action Network and Action Builder are
        merged into a single product, completing the platform disintermediation play.

391.    08/12/21 Bluelink's API specification becomes discoverable to Plaintiff. D1252

392.    On 08/12/21 Higher Ground Labs posted blog post by Acacia Gabriel interviewing Irene
        and Preston Tollinger. Irene is asked "Tell us more about why you started your company
        and its mission". Her answer includes "I did user research and talked to a broad range of
        people in the political world. They kept mentioning data integration. It was an issue for
        organizers who downloaded, munged, and uploaded text files.". Higher Ground Labs
        lists Bluelink's founders as Irene and Preston Tollinger. This is wire fraud since it misrepre-
        sents Lightrail, exploits the essential IP in the OSDI specification to use its application
        ecosystem to get a head start.

393.    01/12/22 Reported by Axios, Civitech raises $10 million in funding from Higher Ground
        Labs D1961. On or before 06/17/22 Civitech acquires Bluelink D1562. This completes the
        OSDI Shell Game.



*OSDI Shell Game*

394.    On or before 2/23/2022, Action Builder launches its API, which is also OSDI based, used as a proprietary walled garden, once again attributed to a woman.

395.    June 2022 According to Linkedin, Gerard Niemira leaves PDI and joins Higher Ground Labs as "Managing Director, Fund IV" D1377.

396.    08/16/22 2:15pm Nathan Woodhull posted on Twitter that he was "Launching something new! Daisychain is an organizing platform that integrates the political tech stack". Woodhull founded DaisyChain with Jon Warnow. D1907 Swirling tweets in response that she is look-ing forward to what emerges, then deletes the tweet.

397.    07/06/23 As Higher Ground Labs Managing Director Gerard Niemira announces its 2023 co-hort including DaisyChain D1949. This creates the opportunity for Niemira to return the favor to Woodhull.

398.    On 12/5/2024, 2 days after Plaintiff's letter to the court on 12/3 MoveOn announced that it had joined Action Squared's Development Committee (PDC) formerly referred to as "keystone partners". It states "By joining the PDC, we are joining a small group of Ac-tion Network users collaborating on the product roadmap" gaining a share of control over an economy of scale which is the application ecosystem.

## IV.E    Data War

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2( |
|------|------|------|------|------|------|------|------|----|

*Data War Timelne*

399.    Defendants sidelined Plaintiff while a data war erupted after the 2016 election. The seeds of the struggle occurred during the 2016 election. These included the Data Breach in 4Q2015 where the DNC locked the Bernie Sanders campaign out of NGPVAN, depriving the campaign of essential resources for candidates running for election, as well as the DNC's alleged favoritism of Hillary Clinton at Bernie Sanders ex-pense, general anger at Trump's election, and the arrival of Billionaires Reid Hoffman, Lauren Powell Jobs, Eric Schmidt and the formation of VCs including Higher Ground Labs and Acronym.

400.    This led to a fierce power struggle over economies of scale.

### IV.E.1    Application Ecosystems

401.    As the largest REST based API ecosystem, which was protect only by a gay male's property, contract and civil rights, it was an valuable but weakly defended economy of scale.

402.    While Defendants were actively misleading Plaintiff with false hope, they were pillaging its resources, using his retirement savings for their own benefit, passing off the work as their own to enrich themselves by securing venture capital, and investing the proceeds into their own enterprises.

403.    Defendants were also "locking out" PDI, preventing them from competing at the level of the market.

### IV.E.2    Voter File Data Warehouses

404.    In late 2018, Reid Hoffman funded a new Voter File project with $35 million which would be known as "Alloy". The DNC would describe it as an "Existential Threat", creating it's counter proposal "Democratic Data Exchange" aka DDX. The DNC went so far as to threaten to lock state parties out of NGPVAN if they supported Alloy instead of DDX.

405.    DDX would prevail with Howard Dean as Chair in early 2019, which was canonized at Netroots Nation 2019.

### IV.E.3    Disinformation Networks

406.    In response to the disinformation tactics used by the Russian GRU, Dimitri Mehlhorn authored a report and proposal to replicate them. He later used Reid Hoffman's money to fund experiments, which originated at Netroots Nation 2017, starting with a fake "Dry Alabama" campaign to influence the 2017 special election in Alabama, which was run by Beth Becker.

407.    Those experiments grew into a coordinated network of nodes portraying themselves as local news sites, which operate in a coordinated manner to fabricate organic behavior and manipulate search results.

## IV.F    Copyright

408.    Plaintiff's copyright claims are based on his authorship contributions, which are the majority of the authorship of the OSDI specification. He registered his copyrights as a literary work. The registrations Txu 2-249-951 and TX0009315996 are for the underlying work, the original version of the OSDI specification in 2013, which was sole authorship, and Plaintiff's subsequent contributions to the derivative work. In Plaintiff's discussions with the Copyright Office via email on 10/23/2023, the office referred to this type of work as "declaring code API as a claim in text"

409.    Google LLC v. Oracle Am., Inc., 593 U.S. 1, 17 (2021) states on page 15 "we believe we should not answer more than is necessary to resolve the parties' dispute. We shall assume, but purely for argument's sake, that the entire Sun Java API falls within the definition of that which can be copyrighted."

410.  Defendants' behavior is similar to Sun Microsystems, Inc. v. Microsoft Corp., 87 F. Supp. 2d 992 (N.D. Cal. 2000), where Microsoft copied the Java APIs and added their own proprietary extensions which break compatibility with the Java standard and due to Microsoft scale and market-share, locked developers into the Windows platform.

411.  The first act by Action Network that led Plaintiff to suspect that there might be an ownership dispute was the announcement of Action Network's Partner Integration Program on 11/23/2020. Plaintiff filed his original complaint on 11/23/2023.

412.  On 1/19/2022, Action Network's Jeff Dugas, published a blog post regarding ActBlue integration, which is an implementation of OSDI's fundraising profile. Dugas states: "We developed the ActBlue sync with our Development Partners at the DNC". Action Network is portraying the work as the work product of itself and its Development Partners. It is also an indication that Action Squared's Product Development Committee (PDC) formerly referred to as "keystone" partners, are evolving the OSDI specification, creating an unauthorized derivative work using Plaintiff's contributions.

# V  VIOLATIONS

## V.A    Action Squared's Infringement

413.  Action Squared infringed on Plaintiff copyrights in the following ways

1.  The Action Network API webpage copies content from the OSDI specification in a way that exceeds the copyright license by creating an unauthorized derivative work and using it as their proprietary API specification. This infringes on Plaintiff's copyrights Txu 2-249-951 and TX0009315996.

2.  Action Network's OSDI implementation was based on source code provided by Plaintiff specifically for the use of an OSDI implementation. TXu 2-386-143.

3.  The Action Builder API webpage copies content from the OSDI specification in a way that exceeds the copyright license by creating an unauthorized derivative work and using it as their proprietary API specification. This infringes on Plaintiff's copyrights Txu 2-249-951 and TX0009315996.

414.  Action Network's use of the OSDI IP can be found at: * https://web.archive.org/web/20201216013651/https://actionnetwork.org/docs/v2/ * https://web.archive.org/web/20201216022013/https://actionnetwork.org/docs/v2/person_signup_helper

415.  In Summer 2022, ActionBuilder released their API, which is published at:

416.  https://web.archive.org/web/20220914003524/https://www.actionbuilder.org/docs/v1/person_signup_helper.html

417.  https://web.archive.org/web/20220914003447/https://www.actionbuilder.org/docs/v1/index.html

418.  After the conversation on Github which ended in February 2021, Plaintiff began to

examine Action Network's use of content of the OSDI specification.

419. According to Action Network's API documentation, in the section "VERSIONS AND WHAT'S NEW" [10]

420. On August 24, 2020:

> Added the ability to POST and PUT phone number and phone subscription status.

421. On its webpage for People[11], the definition of phone subscription status states:

> Denotes the subscription status of this phone number. One of ["subscribed", "unsubscribed", "bouncing", or "previous bounce"].

422. This is an incompatible change and an example of a prohibited derivative work.

423. On July 21, 2022, it added "remove_tags" to the helper action functions. The description states:

> Added the ability to remove tags on person signup helper, record attendance helper, record outreach helper, record signature helper, and record submission helper.

424. This is an incompatible change and an example of a prohibited derivative work.

425. On 2/23/2022, Action Squared launched the ActionBuilder API via a blog post on Medium FAC ¶ 1059. The Action Builder web page for People[12] includes the same phone number status field, which is a prohibited derivative work.

426. The copyright license for the IP is posted here:

427. https://github.com/opensupporter/osdi-docs/blob/gh-pages/license.md

428. Both exceed the Copyright License. They are used for commercial purposes, allowing these products to leverage the economy of scale created by the OSDI project, the bulk of which are Plaintiff's contributions.

429. These infringe on Plaintiff's copyright registrations: Txu 2-249-951 and TX0009315996.

430. Action Network's original implementation was based on source code provided by Plaintiff which is copyrighted, registration TXu 2-386-143. Discovery will reveal if that code is still in use.

431. See Exhibits 1,2,3,4.

## V.B     Bluelink's Infringement

### V.B.1     Bluelink's Copying and Wire Fraud

432. Bluelink's API specification was originally published on GitHub pages[13] in summer 2021, however it has been removed. The Internet Web Archive version as of 5/28/2023 is posted here:

---

[10] https://actionnetwork.org/docs

[11] https://web.archive.org/web/20200909160050/https://actionnetwork.org/docs/v2/people

[12] http://web.archive.org/web/20220914003506/https://www.actionbuilder.org/docs/v1/people.html

[13] https://en.wikipedia.org/wiki/GitHub#GitHub_Pages

433.    https://web.archive.org/web/20230528101658/https://bluelinkdata.github.io/docs/Bluel
inkApiGuide

434.    Like Action Squared, Bluelink's API specification is an incompatible fork, or derivative
work, of the OSDI specification. It describes OSDI Person Signup Helper. It copies the
definition of OSDI person and the textual descriptions of the fields.

435.    It also engages in wire fraud to obscure this, while the incompatible changes lock-in
developers to Bluelink's proprietary API and prevent developers from reusing their OSDI
related skills. Bluelink's description of the "Bluelink Data Models" misrepresents the OSDI
definition.

> Bluelink Data Models
> Bluelink uses flexible and verbose data models. All fields are nullable and may be
> omitted if no data exists, unless explicitly stated otherwise. The structure may seem
> complicated for simple use cases, however it supports more complicated uses such
> as systems supporting multiple emails for a single individual. By default, Bluelink writes
> data to partners in these formats. For partners with existing APIs (e.g., NGPVAN), we
> can easily and correctly convert between their format and ours. Therefore, we
> strongly encourage new partners to use these formats when building new APIs

436.    OSDI Person Signup Helper (PSH) involves an input expression sent to the server, and a
representaiton sent back to the client. The input representation includes a Person ob-
ject, as well as OSDI Helper Action Functions such as "add_list", which can add a person
to a list or "add_tag" to apply a tag.

437.    Bluelink's "Webhook Request Object" describes representations which, on the wire,
match the OSDI Person Signup Helper representations, except OSDI Helper Action Func-
tions, which Bluelink refers to as "activity".

438.    This is wire fraud since it obscures from the developer that they are implementing an
incompatible fork of OSDI Person Signup Helper, preventing them from reusing their
OSDI related skills.

## V.B.2    Bluelink's Copying is Essential to its Business

439.    Bluelink describes itself, and functions as a "universal adapter". Applications that use
Bluelink code connectors that conform to Bluelink's API specification or implement in-
bound APIs conforming to Bluelink's specification.

440.    Therefore it is an essential part of Bluelink's ability to engage in commerce.

441.    Bluelink's Wikipedia page, cites the Wall Street Journal, stating that Lightrail has been
made available to all state parties and national candidates under a trial contract, and
Party insiders have described it as "common in Democratic politics" {D1207: i}

## V.C    RICO Predicate Acts

442.    In summer 2014, Action Network attempted to undermine the project by inciting
conflict, misrepresenting OSDI's progressive keel matrix in front of an audience, which
antagonized NGPVAN, causing them to step back. They then launched their own pro-
prietary API, with DNC encouraging them.

443.    Wire Fraud Action Network: On 8/20/2014, after NGPVAN's announcement, via SMS

chat, Plaintiff states "We want the ecosystem api to be controlled by community/democracy not the party+van" Rosenbaum replies "Though that's a long term project. I'd settle for being one of two for now... Two widely used progressive Apis"

444.  Rosenbaum is encouraging Plaintiff to accept this outcome, with Action Network using OSDI as its API and NGPVAN using its own proprietary API. Rosenbaum is concealing his own part in causing it by inciting a conflict that antagonized NGPVAN. D420 Rosenbaum is also attempting to escape the policy agreements Action Network made when it joined OSDI. If the project became Action Network's proprietary API as Rosenbaum hoped, it would nullify Plaintiff's contract rights. The scheme was unsuccessful because Plaintiff was able to negotiate a compromise that resulted in NGPVAN returning and implementing OSDI.

445.  ~~Wire Fraud~~  Action Network: Between October 2014 and March 2015 on OSDI's GitHub repository, Rosenbaum made 99 commits to the specification, many of which were reformatting, re-indenting, or copying and pasting existing authorship that changed the GitHub blame view to attribute authorship to himself.

446.  At the time, Plaintiff understood the AFL-CIO's relationship with Action Network to be that of a customer, not co-developer. Rosenbaum's rationale was to reformat and prettify the specification in preparation for a Labor Committee, which never materialized. Due to this pretext, and the fact that Git Blame is not the same as copyright authorship, Plaintiff had no reason to suspect that Rosenbaum might be misrepresenting the authorship as his own to AFL-CIO.

447.  ~~Wire Fraud~~  Action Network: Wire Fraud to conceal DMCA 1201 Violations or make the work appear to be his when viewed in GitHub blame mode. Plaintiff is the author of Person Signup Helper Github Commits D1525 D1526. Rosenbaum copies and pastes the authorship in to a new file and labels it "first draft" D1964.

448.  ~~Wire Fraud~~  Action Network: On 3/16/2016, via email, Rosenbaum stated "I had a call with the AFL yesterday, so they're prepped to put on pressure to accept the PR if we need it. Gotta figure out the free work problem though..."

449.  Rosenbaum's portrays the "free work problem" as NGPVAN benefitting from Plaintiff's labor. However, it is Action Network and the AFL-CIO who was benefitting.

450.  Rosenbaum encourages Plaintiff to seek compensation from NGPVAN, which he did seek. NGPVAN's response was negative. Given that Action Network and AFL-CIO were the beneficiaries of Plaintiff's labor, they should have been the ones compensating Plaintiff, instead Rosenbaum induced Plaintiff to take action which worsened the situation.

451.  Defendants' use of Jeff Mann is an example of how they used AFL-CIO's monopsony power to influence NGPVAN's resource allocation to exploit the self-preferencing architecture.

## V.C.1.a   Conspiracy to Commit Extortion Example 1

•  On 3/17/2017, Plaintiff received a Facebook friend request from an ex-military soldier, Josh Seefried, who had been active within the gay rights movement, and who Plaintiff believed was part of the same co-hort as his ex-boyfriend, which Plaintiff emailed Rosenbaum about D157. It

felt like a threat to Plaintiff either from his ex-boyfriend, Bean, or others in the gay rights move-
ment that they wished to do Plaintiff harm.

• Plaintiff then sent email seeking help to Russ Rampersad, Catalist D635. Cristina Sinclaire, a
  leader of Data Ladies Alliance replied on 03/18/17 at 9:29am "Hi Josh - I'm sorry to hear you're
  having a hard time." Defendants were ignoring the danger Plaintiff felt he was in, and instead
  focused their efforts on their property motive. D635

• On 3/20/2017, two days later, via SMS, Jason Rosenbaum attempted to coerce Plaintiff to con-
  fess to "abuse of chair power", using a fraudulent pretext which Rosenbaum described as "If
  you don't understand why asking random people for input on our process was the wrong thing
  to do..." D143

## V.C.1.b    Conspiracy to commit Extortion Example 2

452.    On 2/12/2018, the following events occur:

• Filing of Swirling's letter motion to dismiss

• Publication of the abuse of litigation privilege on Twitter

• Moveon's Active Misleading begins

• Netroots Nation "0.00" invoice D983

• Attempts to coerce members to oust plaintiff, resign to help destroy the project, or face retalia-
  tion. D4

453.    This scheme failed to achieve Defendants' objective, as only members who had little
participation or contributions left, such as Chuck Hagenbuch who repeated the harm-
ful fraud via email "I do not want to support or be affiliated with an organization run by
or attached to Josh Cohen's name or his harassment." and Tweeted "I have no wish to
be associated with the conduct of the chair" on 2/12, which Swirling retweeted.

## V.C.1.c    Conspiracy to commit Extortion Example 2

454.    In february 2018, Woodhull is 4 years overdue from the December 2013 when he
expected to secure venture capital for a universal adapter using OSDI. On 2/14/2018,
via email D41, Woodhull begins to manipulate Plaintiff with the following exchange. He
falsely portrays himself as being helpful.

455.        ✉ 👤Nathan Woodhull 🕐 2018-02-14 12:31pm [D41]

        │ Josh, It seems, as an outsider, wholly unaware of the particulars, that my advice
        │ would be to try and find a way through mediation or human connection to resolve
        │ this issue whatever it might be outside of the courts. It seems like that would be the
        │ best option for you, Robyn, the issues you cared about raising, and OSDI.

456.        ✉ 👤N. Woodhull 🕐 12:31p [D41]

> I get that whatever happened must have felt incredibly hurtful and personally damaging to take the steps you have but surely there are more constructive ways to resolve things?

457.    📧 👤 N. Woodhull 🕐 12:31p [D41]

> I know you both to be very passionate people who care a great deal about many of the same things -- but to me -- again not being aware of any of the exact particulars -- escalating to a lawsuit versus all of the other mechanisms available for dispute resolution...

458.    Woodhull falsely portraying the situation as if Plaintiff had a romantic or person conflict with Swirling, when it was a policy argument he was lured into. He is implying that Plaintiff didn't make reasonable efforts to de-escalate the conflict, however Plaintiff made repeated concessions and retained counsel to negotiate with Wellstone after the ambush at RootsCamp 2016. When Woohull states "It seems like [alternate approaches] that would be the best option for you, Robyn, the issues you cared about raising, and OSDI", he is drawing the connection between the conflict and OSDI and setting up Skyler Duveen/MoveOn who would propose the alternative which involve surrendering the project.

459.    📧 👤 Josh Cohen 🕐 1:15p [D41]

> Does it strike you an accident that someone of her caliber that in her comprehensive attacks she completely airbrushed out my identity as a gay male and antidiscrimination activist?

460.    📧 👤 N. Woodhull 🕐 2018-02-25 1:41pm [D41]

> Of course she's not being fair, you're suing her. You've decided to escalate a conflict with a professional activist who is better at comms than you are.

461.    When Plaintiff pointed out the harm from deception (concealing Plaintiff's sexual orientation), Woodhull is aware of the harm and implies that Plaintiff deserved to be harmed. Woodhull was not helping Plaintiff.

462.    <mark>Injury</mark>  On 2/19/2018, Woodhull sent email to OSDI resigning, stating "I would like to resign my Governance role as part of OSDI and all other official participation by myself and ControlShift." D562

463.    On 2/25/2018, Duveen/MoveOn via email, repeated the demands from lunch on 2/12 including "Stay recused from the OSDI chair position and make sure you are not a controlling entity of that body in any way... Write a confessional blog post about why you are dropping the lawsuit... It should not be defensive. At most, it can have a one-sentence 'I was scared for my career and my community, but that is no excuse'" and to admit that Plaintiff was "wrong to file the lawsuit." D1048

464.    Duveen/MoveOn is following Woodhull's lead, suggesting that the way out of the conflict is for Plaintiff to surrender leadership of OSDI, make a false blanket confession to the distortions in the tweetstorm, which would be fatal for his career, and admit that filing Cohen v. Swirling was wrong. Plaintif was right to file Cohen v. Swirling, Defendants were engaged in defamation which was unjustly harming Plaintiff, and deliberately provoked it to create a pretext to gain control of OSDI.

465.    <mark>Extortion</mark>  On 2/20/2018 at 9:30am, Martha Grant communicated Action Network's resignation, stating ""Action Network will no longer be participating in OSDI..." D1436 The

next email on the thread, at 12:24pm, came from Jeff Mann/AFL-CIO stating "Please remove AFL-CIO as well." This was followed by Beth Becker at 12:28pm stating "Me as well please."

466.   Extortion   Action Network: During a telephone call T23 with Jason Rosenbaum on 5/30/2018, Rosenbaum acknowledges that the tweetstorm on 2/12/2018 was fraud. Rosenbaum then attempts to coerce Plaintiff to resign, ceding control of the project, by citing the unjust harm done to the project and to Plaintiff's reputation.

467.   🔊 Audio 🕐 05/30/18 🕐 2018-05-30 11:11pm "Telephone Call Jason Rosenbaum, Josh Cohen" [T23] 🎤 My Recording;   👤 Jason;   👤 Josh

468.   Jason Rosenbaum concedes that Plaintiff's behavior was within norms and that the unjustly harmful accusation that Plaintiff harassed Rosenbaum's former employee was false.

469.   🔊 👤 Josh 🕐 +11:00 [T23]
       To the extent I am guilty of anything it is unruly and disobedient behavior on a group in September 2016, and mostly silent protest for about a minute in a conference session (November 2016) I just two things completely within the norms of the community.

470.   🔊 👤 Jason 🕐 +11:00 [T23]
       I agree... It's not about the merits.

471.   🔊 👤 Josh 🕐 +11:00 [T23]
       Harassing her over a period of time, No.

472.   🔊 👤 Jason 🕐 +11:00 [T23]
       Again, it's not about the merits. I agree... I agree... It's not about the merits.

473.   🔊 👤 Josh 🕐 +11:00 [T23]
       Yeah, it is about the merits

474.   At any point, Action Network or any other OSDI member could have removed Plaintiff from his position, or the project by majority vote. However, that would not achieve their goal of separating the application ecosystem from the OSDI governance structure, and locking out PDI.

475.   Rosenbaum then uses the unjust harm to attempt to coerce Plaintiff to resign.

476.   🔊 👤 Jason 🕐 +17:06 [T23]
       I would hope that at this point when you've seen what happened to the organization you clearly care about, you would put it first and take that step back.

477.   🔊 👤 Jason 🕐 +41:51 [T23]
       Going forward, you have a reputation in the community and you are unable to do the work of chairman...

478.   Wire Fraud   Nathan Woodhull: On 6/2/2020, Nathan Woodhull posts a message to OSDI Slack, which references his GitHub repository published on or before 5/6/2020 that falsely portray OSDI as the Action Network REST API, thus furthering the conspiracy to invest proceeds. Woodhull's library can be found on GitHub.

479.   Wire Fraud   Netroots Nation: Plaintiff registered for remote attendance on 8/13/2020

and his order was refunded 19 minutes later. D256 D257 "Order REFUNDED for Netroots Nation 2020 (At Home)" Had Plaintiff attended he would have discovered sessions on Action Builder and Cooperative Development. By excluding Plaintiff from remote participation, Netroots Nation prevented Plaintiff from discovering these sessions, which would have allowed him to bring his complaint forward sooner.

480.  Wire Fraud  On 4/27/2020, On GitHub, Skyler Duveen closed the "OSDI action handler and server for import and people, questions, answers, messages" that Plaintiff created, essentially throwing away the work. Duveen's comment stated "contact-loaders sadly make this PR obsolete." Contact loaders are connectors for proprietary APIs.

481.  Wire Fraud  AFL-CIO: Between July and September 2020, Jeff Mann/AFL-CIO made a series of commits to MoveOn Spoke, to the Action Network API contact loader. This furthers the conspiracy because it erases the standardized connector, which lowered integration costs and creates a new connector for the Action Network API, which is really OSDI. As a result, developers who might have sought to build reusable OSDI skills don't realize they are using OSDI, and are locked into Action Network's proprietary fork.

482.  Wire Fraud  Lightrail/Bluelink In Summer 2020, Acronym divested Lightrail and renamed it Bluelink. Gerard Niemira stepped down as CEO and replaced himself with a woman, Irene Tollinger. On 08/12/21 Higher Ground Labs posted blog post by Acacia Gabriel interviewing Irene and Preston Tollinger. Irene is asked "Tell us more about why you started your company and its mission". Her answer includes "I did user research and talked to a broad range of people in the political world. They kept mentioning data integration. It was an issue for organizers who downloaded, munged, and uploaded text files.". Higher Ground Labs lists Bluelink's founders as Irene and Preston Tollinger.

483.  This is wire fraud because Bluelink's synchronization product is really Lightrail, which was announced around the same time the conspiracy to operate OSDI ended and exploits the essential IP in the OSDI specification to use its application ecosystem to get a head start. On or before June 2022, Bluelink was acquired by Civitech, a Higher Ground Labs portfolio company.

484.  Wire Fraud  Action Network: On 11/23/2020 Via its website, Action Network announced its Integration Partnerships Program, which treats the OSDI IP as its own.

485.  Wire Fraud  Jason Rosenbaum/Action Network: During the conversation on the GitHub issue opened on 1/11/21, visible to the public, Rosenbaum states the project is "defunct" and states "here's been no updates in years, I don't think the committees still meet, etc...". Rosenbaum also directs user CiviCRM developer "hifalutin" away from OSDI towards Action Network's Partner Integration Program. Rosenbaum also suggests that platform CiviCRM focus on client implementation (to integrate with Action Network) instead of a platform implementation, which would allow CiviCRM to compete at the level of the market with Action Network.

486.  This furthers the conspiracy by concealing the fact that the current state of the project is due to racketeering activity and extortion by Action Network and its co-conspirators.

487.  Wire Fraud  Bluelink's API specification which became discoverable in summer 2021 on GitHub contains wire fraud because it obscures its embrace, extend, extinguish tactics as described in Violations / Bluelink's infringement

488.    ==Copyright Infringement 2319==  Bluelink's API specification violates Plaintiff's copyright as described in Violations / Bluelink's infringement

489.    ==Copyright Infringement==  Action Network: Copyright Infringement 2319 as described above against Action Network and Action Builder products.

490.    ==Wire Fraud==  Action Network: In a blog post dated 2022-01-19, Action Network's Jeff Dugas states "We developed the ActBlue sync with our Development Partners at the DNC". The ActBlue sync was an OSDI based sync. Since then, ActBlue and Action Network have added proprietary extensions. This furthers the conspiracy by covering up the true origin, which was OSDI.

491.    In a blog post on 05/18/16 ActBlue refers to is as "Our new Action Network-OSDI integration"

492.    ==Wire Fraud==  Action Network: 02/23/22 Via web, Action Builder launches its API stating "We built the API in collaboration with the AFL-CIO and organizers on the ground." which is false.

493.    Action Builder's API specification is another copy of OSDI, which was developed within the OSDI project, and is largely Plaintiff's work. This is an example of the use of a false origin story to conceal the true origin.

494.    ==Wire Fraud==  Woodhull: In an interview on The Great Battlefield podcast on 10/18/2023, Woodhull discussed the business opportunity for DaisyChain to provide integration as a platform, which is enabled by the artificial inefficiency created by Woodhull and co-defendants' racketeering. But for the destruction of OSDI, this would not be viable, or would be less viable.

495.    DaisyChain is funded by Higher Ground Labs, which gives it an equity stake, and a degree of control. Universal adapters, or integration as a platform instead of external network effect, have characteristics similar to digital platform markets. The library of proprietary connectors is similar to applications in an App Store market. New integration platforms will start from zero building a library of connectors to platforms and will need to attract application vendors to build connectors to the integration platform's API.

496.    The artificial inefficiency is only viable with the destruction of OSDI and its external network effect. Conversely, without OSDI, new competitors cannot compete at the level of the market. As a result, these actions have destroyed the value of Plaintiff's investment and constitute a RICO injury under 1962(a).

497.    ==Wire Fraud==  Woodhull: In an interview on The Great Battlefield podcast on 10/18/2023, Woodhull discussed the business opportunity for DaisyChain to provide integration as a platform, which is enabled by the artificial inefficiency created by Woodhull and co-defendants' racketeering. But for the destruction of OSDI, this would not be viable, or would be less viable.

498.    DaisyChain is funded by Higher Ground Labs, which gives it an equity stake, and a degree of control. Universal adapters, or integration as a platform instead of external network effect, have characteristics similar to digital platform markets. The library of proprietary connectors is similar to applications in an App Store market. New integration platforms will start from zero building a library of connectors to platforms and will need to attract application vendors to build connectors to the integration platform's API.

499.     The artificial inefficiency is only viable with the destruction of OSDI and its external network effect. Conversely, without OSDI, new competitors cannot compete at the level of the market. As a result, these actions have destroyed the value of Plaintiff's investment and constitute a RICO injury under 1962(a).

## V.D    Unfair Competition

## V.D.1    Anticompetitive Effects

### V.D.1.a    Introduction

500.     This complaint highlights examples of how Defendants and their co-conspirators entered into and engaged in a racketeering conspiracy, in the market for Digital Political Microtargeting Platforms aka "Platforms", to suppress a technology, OSDI, which served as an external network effect. Defendants and their co-conspirators, aka the Campaign did so in the following ways:

- Gave themselves an unfair competitive advantage and created barriers to entry for competitors, increased customer switching costs and reseller support costs, and reduced customer choice by misappropriating OSDI's essential IP and application ecosystem, and laundered it into proprietary application ecosystems in a manner similar to App Stores.

- Increased customer switching costs.

- Increased application developer costs.

- Created an artificial inefficiency in the market which favors large, well-resourced players who can afford duplicative work.

- Leveraged the artificial inefficiency to launder an external network effect into proprietary internal network effects to create a market for "universal adapters". An analogy would if Defendants coerced the laptop or smartphone market away from USB-C and back to proprietary connectors.

- Since the relevant markets constitute essential resources for candidates running for election, Defendants and their co-conspirators have gained gatekeeper powers over those resources including products and the data pipes that data flows through, allowing them to discriminate to deprive or degrade those for disfavored candidates.

- Excluded Plaintiff from the market depriving him of marketing and sales opportunities in order to protect their products from competition from Plaintiff's products.

#### V.D.1.a.1    Digital Political Microtargeting Platforms Are Relevant Market

501.     Citizens in democracies have the right to run for election, vote for their preferred candidate, and engage in democratic campaigns such as ballot initiatives to achieve societal goals. Those who do require access to Digital Political Microtargeting Platforms and associated applications that integrate with them. Digital Political Microtargeting

Platforms consist of a Customer Relations Management (CRM) and a Data Warehouse which contains Voter Files and other data, which integrates with a set of applications. Applications include text messaging applications, petitions, fundraisers, and others.

### V.D.1.a.2    United States is a Relevant Geographical Market

502.    Customers in the United States require products that comply with campaign finance laws, and they use data products for the US market.

### V.D.1.a.3    Democratic or Progressive Digital Political Microtargeting Platforms are a Relevant Market

503.    In the United States of America, our political system is dominated by two parties, Republicans and Democrats. Since they are in competition, the markets for Digital Political Microtargeting Platforms naturally segregates into two separate markets. One serves the right, where customers are Republicans and Conservatives, and the other serves the left, where customers are Democrats and Progressives. Customers may be candidates running for election or ballot initiatives.

504.    This complaint focuses on the Democratic or Progressive side of the market.

505.    While there are a few exceptions of systems that serve both sides, they are the exception rather than the rule.

### V.D.1.a.4    Defendants and their co-conspirators' Market Power

506.    The fact that Defendants were able to coerce others to abandon OSDI, not to work with Plaintiff, exclude Plaintiff from conferences, google groups and other places illustrates their market power. Defendants and their co-conspirators were seeking to profit from use of OSDI and their racketeering activity in extraordinary ways that included venture capital and doing favors for powerful political entities including AFL-CIO, MoveOn, DNC. They were able to create an irresistible level of temptation in a political donor driven environment to recruit funders and fundraisers within the gay rights movement and women as proxies.

507.    In the 2017 Progressive Data, Analytics, and Technology Salary Survey, D220, 42% of people identified as women, 12% identified as LGBT. By portraying themselves as supporting women, Defendants forced others to make an easy decision.

508.    This power disparity existed during Cohen v. Swirling, though it was concealed from Plaintiff and the court.

### V.D.1.a.5    Microtargeting Systems Are Platforms

### V.D.1.a.5.1    Platform Definition

509.    The economics of Digital Political Microtargeting Platforms increase in value to customers, and in turn to those who own or control the platform when new applications are added to the platform. This occurs by way of an integration with the platform's API.

510.    In a blog post written by Micah Sifry on April 23, 2023, Micah asks Julia Barnes, CEO of The Movement Cooperative, what infrastructure they support for campaigns.

511.    📰 News 🕓 04/23/23 "Living with VANxiety: The Present and Future of Progressive Movement Tech - Micah L. Sifry" [D1985] ⊘ Micah L. Sifry

512.  📖 👤 Micah L. Sifry [D1985]

> What is the core infrastructure that such a co-op would support? Barnes rattles the answer off easily.

513.  Barnes responded:

514.  📖 👤 Julia Barnes [D1985]

> A data warehouse, a voter file, a CRM, a canvassing functionality, a phone functionality, an email functionality. We have to have all of that, and it has to be in designed in a way where it has an open API, where it can talk to all of the tools that people want to sync in, where the users get to determine what aspects of their own data are important, as opposed to that being designed by the company.

515.  Barnes's answer is a set of applications that integrate with a Platform via an API. The following diagram illustrates the relationship between applications and platforms.



*Digital Political Microtargeting Platform*

516.  This complaint focuses on the nature of how applications integrate with platforms via APIs.

V.D.1.a.5.2    Higher Ground Labs Tech Stacks

517.  Another example of this relationship is in a blog post published by Higher Ground Labs aka HGL on March 28th, 2022, which describes their recommended "tech stacks" for customers. {D1442: i}

518.  In the post, there are two diagrams outlining the tech stacks for state level campaigns and local or downballot campaigns.

**Downballot Races: State Level**

| Tool | Function | Price per month | # of months | Total |
|------|----------|-----------------|-------------|-------|
| Deck | Data + Analytics + Fundraising | $200 | 9 | $1800 |
| Universe | "Campaign in a box" CRM + VoterOutreach | $380 | 9 | $3420 |
| Civitech | Campaign OS provides all-in-one campaign management dashboard and tool marketplace | $50-250 | 9 | $450-$2,250 |
| Speakeasy | Digital ad and mail management | $250 | 8 | $2000 |
| BallotReady | GOTV tools and data | $400 | 4 | $1600 |
| Impactiv* | Voter Outreach SMS (P2P and broadcast) + Dialer | $200 | 9 | $1800 |
| | **Tech Total Per Campaign:** | **$1,430** | | **$11,070-$12,879** |

*State Level*

**Downballot Races: Local, City, County**

| Tool | Function | Price per month | # of months | Total cost |
|------|----------|-----------------|-------------|-----------|
| Deck | Data + Analytics + Fundraising | $200 | 9 | $1800 |
| Universe | "Campaign in a box" CRM + VoterOutreach | $380 | 9 | $3420 |
| Speakeasy | Digital ad and mail management | $250 | 8 | $2000 |
| BallotReady | GOTV tools and data | $400 | 4 | $1600 |
| Impactiv* | Voter Outreach SMS (P2P and broadcast) + Dialer | $200 | 9 | $1800 |
| | **Tech Total Per Campaign:** | **$1,430** | | **$10,620** |

*One caveat here: This assumes that campaigns will get access to NGP VAN through the state party.*

*Local Level*

519.     HGL highlights the difference in the tech stacks, where Local depends on NGPVAN, and State depends on Civitech's CampaignOS. NGPVAN and CampaignOS are the platforms, and the others are applications that integrate with the platforms.

### V.D.1.a.6    The Market is Concentrated

520.     As described in the Market Background section of this complaint, a single dominant player, NGPVAN, has had vertical agreements with the DNC, giving it a near monopoly. The main exception was California, which is dominated by PDI.

521.     Existing smaller players, or new players, have had a difficult time gaining a critical mass of customers to compete fairly with the larger players.

### V.D.1.a.7    Customers are Revenue Constrained

522.     In a concentrated market, with revenue constrained customers, the harm of artificial inefficiencies will be exacerbated. Customers are political campaigns who's revenue is fundraising, which is constrained by campaign finance laws. Others are non-profits. Large campaigns, like presidential or federal congressional campaigns may have significant resources. However, they are the minority in numbers. Smaller or "downballot" campaigns will suffer to a greater degree. Customers have limited funds to spend on expenditures, therefore the potential revenue for application vendors is small.

523.     Anne Lewis, CTO of MoveOn.org comments on the market on "The InfoQ Podcast" on 1/11/2021:

524.  🎙 Podcast ⏱ 01/11/21  2021-01-11 "Ann Lewis Discusses the Political Tech Landscape, MoveOn's Architecture, and Scaling Challenges" [T149] 🎙 InfoQ, The InfoQ Podcast; 👤 Anne Lewis;  👤 Charles Humble

525.  🎙 👤 Anne Lewis ⏱ +02:36 [T149]

> the market cap of political tech is relatively small compared to the rest of tech in the US. So there's typically not quite enough funding to create enough organic competition to have multiple offerings per type of system that you might use. So what we typically see is that systems with a wider moat like a Crm where all your user databases and we're all of your engagement mechanisms sink into. There are just a few offerings in that space.

526.  🎙 👤 A. Lewis ⏱ +03:01 [T149]

> typically we see a lot of little apps that try to serve a single purpose and then organizations and tech teams spend a lot of time trying to unify these apps together into a coherent system... the ecosystem is relatively small market cap and so has mixed offerings.

## V.D.1.b   Origin of Anticompetitive Conduct

### V.D.1.b.1   VC New Media Ventures / Universal Adapter Proposal

527.  Plaintiff was originally referred to Nathan Woodhull via email on 2/15/12 [D1057]

528.  Via email on December 11th, 2013, Woodhull communicated a plan where he and partners applied for funding from New Media Ventures to build a "universal adapter". If OSDI succeeded, and applications could directly connect to platforms, this would not be a viable business.

529.

530.

531.  Though unaware of this, Plaintiff OSDI and its external effect was an obstacle to the interests of powerful and wealthy interests who had motive for extortion.

532.  ✉ Email Subject ⏱ 12/11/13 ⏱ 2013-12-11 10:36pm "activity" [D1991**] 👤 Nathan Woodhull

533.  ✉ 👤 Nathan Woodhull ⏱ 10:36p [D1991]

> applied for funding from New Media Ventures for a bunch of things, a small chunk of which was funding to write a "universal adapter" to provide a common API binding to a few CRM vendors that their member organizations use... we'd likely do the implementation work if they were to get funding... I'd look to OSDI spec for a common interface.

### V.D.1.b.2   Action Network Seeks to be 1 of 2 Dominant Platforms

534.  Action Network released their platform implementation using source code provided by Plaintiff in April 2014. At this point, the conspiracy included Woodhull, Action Network, DNC and Netroots Nation. They attempted to undermine the project in August 2014, as described in the section Early Racketeering. The evening of August 20th, 2014, Plaintiff chatted with Jason Rosenbaum via chat. Rosenbaum stated "I'd settle for one of two... two widely used progressive APIs"

535.     Action Network's goal of being one of two widely used progressive APIs would implicitly mean that Action Network would be one of two dominant platforms.

### V.D.1.b.3    Had the Early Racketeering been successful

536.     Action Network, AFL-CIO, Netroots Nation/DailyKOS would have a head start using OSDI and its momentum, which was significant, as their proprietary API and application eco-system, which they share dominant control over.

537.     Woodhull would have gotten venture capital to build his "universal adapter" proposal, and along with VC New Media Ventures would share control over an economy of scale that was based on an artificial inefficiency.

538.     From this point forward, Woodhull, Action Network, Netroots Nation and the AFL-CIO continued to fraudulently induce Plaintiff's labor, while recruiting others including MoveOn.org and the DNC the racketeering conspiracy to gain control of the project, operate it, and invest the proceeds into their own enterprises.

## V.D.1.c    Action Squared Executes Platform Disintermediation Play

539.     One of the few ways to gain a critical mass in a digital platform market is to execute a platform disintermediation play.

540.     Action Squared began as Action Network, which functioned as a digital organizing toolset which acted as an application that integrated with the dominant platform, NGPVAN, using the platforms OSDI endpoint. Today it is a platform which provides a competitive alternative to NGPVAN and has expanded its functionality to include SMS, peer-to-peer and other features that previously were separate applications.

541.     The platform disintermediation strategy is outlined by Charlotte Slaiman, Competition Policy Director of Public Knowledge, when testifying before the House Subcommittee on Antitrust:

542.     📄 Meeting Minutes 🕐 02/25/21 🕐 2021-02-25 1:00pm "Testimony of Charlotte Slaiman" [D717]

543.     📄 👤 Charlotte Slaiman 🕐 1:13p [D717]

   Perhaps most importantly, one of the very few ways of attempting to compete against a dominant digital platform is to start out in an adjacent market, as a company that competes on the platform.

544.     📄 👤 C. Slaiman 🕐 1:14p [D717]

   Often, the market for competition on the platform could serve as a "feeder" market for competition against the platform. From the feeder market of competing on the platform, an entrant can expand out to provide more and more "verticals" to eventually replace the platform for some users.

545.     📄 👤 C. Slaiman 🕐 1:14p [D717]

   Or, an entrant can disintermediate, building a direct relationship with the consumer and bypassing the platform altogether.

546.     📄 👤 C. Slaiman 🕐 1:14p [D717]

   The gatekeeper platforms recognize this, and thus can use the many tools for discrimination at their disposal to demote companies that may pose a competitive

threat to the platform itself -- not just the platform s other businesses that compete on the platform.

547.    Action Squared followed a similar scheme. Action Network began in an adjacent market, as a digital toolset, which was an application that integrated with the dominant platform, NGPVAN. [**397?**] [**D452?**] Early in the Action Network product lifetime, functionality like volunteer management, mobile sms, peer-to-peer, was provided by applications that integrated with Action Network via its platform implementation of OSDI. Examples included Mobile Commons and CallHub for mobile functionality, NGPVAN for volunteer management, and salesforce for CRM functionality.

548.    At SXSW 2015, during the OSDI session, Jason Rosenbaum describes Action Network and makes the point that a common API removes barriers to entry and reduces cost for integrations.

549.    🔊 Audio ⏱ 03/13/15 ⏱ 2015-03-13 11:00am "Turbocharging Social Activism with Data Standards" [T105] 🎤 ; 👤 Jason Rosenbaum, Action Network; 👤 Gayatri Bhalla, Catalist; 👤 Josh Cohen, Self; 👤 Tim Anderegg, Independent

550.    Early in its development. Action Network portrayed itself as a digital toolset, which functioned as an application that integrated with a platform. Action Network and the AFL-CIO used Action Network as an application that integrated with NGPVAN's platform, using OSDI.

551.    🔊 👤 Jason Rosenbaum ⏱ +09:34 [T105]

> a little from my perspective, Action Network is an online organizing tool, so it does one thing and we try to do it really well, which is managing your email, managing your online actions like online donations or signing petitions, that kind of thing. We don't do a lot of the other things that josh mentioned right, We don't do like voter file stuff, volunteer stuff, phone banks, you know, facebook, all that kind of stuff.

552.    Rosenbaum discusses the barrier to entry that OSDI removed. Defendants' racketeering restored the barrier to entry.

553.    🔊 👤 J. Rosenbaum ⏱ +12:51 [T105]

> It takes that job maybe from a three or four weeks development project down to maybe a couple days. Right. If we're all using a common API there's a dream that at some point in the future this is is is plug and play... taking it down from three weeks to a couple of days really changes the barrier to entry for me building an integration that our partners want. We're able to do it quicker. It's less costly. And it means that more integrations can happen.

554.    According to Brian Young, Action Network's founder on The Great Battlefield Podcast on 1/18/2019 stated:

555.    📍 Podcast ⏱ 01/18/19 ⏱ 2019-01-18 11:37am "Building tech tools that help progressive organizations operate w/ the Action Network's Brian Young" [T174] 🎤 Nathaniel G. Pearlman, The Great Battlefield; 👤 Nathaniel; 👤 Brian

556.    📍 👤 Brian Young ⏱ +40:23 [T174]

> So we really always from the beginning we concentrated on an API and trying to build a good API so people could integrate in with us

557.    📍 👤 B. Young ⏱ +40:23 [T174]

> keeping the focus there and building in really think of ourselves as a, as part of a
> tech ecosystem and we're not going to be everything for everybody.

558.    Over time, Action Network integrated those features directly in its product. Action Network's blog post on 2022-01-19 states it has added mobile messaging into its platform

559.    In addition to adding new features to expand horizontally, Action Squared disintermediated the dominant platform. Action Network and the AFL-CIO were building a VAN competitor, ActionBuilder. Today, ActionBuilder is a competitive alternative to NGPVAN. This allows Action Squared to build a direct relationship with the customer and sell a competitor to NGPVAN.

560.    While concealing their motive from Plaintiff, Action Squared used Plaintiff, the OSDI project, and his sexual orientation as a shield to prevent the dominant player NGPVAN from discriminating or impeding their platform disintermediation play. Had NGPVAN, the DNC or other big player overtly destroyed OSDI, the optics would paint them as homophobic, monopolistic, or otherwise hypocritical.

561.    On 7/11/2019, Action Squared released its new platform ActionBuilder at Netroots Nation 2019 in Philadelphia.

562.    On 6/22/21, Action Squared announced that they were merging Action Network and Action Builder.

563.    Action Network's web page listing integrations with other products no longer lists the NGPVAN integration. The page describing its integration with NGPVAN, which used NGPVAN's OSDI service has been hidden.

## V.D.1.d    Tipping Point for External Network Effect

564.    Despite their racketeering efforts, in 2017, OSDI succeeded in creating an external network effect.

565.    In September 2015, NGPVAN's platform implementation came online. As a near monopoly, with the majority of customers, this was sufficient to tip the market. Application vendors who implemented an OSDI connector would gain interoperability with NGPVAN, which was a market requirement. They would also get interoperability with Action Network with little or no additional work.

566.    Action Network itself used NGPVAN's OSDI endpoint for its integration with NGPVAN to support the AFL-CIO's customer requirements. In 2016, Defendant's extortion began.

567.    In Summer 2017, at Netroots Nation 2017, PDI launched its new national platform and stated its intent to join OSDI and implement the specification. Defendants then escalated to Abuse of Process.



*OSDI Tipping Point*

568.    The above diagram illustrates that application developers only need to spend resources to build a single API connector, which allows the application to interoperate with any compliant platform.

*Defendants Racketeering Activity*

### V.D.1.e    Defendants Gave Themselves an Unfair Competitive Advantage

569.    The outcome created by Defendants' racketeering activity allowed them to invest the essential IP and application ecosystem into their own enterprises. This allows Defendants to compete based on controlling an economy of scale.

570.    The effect on application developers is that they need to spend engineering resources building and maintaining connectors for each platform they seek to support. As they do their cost/benefit analysis they will prioritize the platforms with the most customers.

571.    New platforms start from zero in terms of addressable market of customers and applications integrations. For application developers building connectors for them will be lower priority. If they are built at all, and may have less functionality than the connectors they build for larger platforms with larger addressable markets.



*Product specific API - Internal Network Effect*

572.    The above diagram shows that application developers now need to spend resources to build N API connectors in order to interoperate with N platforms.

573.    The effect on platforms is that the set of applications that have built connectors to integrate with their platforms is an economy of scale that they can use as a competitive advantage against other platforms. The effect of this is that the set of applications compatible with each platform resembles App Stores like in the mobile space.



*App Stores*

574.    As a result of Defendants' racketeering, Action Squared and Civitech, via its acquisition of Lightrail/Bluelink, inherited a head start by misappropriating OSDI's essential IP and application ecosystem. Since OSDI was the largest REST API based application ecosystem, it had achieved a self-perpetuating critical mass of adoption.

575.    The House Subcommittee on Antitrust report on Competition in Digital Platform Markets aka CDPM describes the nuances of digital platform markets and the effect they have on competition.

576. ☐ Document ⊙ 10/02/20 "INVESTIGATION of COMPETITION in DIGITAL MARKETS" [D852]

577. ☐ [D852]

New app stores face high barriers to entry. It is unlikely that a third strong mobile app ecosystem can emerge. To offer a new mobile app store that is compelling to consumers, the app store must have a built-in customer base to attract developers to build apps for the store and must have popular apps to attract customers.

578. ☐ [D852]

Over the past decade, several large technology companies have attempted and failed to leverage their large user bases to compete against Apple and Google in the mobile OS market.
Facebook and Amazon both tried to enter the market with variants of Google's Android OS. Both companies quickly exited the market because consumers were mostly accessing Facebook and Amazon content through apps on iOS and Android devices.

579. ☐ [D852]

Companies like Mozilla and Alibaba have also attempted to enter the mobile OS market. Mozilla unveiled its Firefox OS in 2013 and exited the market altogether by 2016.
In 2012, Chinese tech giant Alibaba developed a mobile OS called Aliyun. However, Acer cancelled its collaboration before the launch

580. ☐ [D852]

each platform now serves as a gatekeeper over a key channel of distribution. By controlling access to markets, these giants can pick winners and losers throughout our economy.

581. The report cites Paul Arnold, a venture capitalist, who states that VC's shy away from investing in concentrated markets with dominant platforms due to the challenges these barriers to entry create.

582. ☐ [D852]

Paul Arnold, an early-stage investor and founder of Switch Ventures, commented at the Justice Department s recent workshop on the intersection between venture capital and antitrust law that he considers markets dominated by large platforms to be kill zones. [T]here s an incredibly, concentrated market share because of the economies of scale or because of network effects, it s a really hard barrier to overcome.

V.D.1.e.1    NGPVAN

583. Today, NGPVAN remains a dominant platform and application ecosystem, and has deprecated its OSDI endpoint. Instead it relies on its proprietary REST API, as well as legacy SOAP/XML API.

V.D.1.e.2    Action Squared and Civitech

584. Action Squared and Civitech API's are both OSDI disguised as their proprietary APIs and have made changes or additions that make them slightly incompatible.

585. Action Squared has two platform implementations, Action Network and Action Builder. Both are OSDI in disguise.

586. Civitech owns both CampaignOS and Bluelink (formerly Lightrail). By combining CampaignOS and Bluelink, CampaignOS gains an ecosystem based on the OSDI head

start.

587.   From an application development perspective, building a connector for Action Squared or Civitech will work with the other for the most common scenarios using OSDI helpers like Person Signup Helper (which Bluelink uses). So application developers can build a connector for NGPVAN's proprietary API and Action Squared/Civitech.

588.   Action Squared and Civitech's behavior is similar to Microsoft's behavior in Sun Microsystems v. Microsoft Corp., 21 F.Supp.2d 1109 (N.D.Cal.1998). Microsoft added extensions to its Java implementation, J++. When used by Java developers on Microsoft's J++, applications would be "locked in" to Microsoft's implementation, and to Windows as a result, since they would not be compatible with implementations of the Java standard.

589.   These are "Embrace, Extend, Extinguish" tactics. Over time, depending on future changes and evolution by Action Squared and Civitech, compatibility will decrease over time. However, since both platforms already have a critical mass of adoption, they already have an internal network effect.

590.   Since Action Squared and Civitech have gained a critical mass of adoption and gained a significant addressable market of customers, application developers to have a small customer acquisition cost.

### V.D.1.e.3    PDI

#### V.D.1.e.3.1    PDI National - BlueVote

591.   PDI's national platform, which it released at Netroots Nation 2017 was named BlueVote and had a web page at bluevote.com. It has since been taken down now redirects to PDI's main site. According to the Internet Archive, the last "Integrations" archived page for BlueVote shows only two application integrations, ThruText and Organizer.

592.   Had PDI implemented OSDI, its application ecosystem would have included OSDI compliant products. Those included ActBlue, Mobile Commons, CallHub, Accurate Append, Mobile Commons, Act Blue, New/Mode, CiviCRM, New/Mode, Mobilize, MoveOn Spoke, MoveOn Internal Tools, ProgCode Resistance Calendar, ProgCode National Voter File, ProgCode Maps for Change, RiseUp.

593.   Any application developer that build a connector for Action Network, Action Builder, NGPVAN or Bluelink would also be compatible with PDI's BlueVote.

594.   PDI's BlueVote was launched in 2017, before Action Builder and CampaignOS. But for Defendants' unlawful conduct, PDI's BlueVote would have competed at the level of the market, with the same application ecosystem as Action Squared and Civitech's CampaignOS.

595.   Instead, one challenge that BlueVote faced was the lack of compatible applications in its ecosystem.

#### V.D.1.e.3.2    PDI Today

596.   PDI's website no longer lists BlueVote or a national platform product. PDI's current website site lists "California Campaign Center", who's web page states "Our Campaign Center is not available outside of California at this time. Contact Sales to learn more or

browse our website for product offerings that are available across the country."

597.    Though PDI has gained some integrations, lower priorities can result in integrations with less functionality. An example of this has already occurred with event management application Mobilize's integration with platform PDI. This is stated on Mobilizes web page for PDI integration "This integration supports the uni-directional flow of data from a Mobilize organization to a PDI account. While our integration with PDI is not as robust or fully-featured as our VAN integration, we do sync over our core data models."

### V.D.1.f    Defendants Created a Barrier to Entry for Competitors

598.    Other existing platforms will be "third platforms" or worse and will have difficulty convincing application developers to write additional connectors for their platforms. They will have challenges similar to those of Amazon, Microsoft, Nokia and others who attempted to create their own mobile App Stores.

599.    New platforms will face these challenges to an greater degree. New platforms start with no addressable market of customers or application ecosystems.

600.    CDPM [D852] states "To offer a new mobile app store that is compelling to consumers, the app store must have a built-in customer base to attract developers to build apps for the store and must have popular apps to attract customers."

601.    New platforms will face a "chicken and egg" problem. They will lack a large enough customer base to attract application developers to build connectors for their platforms. They will also lack a competitive ecosystem of applications compatible with their platforms compared to dominant platforms to attract new customers. Nor will it justify the necessary switching costs for customers of other platforms to switch to the new platform.

### V.D.1.g    Defendants Increased Switching Costs

602.    Customers who switch platforms will not be able to take their applications with them to their new platform. They will have to choose from applications that have built a connector for the new platform and are thus in the new platform's App Store.

### V.D.1.h    Defendants Increased Application Developer Costs

603.    Application developers face additional costs per each connector they build for a given platform.

604.    Even in the case where platforms differentiate themselves with proprietary features expressed through an API, Defendants have increased costs as well.

605.    Prior to the destruction of OSDI, application vendors could participate in OSDI at no cost, and participate in a consensus process to decide on definitions in the API specification. They had a vote similar to other members, regardless of their individual scale, finances and market power.

606.    As the OSDI specification evolved, applications developers only needed to track a single specification. Their engineering maintenance costs would be spent on a single connector.

### V.D.1.i    Defendants Gained Gatekeeper Powers

607.    Since the market has a small addressable market, a digital platform market and is concentrated with few platform solutions, Defendants have gained gatekeeper powers over essential resources for candidates running for election.

608.    Action Squared describes its governance model as "Cooperative Development", which is led by its "keystone partners". Those include Action Network, AFL-CIO, DailyKOS and DNC. Netroots Nation evolved from DailyKOS yearly conferences "YearlyKOS" which took place in 2006 and 2007, before being renamed Netroots Nation. Both entities have significant crossover in leadership.

609.    As a result, they share dominant control over a new dominant platform, Action Squared, which is comprised of Action Network and Action Builder.

610.    Higher Ground Labs and its portfolio companies benefited from OSDI, including CiviTech/Bluelink, New/Mode, and Mobilize. Netroots Nation's board chair, Cheryle Conti also sits on Higher Ground Labs's advisory board. [**D2000?**]

611.    But for Defendants' actions:

- Competitors would not face this barrier to entry.

- Customers would not face switching costs from an application ecosystem perspective.

- Application developers would not have to resource duplicative connectors which are an artificial inefficiency.

### V.D.1.j    Effect on Marketplaces

612.    Defendants' racketeering activity and use of the false-flag allowed them to prevent the adoption of OSDI Compliance as a preferred criteria in the DNC's marketplace. In Krikorian's email on 2/1/2018, he states "id like to chat about the role of OSDI and how we can highlight applications that comply in the market." Defendants' abuse of litigation privilege and coercion began on 2/12/2018, which they used to coerce and threaten others to abandon OSDI and refuse to work with Plaintiff. On 4/20/2018, on Medium, DNC's Sally Marx announced "a marketplace filled with tech tools", without inclusion of OSDI compliance D824.

613.    The effect of this keeps the DNC support costs higher, since applications and platforms are not interchangeable. It also increases customer switching costs and barriers to entry for competing platforms. It also creates the same type of artificial inefficiency, which allows the DNC to insert its own Democratic Data Exchange (DDX) into the data pipes.

614.    The DNC's participation has a Jekyll and Hyde component because the behavior of the "insiders" and "outsiders" factions warring in the Data War had effects with different priorities. Krikorian as deemed "outsider" as he came from the technology industry. That perspective allowed him to see the procompetitive benefits of a standards based ecosystem which would, in his words help "democratize access". The insiders factions actions prioritized control over essential resources for candidates running for election.

### V.D.1.k   Victim Company B

615.    Company B is a telephony provider that offers text messaging and other communications features. As mentioned in the market background section, Plaintiff helped Company B gain integration privileges with NGPVAN, which it did using NGPVAN's OSDI endpoint. As a result of Defendants' actions, Company B has been experienced similar harms as Plaintiff.

616.    With NGPVAN's decommissioning of its OSDI endpoint, Company B has had to develop a new connector to NGPVAN's proprietary API. Due to PDI being locked out by Defendants' conduct, Company B has had to develop a connector for PDI's proprietary API.

617.    Company B was deprived of at least a 3x ROI that OSDI delivered. Instead it now has at least a 3x cost increase in its integration work.

618.    If new platforms enter the market, they will need to convince Company B as well as other applications to develop a connector for their API, which is a barrier to entry.

### V.D.1.l   Defendants Created an Artificial Inefficiency

619.    By destroying the external network effect, Defendants have forced application developers to spend resources to fund duplicative and unnecessary work.

620.    For comparison, as laptops converge on USB-C adoption for power and charging, the value of universal adapters, such as those from Targus decreases to zero. At this point in time, USB-C adoption on new laptops has already crossed the tipping point, creating an external network effect. The effect of this is that vendors who have experience building USB devices can participate in the market for chargers and battery packs for laptops, mobile phones and any compliant device.

621.    OSDI had already crossed the tipping point to create an external network effect. Defendants' actions would be like coercing the laptop and mobile phone market to abandon USB-C and return to proprietary connectors for power and charging. This would impose an additional, unnecessary cost upon USB vendors, who would need to build different versions of their products, or supply a myriad of adapters to be compatible with different laptops, mobile phones or other products.

622.    Defendants have exploited this inefficiency to create a need for "universal adapters" to connect to platforms as well as CRMs used by political campaigns.

623.    In 2018, Plaintiff released a synchronizer product "Hero Sync", which synchronized data between political CRMs such as Salsa, as well as Salesforce and microtargeting platform NGPVAN, as well as Action Network, by using OSDI. This involved synchronizing records for People, Events, Attendances etc.

624.    Since the synchronizer was compatible with any OSDI compliant system, For systems that didn't have their own OSDI connector, Plaintiff built one for those platforms, which were available for anyone to use.

625.    As a result, Plaintiff could spend his engineering resources developing feature functionality for the synchronizer rather than integration connectors. For illustration, ex-

amples of features included

- Customer customizable logic rules, where if a person had tag X in the origin system, tag Y would be applied in the destination system.

- Automated charts and graphs that showed synchronization metrics over time.

- Automated "diff" functionality which highlighted the specific change in a record which could be accesed via the logic rules, and shown in reports sent to users of the product.

626.    The following diagram illustrates that only 1 API connector is needed.



*Standard API - External Network Effect*

627.    The less time developers spend writing connectors to different systems, the more time they have available to create features and functionality. Customers purchase products for features and functionality; they expect integration to "just work."

628.    As a result of Defendants' racketeering, separate connectors are now needed to integrate with different platforms, which is an artificial inefficiency. The following diagram illustrates where multiple connectors must be built.



**N Platforms**

*Product specific API - Internal Network Effect*

629.    As a result, the synchronization features and integration connectors have become vertically integrated. Defendants have exploited this artificial inefficiency to create a need for "universal adapters", where the set of connectors for different systems are an economy of scale.

630.    Since an economy of scale requires significant resources to build and grow to a critical mass, as well as maintain the various API connectors as the platform vendors inde-pendently evolve their own APIs, Defendants have an economy of scale they can con-trol using the "strings" of funding. This also allows Defendants to gain gatekeeper powers over essential resources by controlling the "data pipes" political data flows through.

## V.D.1.m   Defendants created a market for "Universal Adapters" and Exchanges

631.    Application developers will prioritize platforms with resources to grow their platform and largest addressable market for them to acquire customers. NGPVAN, Action Squared and Civitech's CampaignOS will benefit from this.

632.    As described above, application developers who would prefer to spend their engineering resources on features rather than connectors, can utilize a "universal adapter" service to connect with different platforms.

633.    Universal adapters Plaintiff has discovered include the following:

   •    Lightrail/Bluelink -- Funded by VC's Acronym and later Higher Ground Labs. In 2022, Higher Ground Labs provided additional funding to Civitech, who then acquired Bluelink.

   •    Parsons -- Controlled by The Movement Cooperative, whose largest funder is MoveOn.org [**D756?**]

   •    DaisyChain -- Founded by Nathan Woodhull and Jon Warnow, funded by Higher Ground Labs

   •    Community Tech Alliance (CTA) PAD -- A new entrant

634.    The market has been coerced to an internal network effect model, where universal adapters and their library of connectors are an economy of scale.



*Universal Adapters*

635.   Those who control the universal adapters can use that economy of scale as a beachhead and then add feature functionality and evolve into a platform. This is a similar approach to Action Squared's platform disintermediation play.

636.   DaisyChain is an example of this. When initially launched, Nathan Woodhull describes DaisyChain on Twitter on 8/16/22 "Daisychain is an organizing platform that integrates the political tech stack." However, since then DaisyChain has added new features to build out a platform. [**D1907?**]

637.   On its web page, Community Tech Alliance touts its data integrations and the barrier to entry of needing to build integrations. It states "PAD also syncs with over 50 tools (and counting). That s 50+ integrations you don't need to custom build."

638.   The universal adapters also have connectors for commodity services unrelated to politics, such as Amazon Redshift, Google Cloud, Microsoft Azure and Salesforce. These services have open source libraries provided by service providers and generic community projects which can be used by applications, but are not unique to the universal adapters.

639.   What is unique to the universal adapters is the connectors for the platforms and political CRMs, which are unique to these markets. That is addresses the need that application developers have due to the artificial inefficiency.

640.   As more application data flows through the universal adapter, the more it becomes an exchange where political data flows through it, essentially becoming "data pipes".



*Exchange Universal Adapter*

641.    Those who control the exchanges now have gatekeeper powers over data pipes.



*Gatekeeper Powers*

642.    Since API connectors are individually identifiable, they can be targeted for discrimina-tion. For example, if a vendor serves customers who represent primary challengers or candidates otherwise disfavored by the gatekeepers, their API connector can be indi-vidually disabled or degraded without affecting other applications. This can be used to create an unlevel playing field in an election, or to retaliate against the vendor to dis-courage future support for disfavored candidates.

643.    The emergence of Data Brokers, who function as exchanges, has been reported in the news.

644.    📰 News 🕐 03/19/19 "The Secret Power of Political Data Trusts,The Secret Power of Political Data Trusts - Overture Global" [D591] 🌐 Overture Global

645.    📰 🌐 Sean McDonald, overture_global [D591]

The Secret Power of Political Data Trusts,The Secret Power of Political Data Trusts - Overture Global

646.  📖 👤 Sean McDonald [D591]

> Most of the recent coverage about politics and data has been about scandal. What gets less coverage is the underlying way that data is shaping more than the way in which parties and movements work data is also changing the way they re organized.

647.  📖 👤 S. McDonald [D591]

> And how parties share data increasingly defines who gets access to the party s platform, resources, and seats. Across both aisles, a new generation of data power brokers decides who gets to participate in politics.

648.  📖 👤 S. McDonald [D591]

> The fissures in the core negotiating foundations of the Democrats' data architecture were on display in the last presidential election. In late 2015, one of Bernie Sanders's campaign staffers accessed Hillary Clinton's voter file, causing the Democratic Convention to revoke his campaign's access. The DNC relented after the Sanders campaign mounted a breach of contract lawsuit, but damage to the party's digital unity had been done.

649.  📖 🌐 S. McDonald [D591]

> ...a growing group of large progressive-cause campaign organizations are starting to share data under the banner of the Movement Cooperative, which will essentially govern the way the group buys, combines, and uses its voter files.

650.  Examples of exchanges that Plaintiff has discovered:

### V.D.1.m.1   Parsons

651.  The Movement Cooperative project Parsons is an example of a "universal adapter". Its "about: page states that Parson "...contains a growing list of connectors and integrations to move data between various tools. Parsons is focused on integrations and connectors for tools utilized by the progressive community. Parsons was built out of a belief that progressive organizations spend far too much time building the same integrations, over and over and over again, while they should be engaged in more important and impactful work."

652.  It serves as a universal adapter by having individually coded connectors for each platform or product it can connect to. These include ActBlue, Action Network, Action Kit, Mobile Commons, NewMode, NGPVAN and Bluelink.

653.  According to OpenSecrets.org, as of the 2022 election cycle, MoveOn.org has been the largest funder of The Movement Cooperative.

654.  On website "Progressive Data Jobs", The Movement Cooperative posted a job position "Data & Technology Strategist", states ""We help with the establishment of syncs, data pipelines, analytics..."

655.  Bluelink submitted a connector for Parsons, in September 2021, just over 4 years after Netroots Nation 2017. Examining the source code reveals that it is using OSDI Person Signup Helper. Therefore, Action Network and Bluelink's connectors are essentially the same. The source code repository for Parsons lists source code for connectors to systems it integrates with. Though it lists Bluelink on the About page, the source code has

been hidden or removed. Plaintiff saved the original version.

### V.D.1.m.2    Lightrail/Bluelink/Civitech

656.    In Summer 2017, Higher Ground Labs initial cohort of funded companies included GroundBase, which was founded by Gerard Niemira after his employment at Hillary for America aka HFA. At the conclusion of the racketeering conspiracy to operate OSDI, in early 2019, Acronym acquired GroundBase and renamed it Shadow. At that point Niemira announced Lightrail, which billed itself as a "universal adapter". Shadow was subsequently divested from Acronym, and its other product terminated, leaving only Lightrail. Shadow was then renamed Bluelink, which then received funding as part of HGL's 2021 cohort. In 2022, Civitech received a round of funding and then acquired Bluelink. Civitech also acquired Alloy, Reid Hoffman's voter file project.

657.    In September 2021, Bluelink's API became discoverable, revealing its use of OSDI as its inbound API. This is consistent with the proposal Woodhull shared with Plaintiff in 2013.

658.    As of January 2022, Bluelink's library of connectors is shown in the diagram below, taken from Bluelink's website:



*Bluelink Ecosystem 2022*

### V.D.1.m.3    Democratic Data Exchange

659.    Shortly after the end of the racketeering conspiracy to operate OSDI, and the DNC Winter meetings, the Democratic Data Exchange aka DDX was announced.

660.    📰 News ⏱ 02/13/19 "Howard Dean to head new Democratic voter data exchange" [D588] 🌐 The Burlington Free Press

661.    📰 👤 Bill Barrow, Burlington Free Press [D588]

> Dean confirmed that he's signed on to lead a planned data exchange hammered out by DNC officials, state party leaders and Democratic consultants. The agreement still requires the expected approval from state party leaders gathering Wednesday in Washington, but it would end more than 18 months of internal party wrangling that has dogged DNC Chairman Tom Perez amid fights over money and control.

662.     BILL BARROW [D588]

     "He's really a unique person in the DNC," said Mary Beth Cahill, a top Perez lieutenant who led the negotiations and who managed John Kerry's 2004 presidential campaign that defeated Dean. "Just looking at the landscape, he seems like one of the best signals we could send" to get everyone on board.

663.     B. BARROW [D588]

     The new exchange will operate as an independent for-profit enterprise led by Democratic strategist Jen O'Malley Dillon, once a top adviser to Hillary Clinton's campaign.

664.     On 4/2/2019, The Burlington Press published "Inside the Democrats Plan to Fix Their Crumbling Data Operation". The article states "tate party officials, who manage their states' voter files, were initially reluctant to give up control of the party's most precious resource" and "The data exchange would merely track who's giving and taking what information and build the pipes that connect the data sets."

665.     A 2/16/24 job posting on Movement Builders from the Democratic Data Exchange, it describes the Movement Infrastructure Working Group's API for sharing data between tools used by campaigns stating ""MIG is developing infrastructure in the form of APIs and a data application layer to make it possible for organizations and campaigns to move data to all destinations across the progressive ecosystem."

666.     In a Google document 10:45 Oct 25, 2021 shared by Santiago Martinez from Arena titled "DDx OVERVIEW 2021-2022", it discusses the synchronization aspects of the product "allowing programs to seamlessly sync voter data with DDx during and between election cycles."

### V.D.1.m.4  DaisyChain

667.     On 8/16/2022 Nathan Woodhull posted on Twitter that he was "Launching something new! Daisychain is an organizing platform that integrates the political tech stack". Woodhull founded DaisyChain with Jon Warnow.

668.     At this point the culpable person Woodhull merged with DaisyChain.

669.     Woodhull states "We're aspiring to integrate with just about everything, but we're prioritizing by integrating with the tools early folks are interested in." Woodhull began building a library of Ruby based connectors for political applications and platforms.

670.     Based on examining the HTML source of a response to an HTTP POST on DaisyChain's login page, DaisyChain is a Ruby on Rails application. Therefore, DaisyChain can reuse the library of Ruby connectors that Woodhull started building in 2013, and thus has a head start.

671.     On 7/6/2023 Higher Ground Labs announced their 2023 Accelerator Companies, which included DaisyChain. Woodhull initially sought venture capital from New Media Ventures in 2013 to build an integration platform, which would not have been a viable business with OSDI's external network effect in place.

672.     With the destruction of OSDI and its network effect, DaisyChain can compete based on the economy of scale of connectors for different systems. DaisyChain's head start comes from the library of connectors Woodhull began building in 2013, but competitors

will have to start from zero.

673. Since DaisyChain is backed and funded by venture capital including Higher Ground Labs, it can afford to spend resources on duplicative work.

674. On 10/18/2023, Nathan Woodhull is interviewed on The Great Battlefield podcast regarding DaisyChain. Woodhull discusses the inefficiency and how it creates an opportunity for DaisyChain.

675. ⦿ Podcast ⊙ 10/18/23 ⊙ 2023-10-18 5:52pm "Integrating and Connecting Political Organizing Data with Jon and Nathan of Daisychain" [T262] 🎤 Nathaniel G. Pearlman, The Great Battlefield; 👤 Nathan

676. ⦿ 👤 Spk3 ⊙ +51:12 [T262]

> So for example, we have customers using... Action Network for digital tools and then Bonterra products for other parts of their organizing in the field stuff. And those two tools really don't integrate well. Action Network and mobilize should, in my view, integrate much better than they do. But like they don't for essentially political reasons

677. But for the destruction of OSDI and its external network effect, Action Network could use the client side OSDI connector it built and used to integrate with VAN to serve AFL-CIO, with Mobilize.

678. Woodhull is concealing his participation in the racketeering conspiracies have exacerbated the problem he is citing.

679. ⦿ 👤 Natha ⊙ +51:39 [T262]

> So I think because of that some of the ways in which that plays out, it actually does create a role for us to be sort of like a way that organizations can still stitch things together.

680. ⦿ 👤 Natha ⊙ +55:27 [T262]

> We're trying to like, figure out a way to sort of be this glue piece to be a way to help people sort of stitch things together.

681. In both statements, Woodhull describes the opportunity to compete based on a library of proprietary connectors, which is an economy of scale. The opportunity was created by Defendants' racketeering activity and extortion. The VCs were unwilling to fund synchronizer applications until they could compete based on an economy of scale.

682. On 12/11/2013 Via email, Woodhull originally shared his plan to secure venture capital for a universal adapter that leverages the same kind of inefficiency. [D1991] Due to Plaintiff's labor, proficiency, and OSDI's success, his goal of seeking funding for this type of product was delayed 10 years.

## V.D.2    Plus Factors

### V.D.2.a    Evidence of motive to enter a conspiracy and Rewards

#### V.D.2.a.1    Nathan Woodhull

683. Nathan Woodhull began building a library of connectors for proprietary CRM APIs. [**D648?**] He also shared his plan to seek funding from VC New Media Ventures to build a "universal adapter."

684.     Plaintiff, OSDI and its external network effect were an obstacle to the exchange approach because only one connector would be needed.

685.     Since he was serving the interests of venture capitalists, he had means to recruit others to join the conspiracy.

686.     08/16/22 2:15pm Nathan Woodhull posted on Twitter that he was "Launching something new! Daisychain is an organizing platform that integrates the political tech stack". Woodhull founded DaisyChain with Jon Warnow. [D1907?]

687.     07/06/23 Higher Ground Labs announces its 2023 cohort including DaisyChain [D1949?] Woodhull accomplished his goal of securing venture capital for an integration platform.

### V.D.2.a.2    Action Squared

688.     During the early racketeering, on 8/20/14, via Google Chat D420, Jason Rosenbaum/Action Network stated their goal of becoming one of two widely used progressive APIs. That would implicitly mean one of two dominant platforms. That is the opposite of OSDI's mission to serve as a standard API and external network effect.

689.     Later, Jason Rosenbaum began changing the apparent authorship of the OSDI spec which made it appear to be his work.

690.     AFL-CIO had motive to participate, since it was frustrated with gatekeeper powers possessed by the DNC and NGPVAN.

691.     Action Squared has motive to conceal their actions because an essential element of their success depends on exploitation of a minority's labor, proficiency, and retirement savings, and misappropriating Plaintiff's work. As a labor union, the AFL-CIO portrays its mission as preventing exploitation and thus has motive to conceal its actions to conceal its hypocrisy.

### V.D.2.a.3    MoveOn.org

692.     MoveOn benefited from the racketeering by making use of OSDI in its internal tools, which gave it a head start on interoperability. T23 MoveOn is the largest funder of The Movement Cooperative, which controls Parsons. Parsons serves as a universal adapter for platforms and political CRMs. But for the racketeering, the primary appeal of Parsons would not be present.

### V.D.2.a.4    Sonya Reynolds/Colibri

693.     Colibri joined OSDI in 2017. Around the same time as Plaintiff was pitched by Dimitri Mehlhorn in summer 2017, Josh Nussbaum, the founder of The Movement Cooperative (TMC) contacted Plaintiff, seeking to discuss his plans. While serving as Chair of OSDI, Sonya led a proposal to set the end time of officer positions to January 31, 2019. At the same time as she resigned, she began employment at TMC. TMC, whose largest funder is MoveOn, benefited from the racketeering that its Parson synchronizer project gained the artificial inefficiency that wouldn't be possible, but for the destruction of OSDI and its external network effect.

### V.D.2.a.5    Robyn Swirling

694.     As a person founding her own non-profit organization, she could benefit from helping

venture capitalists as well as her friend Woodhull in his efforts to secure venture capital. She also benefited in her efforts to build her brand on social media by misrepresenting a policy argument with a gay male as a dramatic, extreme case of retaliation against her efforts to protect women. In her tweetstorm, she stated: "This isn't a #metoo story, but it is a story about what I'm dealing with in response to my work on ending sexual and gender-based harassment in the progressive movement." and "I am trying to do the hard and necessary work of combatting harassment within our movement, but Josh has interfered and disrupted on multiple occasions, then threatened retaliation if I spoke up."

### V.D.2.a.6    DNC

695.    The DNC has a history of using control over essential resources for candidates running for election in order to give its incumbent or otherwise favored candidates an unfair advantage.

696.    During the Data War, Reid Hoffman's Alloy Voter File project was also an external network effect because it would provide its services without party control. According to Politico, on 12/10/18, "The DNC s top leaders have been telling people that Hoffman s project represents an existential threat" to the party, according to two sources with knowledge of the discussions." [**583?**]

697.    OSDI functioned as an external network effect, and from the application ecosystem point of view, would represent the same kind of threat.

698.    But for the racketeering and extortion that it participated in, application ecosystems would not be an economy of scale that could be controlled to serve that purpose.

### V.D.2.a.7    Higher Ground Labs

699.    Higher Ground Labs had motive to use OSDI to give its portfolio companies a head start, which it did. The portfolio companies that benefited from OSDI include New/Mode, Mobilize, and Bluelink.

700.    In August 2017, Dimitri Mehlhorn, Hoffman's political director, met with Plaintiff [**D672?**] proposing to fund OSDI to be used according to a vision he shared with Plaintiff. The vision was similar to the paper Dimitri had co-authored at Harvard [**D1867?**] The vision resembled a platform that served as a universal adapter.

701.    Higher Ground Labs has motive to conceal its actions from its funder, Reid Hoffman.

### V.D.2.a.8    Ragtag

702.    RagTag's leader, Brady Kriss introduced Plaintiff to Reid Hoffman's political director, Dimitri Mehlhorn in July 2017 D672, stating "I personally think it would be rad to get some funding into OSDI itself, or to get some funding for Ragtag to manage people to work on OSDI stuff, or something along those lines." RagTag evolved from Dev Progress, the volunteer developer team for Hillary for America and the DNC during the 2016 election, where Gerard Niemira worked.

### V.D.2.a.9    Broadstripes

703.    Broadstripes main customer based is labor customers. According to Tim Holo-

han/Broadstripes, the company had been the victim of retaliation at the hands of the AFL-CIO due to its support of a candidate disfavored by the AFL-CIO. [**T20?**]

### V.D.2.a.10    Netroots Nation / DailyKOS

704.    Had the early racketeering in 2014 succeeded Netroots Nation would have gained a share of control over Action Network and AFL-CIO's proprietary ecosystem by misappropriating OSDI through its proxy DailyKOS. Since that failed, Netroots Nation had motive to participate in the racketeering and extortion to misappropriate OSDI.

705.    An essential component of Defendants' schemes was concealing the misappropriation and wire fraud to fabricate false origin stories for the misappropriated IP. Both occurred during sessions at Netroots Nation 2017, 2018, 2019, 2020.

706.    Therefore, Netroots Nation had motive to participate in the use of false accusations to justify excluding Plaintiff from those events. According to Higher Ground Labs's website, on or before September 2019, Netroots Nation's board chair Cheryl Contee joined Higher Ground Labs' advisory board. This gives Netroots Nation influence into Higher Ground Labs's funding decisions, so it can steer money and favor allies that help Netroots Nation achieve it's own political goals. This was an opportunity for Higher Ground Labs to return the favor for Netroots Nation's assistance in the conspiracy.

### V.D.2.a.11    Gerard Niemira / Lightrail / Bluelink

707.    Gerard Niemira sought and received venture capital for GroundBase as part of Higher Ground Labs initial cohort in 2017. He and his team then began building a series of applications, all of which failed, except Lightrail. Lightrail exploited OSDI's application ecosystem and essential IP.

### V.D.2.a.12    Jennings and McGonnigal

708.    Jennings served as a Deputy Undersecretary in President Obama's administration. Higher Ground Labs (HGL) was founded by Obama Alumni. Dimitri Mehlhorn and Jennings are Harvard Alumni. Since HGL sought to, and did use OSDI to bootstrap its portfolio companies, which required nullifying a gay male's property, contract, civil rights and engaging in dangerous coercion, they would have motive to seek help from Jennings.

709.    As Executive Director of the Arcus Foundation, one of 2 dominant funders of the gay rights movement, Jennings would have motive to help venture capitalists as well as DNC allies. te OSDI. In late 2019, Lambda Legal announced that Kevin Jennings became CEO of Lambda Legal. As the leader of a donor driven political organization, having helped Defendants, they could return the favor and make him a more valuable candidate.

710.    McGonnigal could benefit from helping venture capitalists and political organizations like Defendants. According to LinkedIn he began employment at Impactive, an HGL portfolio company on Feb 2020.

### V.D.2.a.13    The Motive for coercion

711.    The Campaign participants who participated in OSDI knew that the mission of OSDI was an external network effect.

712. At any point, the Campaign participants could have made a motion to remove Plaintiff and secured a majority vote to remove Plaintiff from his position or the project, which they never did. Plaintiff would have accepted that because it would have preserved the external network effect as well as his property rights.

713. However, that would not have allowed Defendants to achieve the outcome that they did. To achive the outcomes they are benefiting from, Defendants needed to separate the OSDI application ecosystem from its governance policy and structure which made it a level playing field. To use it for their own proprietary interests, they also needed control over the essential IP in the specification. Since the bulk of that is Plaintiff's authorship, they needed to gain control over Plaintiff's copyrights.

714. Defendants knew Plaintiff would never agree to what they wanted.

715. As a result, they needed resort to coercion and fraud.

### V.D.2.b   Evidence of Conspiracy

716. In April 2018, after the Order of Discontinuance for Cohen v. Swirling, Brian Young arranged a meeting with Plaintiff, demanding that Plaintiff resign. Young stated that he was speaking on behalf of the DNC, MoveOn and AFL-CIO.

717. Plaintiff insisted that Action Network keep its commitment to democracy. Eg, if they wanted to remove Plaintiff, they would need to make a motion and take a vote.

718. On 5/30/2018, Plaintiff and Jason Rosenbaum/Action Network met via telephone. Rosenbaum also attempted to coerce Plaintiff to resign, which Plaintiff refused.

719. Plaintiff asked Rosenbaum to confirm that Action Network was speaking on behalf of the DNC, MoveOn and possible others. Rosenbaum replied "A few organizations have called him to express their positions, so he's relaying that information. That's true. Yeah."

720. During Cohen v. Swirling, on 2/12/2018 Defendant filed a Letter Motion to Dismiss and posted the tweetstorm simultaneously. Via email, Adriel Hampton stated to Plaintiff "There is an organized campaign to get OSDI affiliates to repudiate you - a former colleague contacted me asking me to call for your ouster as chair" and that he was contacted by a friend of Swirling.

721. At Personal Democracy Forum 2018, Swirling, MoveOn CTO Ann Lewis, and proxies Reynolds and Kriss were present.

722. At the end of the racketeering to operate phase, Plaintiff was unwilling to vote for proposals such as deleting the master branch or consolidation of power by RagTag. The proxies Broadstripes, RagTag and Colibri resigned their positions.

723. On 2/01/2019, Plaintiff met with Tim Holohan/Broadstripes via telephone. Holohan told Plaintiff "you are now at a parting of the ways with people who are more important than me, people less willing to talk to you about it." Plaintiff was at a parting of ways after he refused to agree to proposal that would facilitate the outcomes Defendants achieved. Plaintiff does not know who Holohan was referring to or how powerful they are.

724. At Netroots Nation 2018, 2019, 2020, Defendants were present, and collaborating on their origin story "Cooperative Development"

## V.E    Abuse of Process

### V.E.1.a    Fraudulent Concealment

725.    Defendants fraudulently concealed their actions preventing Plaintiff from discovering the facts necessary to know that he has suffered an injury resulting from the parallel conduct of a group in suspicious circumstances, such as when the group has a motive to collude. Examples include Defendants' parallel conduct at Personal Democracy Forum and Netroots Nation 2019 and 2020 using manufactured pretexts to have Plaintiff excluded from conferences where he might have discovered relevant facts, and how Netroots Nation conspired to help them conceal. Defendants actions to provoke Cohen v. Swirling provided them with a pretext to exclude Plaintiff from places where he might have discovered relevant facts necessary to bring a complaint forward.

### V.E.2    Parallel Conduct and Proxies

726.    Defendants used parallel conduct and proxies, including splitting the elements of the violations they were engaged in, such as their extortion scheme.

### V.E.3    Active Misleading

727.    MoveOn's Active Misleading began on February 12, 2018, the same day as the Abuse of Litigation Tweetstorm.

728.    MoveOn created an OSDI project within its Spoke repository with 4 OSDI subitems. These led to work items and pull requests implementing OSDI support in Spoke. After the conspiracy to operate OSDI ended in early 2019, Plaintiff set his attention to contributing to Spoke's OSDI items. Plaintiff contributed an OSDI implementation to Spoke and on DATE on GitHub, Duveen stated "This PR creates a fantastic external API that will help other programs interface with Spoke -- it's breadth is excellent..."

729.    This misleading continued until December 2019, when Duveen updated the Spoke project's code of conduct adding prohibitions on use of litigation D51, then blocked Plaintiff from the project on 12/10/2019. On 12/11/2019 at NYC HackNight, Duveen stated that Plaintiff violated the code of conduct due to Cohen v. Swirling, and then made a complaint to the organizer (Kenyetta Dillon) claiming Plaintiff had harassed Duveen. MoveOn used Dillon, a woman of color, to continue the misleading through early 2020.

### V.E.4    Plaintiff Has Been Dilligent

730.    While in contact with Defendants' racketeering, Plaintiff attempted dilligence even when he was excluded from conferences such as Netroots Nation 2019. Since the GitHub conversation in early 2021, Plaintiff has re-read relevant emails dating back to 2012, scoured the World Wide Web, Conference Agendas, News Articles, et al, in order to piece together the conspiracy.

# VI INJURIES

## VI.A    Violations

### VI.A.1    Extortion

731.    Defendants used deception to increasingly damage Plaintiff's reputation, depriving him of his intangible right to conduct business. Defendants were doing this to coerce him to abandon his intangible copyright and contract rights. Defendants' extortion scheme also created a foreseeable risk of inciting violence towards Plaintiff and or a hate crime.

### VI.A.2    Fraudulently Induced OSDI Labor

732.    When Action Network joined, it agreed to the OSDI policies and when Defendants and their proxies participated in OSDI they conformed to those policies. Plaintiff relied on those agreements and scrutinized behavior over time for compliance when he decided to liquidate assets along the way.

#### VI.A.2.a    Copyright Infringement and Embrace, Extend, Extinguish

733.    In order to misappropriate and use the OSDI ecosystem as a head start, Defendants needed the essential IP in the OSDI specification. For other products to integrate with theirs, Defendants needed to publish their own API specification that developers could conform to when building connectors, which requires the essential IP in the OSDI specification.

### VI.A.3    Exclusions

734.    Exclusions from Conferences, Google Groups and other places deprived Plaintiff of marketing and sales opportunities which were necessary to sustain his sole-proprietorship due to Defendants exclusions from conferences, google groups and other places.

## VI.B    Plaintiff's Antitrust Standing

### VI.B.1    Defendants' Conduct Affects Competition in General

735.    As described in the *Anticompetitive Effects* section of this complaint, Defendants conduct affects competition within the market.

### VI.B.2    But for Defendants conduct

736.    In 2017, application developers who integrated with OSDI got a 2x ROI, interoperating with platforms NGPVAN and Action Network. Since NGPVAN had a near monopoly, supporting it was a market requirement, and interoperability with Action Network would come at little or no cost. PDI launched their national platform BlueVote at Netroots Nation 2017 and planned to implement, which would have been a 3x ROI but for Defend-

ants' actions. In late 2019, Plaintiff, with others, built a CiviCRM platform implementation, which created a 3x ROI. A rational actor would implementing OSDI and immediately gain the same ecosystem of application. That's a self-perpetuating critical mass of adoption. The ROI for platforms and applications would increase with each newly compliant platform or application resulting in an external network effect.

### VI.B.3    Plaintiff's Antitrust Injuries

737.    Plaintiff suffers the same injuries as competition in general. As a result of Defendants' actions Plaintiff and other application developers must spend resources to build N connectors for N platforms, and must track the evolution of N APIs and maintain those connectors. Defendants exclusions deprived Plaintiff of his intangible right to conduct business.

738.    Defendants use of Plaintiff's intellectual property devalues the copyrighted work, as well as the value of investment Plaintiff made as a result of Defendants' fraudulent inducement of Plaintiff's labor. Plaintiff's investment, labor and intellectual property lowered barriers to entry and integration costs for application developers, including himself. Defendants actions reverse that, restoring barriers to entry and artificial inefficiencies, thus destroying the value of his investment after the fact. Plaintiff's expended savings are losses.

### VI.B.4    Plaintiff is an efficient enforcer of Antitrust Law

739.    Plaintiff is a would-be competitor excluded from the market for synchronizer applications. His Hero Sync product is a competitor to the synchronizer components of Lightrail->Bluelink->Civitech and The Movement Cooperative's Parson.

740.    Even if Plaintiff was not excluded, due to their inclusion of vertically integrated universal adapters, Plaintiff would face needing to invest in an economy of scale of connectors to different Platform APIs. For a sole-proprietor, that is infeasible.

#### VI.B.4.a   Intellectual Property Damage

741.    The investment of Plaintiff's savings to fund the fraudulently induced labor created the external network effect that removed this need and cost. Defendants' actions have reversed that and destroyed the value of his investment making it a loss. The value of the investment ended up being used by Defendants for their personal and proprietary enrichment.

### VI.B.5    Defendants Conspiracies are Open Ended

742.    As demonstrated above, Defendants were only able to stop the external network effect by gaining control of the project using racketeering and extortion because they couldn't compete fairly with Plaintiff.

743.    But for Defendants' actions to exclude Plaintiff from conferences and other industry spaces, they would not be able to prevent the external network effect from returning.

# VII CLAIMS

## VII.A    Count 1 NY State Fraudulent Inducement

744.    MoveOn joined OSDI in October 2017. This was after OSDI became valuable enough to misappropriate, had become a threat to Defendants' racketeering goals, and after Defendants knew they succeeded at provoking Cohen v. Swirling.

745.    MoveOn participated in the conspiracy to commit extortion and began active misleading on 2/12 leading Plaintiff to believe MoveOn was interested in the goals of the project. They did this by creating a set of OSDI work items in their GitHub Spoke project, visible to the public, which attracted Plaintiff to contribute.

746.    In parallel, the abuse of litigation privilege remained published on Twitter, inflicting unjust harm, especially due to the concealment of Plaintiff's sexual orientation, which added coercion.

747.    On 2/20/2018, at lunch, Duveen/MoveOn attempted to coerce Plaintiff to resign and make blanket apology to the allegations in the tweetstorm. Duveen later sent similar via email on 2/25/2018 D1048, portraying himself as trying to help Plaintiff save OSDI, while at the same time encouraging him to make a false confession.

748.    On 2/21/2018, via Github and email MoveOn began attempted to convince Plaintiff to agree to an open source license by falsely portraying the lack of one as an obstacle to MoveOn's participation stating "We can't responsibly participate in open source projects without licenses" The implication, in context, was that MoveOn would participate once this was agreed to.

749.    Plaintiff refused and proposed the W3C license instead.

750.    The license was agreed to during 4/19/2018 OSDI meeting, which was the last meeting MoveOn attended. MoveOn didn't participate in OSDI after that, though it continued the active misleading until they broke contact.

751.    OSDI committee meetings continued weekly through early 2019, MoveOn's lack of participation once it got what it wanted regarding copyrights, and continued use of the false-flag as a pretext to harm Plaintiff illustrates the fraudulent nature of their actions. MoveOn's only participation in OSDI was in the context of Defendants' efforts to destroy it and Plaintiff's economic viability.

752.    In late 2019, Duveen updated the Spoke project's code of conduct on GitHub, adding prohibitions on use of litigation D51, then blocked Plaintiff from the project on 12/10/2019. On 12/11/2019 at NYC HackNight, Duveen stated that Plaintiff violated the code of conduct due to Cohen v. Swirling, and then made a complaint to the organizer (Kenyetta Dillon) claiming Plaintiff had harassed Duveen. Dillon met with Plaintiff at Hacknight on 1/22/2020 and 1/28/2020 discussed the complaint and barred Plaintiff from participating in the Spoke group at Hacknight and referred to evangelism for OSDI and its level playing field (which Defendants benefited from) as harassment. Plaintiff recorded both meetings.

753.    MoveOn benefited from use of OSDI in its internal tools. On 12/5/2024, MoveOn announced that it had joined Action Squared's Development Committee (PDC) former-

ly referred to as "keystone partners", stating "By joining the PDC, we are joining a small group of Action Network users that are collaborating on the roadmap for the product." D2007 MoveOn joins its co-conspirators gaining a share of control over an economy of scale which is the application ecosystem.

754.    But for MoveOn's fraudulent rationale and surrounding coercion, Plaintiff wouldn't have agreed to any copyright license. Plaintiff relied on MoveOn's statements and as a result lost some of his intangible copyrights, which limit his ability to be compensated for his work which was fraududuently induced.

## VII.B    Count 2 Copyright Infringement Action Squared

755.    Plaintiff has a valid copyright for his contributions to the OSDI specification registrations Txu 2-249-951 and TX0009315996.

756.    Defendant Action Squared copied Plaintiff's work, specifically by copying Plaintiff's contributions and posting them, paraphrasing them on the Action Network and Action Builder web pages for their API specifications. See section V.A Action Squared's Infringement.

757.    A substantial similarity exists between Defendants work and the protectable elements of Plaintiff's authorship.

758.    Action Network's copying is outside the copyright license agreement, creating unauthorized derivative works.

759.    By Defendant's actions alleged above, products Action Builder and Action Network has infringed and will continue to infringe upon Plaintiff's contributions to the OSDI specification,

760.    Defendant's infringement is willful, and have realized unjust profits, gains and advantages as a proximate result of its infringement.

761.    Plaintiff, as well as other market participants suffer and will continue to suffer monetary loss, barriers to fair competition as a direct and proximate result of Defendants actions.

762.    Plaintiff seeks declarative judgement on copyright authorship. Specifically, Action Network and Action Builder may not refer to the work as their proprietary APIs.

763.    Plaintiff seeks injunctive relief, preventing Defendants from continuing their infringing use.

764.    Plaintiff seeks monetary damages for infringing use.

## VII.C    Count 3 Copyright Infringement Civitech

765.    Civitech acquired Bluelink in 2022, which at its inception was Lightrail. Civitech is Defendant as successor.

766.    Plaintiff has a valid copyright for his contributions to the OSDI specification registrations Txu 2-249-951 and TX0009315996.

767.    Defendant Civitech copied Plaintiff's work, specifically by copying Plaintiff's contributions to the OSDI specification and posting them on the Bluelink product's API specifica-

tion on Github in summer 2021.

768.  A substantial similarity exists between Defendants work and the protectable elements of Plaintiff's authorship.

769.  Action Network's copying is outside the copyright license agreement, creating unauthorized derivative works.

770.  By Defendant's actions alleged above, product Bluelink has infringed and will continue to infringe upon Plaintiff's contributions to the OSDI specification.

771.  Defendant's infringement is willful, and have realized unjust profits, gains and advantages as a proximate result of its infringement.

772.  Plaintiff, as well as other market participants suffer and will continue to suffer monetary loss, barriers to fair competition as a direct and proximate result of Defendants actions.

773.  Plaintiff seeks declarative judgement on copyright authorship. Specifically, Bluelink may not refer to the work as their proprietary API.

774.  Plaintiff seeks injunctive relief, preventing Defendants from continuing their infringing use.

775.  Plaintiff seeks monetary damages for infringing use.

## VII.D    Count 4 RICO 1962(c)

776.  In the alternative RICO 1962(d) conspiracy to commit 1962(c)

777.  Against Defendants Woodhull, Civitech, AFL-CIO, MoveOn, Netroots Nation, Action Network who constitute an enterprise within the meaning of 18 USC 1961(c), in that they are "a group of individuals associated in fact", hereinafter referred to as the "Campaign".

778.  The Campaign agreed to and conspired to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically, the Campaign conspired to engage in extortion to coerce Plaintiff to abandon his copyrights and governance of the OSDI project, defraud him of his savings by fraudulently inducing his labor, infringe on his copyrights in order to unjustly enrich themselves for personal or proprietary benefit.

779.  Pursuant to and in furtherance of their fraudulent scheme, the Campaign committed multiple related acts of Wire Fraud, Copyright Infringement, Extortion, as well as non-predicate acts of Abuse of Process and Litigation Privilege, and Fraudulently inducing agreement to a copyright license.

780.  The individual acts are set forth in the above Predicate Acts section constitute a pattern of racketeering activity.

781.  As a direct and proximate result of the Campaign's racketeering activities, Plaintiff has been injured in his business and property in that:

• The deception used in their extortion damaged Plaintiff reputation and economic viability, depriving him of intangible rights to conduct business.

- Their fraud damaged and devalued Plaintiff's intangible copyrights

- They defrauded Plaintiff of his savings that he used to fund fraudulently induced labor.

## VII.E     Count 5 RICO 1962(a) Invest Proceeds into Enterprise Action Squared

782.    In the alternative, RICO 1962(d) Conspiracy to commit 1962(a)

783.    Title 18, 1962(a), , 2319 Copyright Infringement, 1343 Wire Fraud, 1951 Extortion.

784.    This Count is against Defendants Nathan Woodhull, Action Network, AFL-CIO, MoveOn, Netroots Nation.

785.    Action Squared a joint venture between Action Network and AFL-CIO constitute an enterprise engaged in and whose activities affect interstate commerce.

786.    The Defendants made use of, in the operation of the proceeds derived from a pattern of racketeering activity in an interstate enterprise. Specifically, Defendants incorporated Plaintiff's copyrighted contributions into their Bluelink product, as well as the proceeds of labor fraudulently induced by wire fraud, which include the scale of the OSDI ecosystem.

787.    The racketeering activity referenced in Count 4 RICO 1962(c) constitutes a pattern of racketeering activity.

788.    As direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in their business and property in that:

789.    Defendants use of Plaintiff's intellectual property devalues the copyrighted work, as well as the value of investment Plaintiff made as a result of Defendants' fraudulent inducement of Plaintiff's labor. Plaintiff's investment, labor and intellectual property lowered barriers to entry and integration costs for application developers, including himself. Defendants actions reverse that, restoring barriers to entry and artificial inefficiencies, thus destroying the value of his investment after the fact. Plaintiff's expended savings are losses.

## VII.F     Count 6 RICO 1962(a) Invest Proceeds into Enterprise Civitech

790.    In the alternative, RICO 1962(d) Conspiracy to commit 1962(a)

791.    Title 18, 1962(a), 2319 Copyright Infringement, 1343 Wire Fraud, 1951 Extortion.

792.    This count is against Defendants Nathan Woodhull, Civitech, AFL-CIO, MoveOn, Netroots Nation.

793.    Civtech is an enterprise engaged in and whose activities affect interstate commerce. Civitech acquired Bluelink in 2022 and is successor to Bluelink.

794.    The Defendants made use of, in the operation of the proceeds derived from a pattern of racketeering activity in an interstate enterprise. Specifically, Defendants incorporated Plaintiff's copyrighted contributions into their Bluelink product, as well as the proceeds of labor fraudulently induced by wire fraud, which include the scale of the OSDI ecosystem.

795.     The racketeering activity referenced in Count 4 RICO 1962(c) constitutes a pattern of racketeering activity.

796.     As direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in their business and property in that:

797.     Defendants use of Plaintiff's intellectual property devalues the copyrighted work, as well as the value of investment Plaintiff made as a result of Defendants' fraudulent inducement of Plaintiff's labor. Plaintiff's investment, labor and intellectual property lowered barriers to entry and integration costs for application developers, including himself. Defendants actions reverse that, restoring barriers to entry and artificial inefficiencies, thus destroying the value of his investment after the fact. Plaintiff's expended savings are losses.

## VII.G    Count 7 Violation of Section I of the Sherman Act, 15 U.S.C.

798.     Against Defendants Action Network, AFL-CIO, Civitech, Nathan Woodhull, MoveOn.org, Democratic National Committee, Netroots Nation aka Antitrust Defendants.

799.     The preceding section Violations / Unfair Competition is incorporated here by reference.

800.     Antitrust Defendants, by and through its officers, directors, employees or other representatives, entered into an unlawful agreement with their co-conspirators in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The conspiracy begins with Woodhull, and over time co-defendants joined the conspiracy and acted in concert towards their shared anticompetitive goals.

801.     Plaintiff will prove agreement to the conspiracy with evidence of his antitrust injury, how Defendants' actions harm competition and evidence of plus factors:

   •   The market background describes a concentrated market at the beginning of the conspiracy

   •   Defendants and their proxies had a common motive to collude

   •   Defendants and their proxies had meetings or opportunities to agree

   •   Defendants and their proxies engaged in parallel conduct and took actions which helped them achieve the goals of the conspiracy

   •   Defendants and their proxies engaged in horizontal behavior such as the Disparate Impact scheme and coercing others to leave OSDI and not to do business with Plaintiff.

802.     The Plus Factors section of this complaint elaborates on plus factors.

803.     Antitrust Defendants engaged in racketeering conspiracies to gain control of, operate, and destroy a OSDI, a technology which served as an external network effect, then invest the essential intellectual property including copyright authorship and OSDI's application ecosystem into their own enterprises.

804.     These actions allowed Antitrust Defendants to unreasonably restrain trade in the following ways:

- Gave themselves an unfair competitive advantage and created barriers to entry for competitors, increased customer switching costs and reseller support costs, and reduced customer choice by misappropriating OSDI's essential IP and application ecosystem, and laundered it into proprietary application ecosystems in a manner similar to App Stores.

- Increased customer switching costs.

- Increased application developer costs.

- Created an artificial inefficiency in the market which favors large, well-resourced players who can afford duplicative work.

- Leveraged the artificial inefficiency to launder an external network effect into proprietary internal network effects to create a market for "universal adapters". An analogy would if Defendants coerced the laptop or smartphone market away from USB-C and back to proprietary connectors.

- Since the relevant markets constitute essential resources for candidates running for election, Defendants and their co-conspirators have gained gatekeeper powers over those resources including products and the data pipes that data flows through, allowing them to discriminate to deprive or degrade those for disfavored candidates.

805. But for Defendants actions, which included destroying OSDI and Plaintiff, they could not have achieved these outcomes.

806. Antitrust Defendants conspiracies affect interstate commerce since it involves products sold across state lines.

807. Antitrust Defendants' conduct is a per se violation that restrains trade and harms competition through an unlawful agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

808. In the alternative, Defendants Agreement as described above caused significant anticompetitive effects that outweigh any pro-competitive benefits that could not be achieved through less anticompetitive means, if any such benefits exist at all. For that reason, the agreement is a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

# VIII PRAYER FOR RELIEF

809. Plaintiff seeks damages of at least $650,000.

810. Plaintiff seeks treble damages.

811. Plaintiff seeks Rescission of the fraudulently induced copyright license.

812. Plaintiff seeks injunctive relief to prevent further infringement by Bluelink, Action Network and Action Builder.

813. Plaintiff seeks the court's help to restore the external network effect and its competitive benefits.

814. Plaintiff seeks injunctive relief against Netroots Nation and other Defendants preventing

them from excluding Plaintiff from conferences or other spaces.

815.    Respectfully Submitted, /s/Josh R. Cohen